**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
Annick M. Persinger (State Bar No. 272996)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:   ltfisher@bursor.com
              swestcot@bursor.com
              apersinger@bursor.com


*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOLLIE DELANEY, ANGELA DOBBINS, and AMANDA RETCOFSKY individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SENSA PRODUCTS, LLC, SENSA, INC., f/k/a INTELLIGENT BEAUTY, INC., GENERAL NUTRITION CORP., GENERAL NUTRITION CENTERS, INC., and ALAN R. HIRSCH,<br><br>Defendants. | Case No._____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

CLASS ACTION COMPLAINT

Plaintiffs Mollie Delaney, Angela Dobbins, and Amanda Retcofsky, by their undersigned attorneys, bring this class action complaint against Sensa Products, LLC, General Nutrition Corporation, General Nutrition Centers, Inc., and Sensa, Inc. (formerly Intelligent Beauty, Inc.), and Dr. Alan R. Hirsch (collectively, "Defendants").  Plaintiffs' allegations are based upon personal knowledge as to their own acts and upon information and belief as to all other matters.

## **NATURE OF THE ACTION**

1.      This is a class action lawsuit on behalf of purchasers of the Sensa Weight Loss System ("Sensa"), which is marketed as "an easy, effective way to lose weight" that is "doctor formulated" and "clinically shown to help you lose up to 30lbs or more in just 6 months."   Sensa consists of shakers of magic "tastant crystals," also described as "sprinkles," which users are instructed to sprinkle on their food.  The "Sensa 6-Month System" includes two shakers of tastants for each month starting with "Month 1" and continuing through "Month 6."  To "increase your results," Sensa also consists of "healthy, sugar-free and delicious SENSA® QUENCH, with ingredients to help you feel energized and increase metabolism," SENSA® CHEWS to "help you feel full and satisfied in between meals," and SENSA® On-the-Go Packets.  According to the sales pitch, users can lose 30+ pounds without a change in "exercise routine" or "lifestyle," and without "food restrictions," simply by sprinkling Sensa crystals on their food to "take the weight off." Sensa's website explains "How It Works" with the following image:

 

*See* Sensa Website, www.sensa.com (last visited Jan 14, 2014).

2.      According to Defendants, "[as] you eat, smell and taste receptors send messages that tell your body it's time to stop eating.  This is a phenomenon we call Sensory Specific Satiety.  By enhancing smell, SENSA® Testants were designed to help speed up the process and trigger your 'I feel full' signal, so you eat less and feel more satisfied."  As a result, you supposedly eat less and lose weight.[1]

3.      The Sensa website and Sensa YouTube channel provide an instructional video on "How Sensa Works."[2]  The video asks, "So, how do you use Sensa?"  The video explains, "Simply sprinkle Sensa on your food to take the weight off."  The following images, obtained from the video on the Sensa website, illustrate how Sensa purports to help you lose weight "without dieting."   The video explains that "as you eat, Sensa works with your sense of smell and taste to help stimulate your body's natural hunger control switch."  When Sensa activates the "hunger control switch" the meter in the user's brain switches from empty to full.



---

[1] Sensa Website, http://www.sensa.com/?action=works.main (last visited Jan. 16, 2014).
[2] *See* Sensa Website, http://www.sensa.com/?action=works.main (last visited Jan. 15, 2014); *see also* SENSA, YouTube.com, http://www.youtube.com/watch?v=-ebppfjqHaQ (last visited Jan. 15, 2014).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



4.      The instructional video explains that Sensa activates "your body's natural hunger control switch" so Sensa users can "Lose 30lbs in just 6 months without dieting.  You simply sprinkle Sensa on your food."  Indeed, the onscreen graphic clearly illustrates "studies show avg. weight loss of 30lbs in 6 months."

18
19
20
21
22
23
24
25
26
27
28



5.      GNC in-store displays and promotional pamphlets also tout the benefits of Sensa. As the GNC store display below shows, GNC claims that the Sensa Weight Loss System is "[c]linically shown to help you lose up to 30 lbs. or more" and is "[s]upported by impressive clinical results."



6.      The foregoing image further demonstrates that the Sensa Weight-Loss System purportedly includes a "[b]reakthrough formula [that] works with your body's natural impulses, not against them," and the formula is "[e]asy to use and effective."  All you have to do is "[s]imply sprinkle [Sensa] on everything that you eat."

7.      Additionally, Sensa is promoted through spam emails, including emails entitled "Eat Yourself Skinny" and "Look Great Naked" that state the Sensa Weight Loss System is "[t]he Easiest Diet Ever" and is "[c]linically Proven to Help You Lose 30 Pounds."  The emails encourage consumers to "Try Sensa Free" by clicking on a brightly colored link to the Sensa website.

8.      To bestow Sensa with an aura of legitimacy, the statement "DOCTOR FORMULATED" appears in all caps under the name "Alan Hirsch M.D" on the labels of Sensa products.  The packaging also states "Shake. Eat. Lose." with "No Pills, No Diuretics, No Calorie Counting."

9.      The marketing of Sensa is false and misleading because Sensa crystals are ineffective.  Sensa has not been "clinically shown" to cause weight loss.  Sensa crystals do not induce a "phenomenon" called "Sensory Specific Satiety."  Further, the Sensa Weight Loss System

1  is not "supported by impressive clinical results" because those supposed results are based on

2  fabricated clinical trials.

3        10.     Plaintiffs relied on Defendants' false and misleading sales pitch for Sensa crystals,

4  and they would not have purchased Sensa crystals had they known the product is ineffective.  They

5  bring this class action on behalf of themselves and other purchasers of Sensa crystals and assert

6  claims against Defendants for violations of the Magnuson-Moss Warranty Act, California's

7  Consumers Legal Remedies Act, California's False Advertising Law, the unlawful, unfair and

8  fraudulent prongs of California's Unfair Competition Law, Pennsylvania's Unfair Trade Practices

9  and Consumer Protection Law, for breach of implied and express warranties, and for negligent

10  misrepresentation.

11  **BACKGROUND**

12        11.     According to a September 2002 Federal Trade Commission Staff Report,[3] the

13  number of Americans who are overweight or obese have reached epidemic proportions; it afflicts 6

14  out of every 10 Americans.  At the same time, nearly 29% of men and 44% of women are trying to

15  lose weight (an estimated 68 million American adults).  Thus, the potential market for sellers of

16  weight-loss products and services is huge.  Consumers spent an estimated $34.7 billion in 2000 on

17  weight-loss products and programs.  The marketplace has responded with a proliferation of products

18  and services, and many promise miraculous, quick-fix remedies.  The FTC found that "[t]he use of

19  false or misleading claims in weight-loss advertising is rampant."[4]

20        12.     Into this lucrative market stepped a particularly sophisticated huckster – one with a

21  medical degree and a thick stack of junk science to support the claim that his magic crystals are

22  "clinically shown" to promote weight loss without dieting.  Dr. Alan Hirsch, M.D., is a board-

23  certified neurologist.  His name and photograph appear on Sensa's packaging, website,

24  advertisements, and promotional literature, together with claims that he has conducted and

25  

26  [3]  Richard L. Cleland, *et al.*, "Weight Loss Advertising: An Analysis of Current Trends, A Federal
Trade Commission Staff Report," September 2002 (hereafter, "FTC Staff Report"), *available at*

27  www.ftc.gov/reports/weight-loss-advertisingan-analysis-current-trends/ (last visited Jan. 15, 2014).

28  [4]  *Id.*, Executive Summary, at p. x.

1    published more than 200 research studies, authored 8 books, and appeared on numerous television

2    programs including Dateline NBC, CNN, the CBS Early Show, Good Morning America, and Extra.

3    Dr. Hirsch's 20-plus years of research regarding the impact of smell and taste on weight loss

4    purportedly culminated in the patent-pending technology used in the SENSA® Weight-Loss

5    System.  In fact, neither Dr. Hirsch nor any other medical professional has ever "clinically shown"

6    that Sensa crystals effectively promote weight loss.

7           13.    Prior to 1994, weight-control products were regulated as drugs.  Unless they were

8    either generally recognized as safe and effective or an approved new drug, over-the-counter

9    ("OTC") products labeled for weight control were misbranded under Section 502 of the Food, Drug,

10   and Cosmetic Act.  *See* FTC Staff Report at 27-28.  With some limited exceptions not pertinent

11   here, an OTC product labeled for weight control required some form of pre-market review and

12   approval by the Food and Drug Administration ("FDA") to determine safety and effectiveness.  *Id.*

13   at 28.  "In 1994, the passage of the Dietary Supplement Health and Education Act of 1994

14   (DSHEA) dramatically changed the regulatory framework for weight-loss supplements, shifting

15   FDA's role from premarket clearance to post-market enforcement and shifting the responsibility

16   from government to industry to ensure products were safe and effective."  *Id.*

17          14.    According to the FTC, "this change in regulatory structure has coincided with a

18   dramatic increase in the number of dietary supplement weight-loss products as well as the amount

19   of weight-loss product advertising."  *Id.*  Dr. Hirsch took advantage of this change in the regulatory

20   structure to market Sensa crystals to millions of consumers who would be unable to decipher and

21   debunk the junk science behind the product.  In fact, his skillful and crooked manipulation of the

22   regulatory shift resulted in Sensa sales totaling nearly $364 million from 2008-2012.

23          15.    Despite this regulatory change relaxing the criteria to place weight loss products on

24   the market, on January 7, 2014 the FTC brought suit against Defendants for unfair or deceptive

25   practices and false advertisement in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C.

26   §§45(a) and 52.  As a result, the FTC and Defendants entered into a stipulated judgment for $46.5

27

28

CLASS ACTION COMPLAINT                                                                    6

1   million.  The judgment also enjoined Defendants from making misleading claims that Sensa causes

2   or helps weight loss.

3   **THE PARTIES**

4   **Defendants**

5   16.   Defendant **Sensa Products, LLC** is a Delaware corporation, registered with the

6   California Secretary of State to conduct business in California.  Sensa Products, LLC's principal

7   place of business is in El Segundo, California.

8   17.   Defendant **Sensa, Inc.**, formerly known as **Intelligent Beauty, Inc.**, is a Delaware

9   Corporation registered with the California Secretary of State, with its headquarters and principal

10   place of business in El Segundo, California. Sensa has an ownership interest in Sensa Products,

11   LLC.

12   18.   Defendant **Alan R. Hirsch** is a citizen of Illinois who created Sensa after he

13   purportedly did 25 years of research on "tastants."  Dr. Hirsch's name appears on Sensa packaging

14   under the words "Dr. Formulated," and his research is touted on the Sensa websites, GNC store

15   displays, and in GNC pamphlets.

16   19.   Defendant **General Nutrition Corporation** ("GNC Corp.") is a Pennsylvania

17   Corporation that has its principal place of business in Pennsylvania.

18   20.   Defendant **General Nutrition Centers, Inc**. ("GNC Inc."), is a Delaware

19   corporation that has its principal place of business in Pennsylvania. GNC Inc. is a wholly owned

20   subsidiary of GNC Corp. GNC Inc. and GNC Corp. are collectively referred to as "GNC."

21   21.   GNC advertises promotes, distributes, and sells Sensa's products to consumers.  It

22   advertises the product on its website, with in-store displays, and in a GNC published Sensa-

23   pamphlet.  It has received and will continue to receive substantial benefits and income from its

24   activities through promotion, distribution, and sale of the product.  GNC sold Sensa's products to

25   consumers throughout the United States and authorized the false, misleading, deceptive, fraudulent,

26   and unlawful misrepresentations about the product through its officers, directors, and agents.

27

28

---

CLASS ACTION COMPLAINT                                                                                      7

22.     Each of the Defendants acted jointly to perpetrate the acts described herein.  At all times relevant to the allegations in this matter, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendants within the course and scope of the agency, regarding the acts and omissions alleged.

**Plaintiffs**

23.     Plaintiff **Mollie Delaney** is a resident of Daly City, California who purchased Sensa crystals in 2012 based on Sensa's advertisements.  She purchased Sensa crystals after seeing advertisements claiming that the crystals were clinically shown to help people lose weight without dieting.  The representations made in those advertisements ultimately influenced Ms. Delaney's decision to purchase Sensa crystals.  If she had not seen those advertisements, Ms. Delaney would not have purchased Sensa crystals.

24.     Plaintiff **Angela Dobbins** is a California citizen residing in Alameda, California.  In 2012, she purchased Sensa crystals after seeing advertisements claiming the crystals were clinically shown to help people lose weight without dieting.  The advertisements also stated that people using Sensa crystals could eat whatever they want and still lose weight.  The representations made in those advertisements were substantial factors influencing Ms. Dobbins' decision to purchase Sensa crystals.  If she had not seen those representations, Ms. Dobbins would not have purchased Sensa crystals.

25.     Plaintiff **Amanda Retcofsky** is a resident of Uniontown, Pennsylvania.  In September 2012, she saw a commercial claiming you could lose weight just by sprinkling the crystals on your food without dieting or exercising.  Relying on those representations, Ms. Retcofsky purchased a 6-month supply of Sensa, including Sensa shakers and Sensa Quench, for $325.00 from a television shopping channel.  The representations made in those commercials ultimately influenced Ms. Retcofsky's decision to purchase Sensa crystals.  If she had not seen those advertisements, Ms. Retcofsky would not have purchased Sensa crystals.

**JURISDICTION AND VENUE**

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class Members, and the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs.  At least one Class Member is a citizen of a state different than at least one Defendant.

27.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

28.     This Court has personal jurisdiction over Sensa Products, LLC because it is registered with the California Secretary of State to conduct business within California.  In addition, it conducts substantial business within California.

29.     This Court has personal jurisdiction over Dr. Alan R. Hirsch because he purposefully directed his activities at California residents through his active participation in the fraudulent sale and marketing of Sensa crystals to California residents.  Specifically, Dr. Hirsch created Sensa crystals with the intention that they would be marketed and sold to California residents.  He has also appeared in television advertisements and infomercials promoting Sensa crystals that have aired on television in California.  Dr. Hirsch has also promoted Sensa crystals on television programs that air in California such as Extra TV and KTLA Prime News.[5]

30.     This Court has personal jurisdiction over Sensa, Inc. because it is registered with the California Secretary of State to conduct business within California and is headquartered in California.  In addition, it conducts substantial business within California.

31.     This Court has personal jurisdiction over GNC Corp. and GNC Inc. because they conduct substantial business within California, including the sale, marketing, and advertising of Sensa.  GNC also maintains retail stores in California.

32.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants transact significant business within this District and because Plaintiffs Dobbins and Delaney purchased Sensa crystals in this District.

---

[5] *See* Sensa in the News, Sensa.com, http://www.trysensa.com/news-stories.htm (last visited Jan. 16, 2014).

**THE MARKETING OF SENSA**

33.     In early 2008, Dr. Hirsh and Sensa Products, LLC announced what was "[q]uite possibly the most important weight-loss discovery of the 21st century."[6]  Through their website, they explained that Sensa is "an entirely NEW, clinically proven method of losing weight … [with] no food restrictions, and no change in lifestyle."[7]  These statements were false in at least three respects.

34.     First, Sensa was not "entirely NEW."  Dr. Hirsch had previously marketed his magic tastant crystals in 2004, at which time he called the product "Sprinkle Thin."  By 2005, Sprinkle Thin had been pulled from the market and the company that had sold it was out of business.  So when the product was reincarnated as "Sensa crystals" in 2008, it was not "entirely NEW."

35.     Second, Sensa crystals were not a "clinically proven" method of losing weight.  In 2008, there was no reliable scientific evidence showing that Sensa crystals had any effect on weight loss, and no such evidence exists today.

36.     Third, the claim that Sensa could cause weight loss without dieting is a "red flag" weight loss claim which the FTC has found is "almost always deceptive."[8]

37.     The FTC has also identified claims of scientific proof and doctor endorsements as common tactics used by weight-loss hucksters:

> "And for those who remain skeptical, there is an answer.  The products are backed by 'clinical studies' or are 'clinically tested' ….  Even if they do not purport to be clinically proven, many claim to be

---

[6]   *See* Try Sensa Website, www.trysensa.com (May 17, 2008), attached hereto as Exhibit A.

[7]   *Id.*

[8]   Leslie Fair, "Weighing the Evidence: Substantiating Claims for Weight Loss Products," Federal Trade Commission, *available at* http://business.ftc.gov/documents/weighing-evidence-substantiating-claims-weight-loss-products ("The FTC has listed seven 'red flag' weight loss claims that are almost always deceptive.  Think twice before participating in the promotion of any product that says it can cause weight loss without diet or exercise …."); *see also* Federal Trade Commission, Gut Check: A Reference Guide for Media on Spotting False Weight Loss Claims, *available at* http://www.business.ftc.gov/documents/gut-check-reference-guide-media-spotting-false-weight-loss-claims (last visited Jan. 15, 2014) (explaining that claims a weight loss product["c]auses substantial weight loss no matter what or how much the consumer eats" are impossible "as a matter of science").

the product of years of scientific research … or are doctor recommended."

FTC Staff Report at 6.

> "Phrases like 'the clinically proven healthy way to lose weight,' 'clinically tested,' 'scientifically proven,' and 'studies confirm' bestow products with an aura of scientific legitimacy and aim to persuade consumers that they should feel confident that a product will work."

*Id.* at 17.  This tactic is at the very core of the Sensa scam, as nearly every element of the product labeling, every advertisement, and every page of the Sensa website emphasizes that Sensa crystals are "[c]linically shown" to work by "clinical studies" and were "Doctor Formulated" by Dr. Hirsch following "20-plus years of research."

38.  When it launched in 2008, Sensa's website touted "more than 2 decades of research." *See* Exhibit A.  It stated that "Sensa's exclusive Tastant Technology is proven in clinical testing to produce an average weight loss of 30.5 pounds in just 6 months."  It stated that "Sensa is the ONLY weight-loss system with this revolutionary technology and these amazing clinical results."  Under a link titled "Where's the Proof?," the website presented a bold headline stating "**Clinical Study Proved Average Weight Loss of 30.5 lbs!**"  Under that headline, the text read:

> "In one of the largest clinical studies for a non-prescription weight-loss product ever conducted, 1436 men and women participants were instructed to sprinkle Sensa Tastants on all of their daily food for 6 months.  100 men and women participants were monitored in a placebo group.  The participants were not advised to change their regular diet or exercise and were weighed at the beginning and the end of the study.

> At the end of the 6-month study, the average weight loss of the Sensa Tastant group was 30.5 pounds, or an average of 5.1 pounds per month.  The placebo group only lost an average of 2 pounds."

39.  The statements identified in the foregoing paragraph were all false, misleading, and unsubstantiated.  First, despite the repeated references to a "placebo group," the purported 6-month clinical study was not placebo-controlled.  The references to a "placebo group" are simply false.  Dr. Hirsch later admitted the falsity of those statements and attributed them to a "misunderstanding."  Second, the purported "study" was so lacking in rigor that calling it "junk science" would probably overstate its validity.  The study does not appear to have been done at a

clinic or medical facility; participants weighed themselves and reported their own weight losses with no outside checks.  They paid Dr. Hirsch $49 per month to participate.  More than a thousand participants dropped out, and no report of their weight loss, or gain, was made.  ABC News showed Dr. Hirsch's "study" to a former Research Director of a National Institutes of Health-funded Research Center, Professor R. Barker Bussell of the University of Maryland.  His reaction was to "laugh out loud."[9]  According to Professor Bussell, Dr. Hirsch's research is beyond worthless – it "has a negative value."[10]

40.     Prior to filing this action, Counsel retained an independent expert to review Dr. Hirsch's purported "clinical study."  That expert examined the reports from Dr. Hirsch's "study" and concluded that it is not scientifically credible and does not support claims that Sensa crystals are effective for weight loss.

41.     Nevertheless, claims that Sensa crystals are "clinically proven" and "clinically shown" to cause weight loss pervade every aspect of Sensa's packaging, labeling, advertisements, and marketing materials.  Front and center on the box, shown below, is the statement "DOCTOR FORMULATED" in all caps, next to a caduceus and the name Alan Hirsch M.D.  The "doctor formulated" claim, together with the prominent display of a symbol of medicine, is designed to bestow Sensa crystals with the aura of scientific and medical credibility.  Further down the front center of the box says:

SHAKE.

EAT.

LOSE.

---

[9]     Jim Avila, "Eat Ice Cream, Burgers and Pizza and Still Lose Weight?," ABC NEWS, *available at* http://abcnews.go.com/print?id=5495808 (last visited Jan. 15, 2014).

[10]    *Id.*

42.     The back of the box features a photograph of Dr. Alan Hirsch, together with this text:

About SENSA® Creator: Dr. Alan Hirsch, M.D., board-certified neurologist, has conducted over 25 years of research regarding the impact of smell and taste on weight loss.  This research culminated in the creation of the SENSA® Weight-Loss System.

These statements are also designed to bestow Sensa crystals with the aura of scientific and medical credibility.

43.     The back of the box also states "EFFECTIVE RESULTS 1436 men and women lost an average of 30.5 pounds in just 6 months *without changing their diet or exercise program.*" (emphasis added).  These statements are also designed to bestow Sensa crystals with an aura of scientific and medical credibility and to convey the message Sensa crystals are scientifically proven for effective weight loss.

44.     The back surface of the box features before-and-after photographs of a woman wearing a bikini with high-heels, together with representations that the woman "lost 35 lbs."  Near these photos, the following text appears: "studies show average weight loss of 30.5lbs in 6 months."

45.     Inside the box is a "GET STARTED!" package insert pamphlet.  The pamphlet contains before-and-after pictures of "Real Users" who got "Real Results," including a woman who "LOST 30 lbs," a woman who "LOST 25 lbs," a man who "LOST 30lbs," a man who "LOST 34 lbs," a woman who "LOST 35 lbs," and a man who "LOST 15 lbs."

46.     The pamphlet explains the "The Sensa 6-Month System" as follows:

CLASS ACTION COMPLAINT                                                                                      13

"SENSA® is a 6-month weight-loss system.  Sensa® creator Dr. Alan Hirsch spearheaded one of the largest clinical studies on a non-prescription weight loss system, where 1,436 people lost an average of 30.5 pounds in 6 months.

For best results, Dr. Hirsch recommends following the 6-month system in order.

Each month is indicated by the number on the container and contains a different blend of Tastants.  You are given two shakers for each month: one to keep at home and one to carry with you.

It is important to move on to the next month in the system after 30 days so you continue to lose weight.

Start with Month 1, and shake SENSA® on everything you eat for 30 days.  After 30 days, move on to the next month in the system.  If you wish to continue past Month 6, simply start the system over with Month 1."

47.     The pamphlet goes on to explain the following in relevant part:

"Unlike traditional diets, SENSA® isn't based on restriction … During your first 60 days, it's crucial that you use SENSA® consistently … It may take some time for you to start seeing results."

48.     The pamphlet instructs users to take Sensa "From morning 'til night," and then provides the following daily Sensa consumption itinerary:

"Here's what a sample day looks like:
8 am Shake SENSA® on breakfast
8:15 am Take SENSA® COMPLETE
10 am Have a SENSA® CHEW and drink SENSA® QUENCH
12 pm Shake SENSA® on lunch
2 pm Drink SENSA® QUENCH
4 pm Have a SENSA® CHEW
6 pm Shake SENSA® on dinner"

49.     The pamphlet asks "Skeptical?" and then provides the following reassurance:

"It's natural to have doubts when starting a new weight-loss program.  Many of our users initially questioned whether SENSA® would work, but they stuck with it and went on to reach their goals."

50.     The pamphlet concludes with answers to frequently asked questions, including:

"How long will it take until I lose weight?

Although many people lose weight within the first month of using SENSA®, it may take a few months for others to start seeing results.  Stick with the 6-month system, and you can lose weight."

51.     Also inside the box is a "How To DVD."  The video on the DVD features Dayna

Devon.  Dayna says:

> "Hi!   You're here because you made the decision to lose weight.
> Congratulations!  I'm Dayna Devon and I've lost 20lbs with the Sensa
> Weight-Loss System.   You know, Sensa has changed my life, and it's
> about to change yours too.  In the next ten minutes, I'm gonna tell you
> how easy it is to sprinkle the pounds away.   Now, get ready to
> discover the thinner, healthier, happier you."

Approximately 2 minutes and 55 seconds into the video, Dayna

continues:

> "[Y]ou may be wondering what's in your tastants.  Looking at the
> ingredient list, you'll see that the tastants are made up of common
> ingredients that you would find in your own kitchen pantry.  That's
> right; Sensa contains only 100% FDA generally recognized as safe
> ingredients, so there's nothing harmful in Sensa.  In fact, Sensa is
> made up of just 4 simple ingredients.  The first ingredient,
> Maltodextrin, is derived from corn and found in cereals and canned
> fruits.  The second ingredient, Tricalcium Phosphate, is commonly
> found in juices and jams.  And the third ingredient, Silica, is an
> essential element that's found in leafy green vegetables.  These three
> ingredients are combined with Dr. Hirch's flavor combinations to
> help you feel full and satisfied sooner, so you eat less.
>
> If you've ever been on a restrictive diet, you may have noticed that
> you lose weight the first few weeks, but once your body gets used to
> the diet, you stop losing weight all together.  This is called the plateau
> effect.  Sensa shatters the plateau effect because your body never gets
> used to the tastants.  Over the course of the 6 month system there is a
> different proprietary blend of tastants each month so you continue to
> drop pounds.  **The introduction of new tastants every 30 days
> makes each month of Sensa as effective as the first.  Resulting in
> greater overall weight loss**.  *So you can reach your goal weight and
> transform your body in only 6 months.*
>
> The entire 6 month system is *Dr. Hirsch's prescription* for weight
> loss success with Sensa.  *Just like a doctor's prescription*, you need
> to follow it consistently in order to achieve your ideal weight.  So if
> you're looking to get the best results, stick with the system until
> you've met your goal.  Simply start with Month 1 and use it for 30
> days.  Then, move on to Month 2, and so on with Months 3, 4, 5, and
> 6.  If you wish to continue with the system after Month 6, cycle right
> back again with Month number 1.  You should always move on to the
> next month even if you have some tastants left over, this way you can
> achieve maximum weight loss.  There are two shakers in the program
> for each month.  One to keep at home, and one to always carry with
> you. The two shakers combined should last you 30 days if you are
> sprinkling on every meal and snack.  If you have a lot left over at the
> end of the month, start sprinkling Sensa more liberally and be sure

1

you're using it every day.  On the other hand, if you run out of
tastants before the end of the month, simply move on to the next
month and try and sprinkle a little less next time. *See, it really is as*
*simple as sprinkle, eat, and lose weight*."

2

3        Approximately 7 minutes and 25 seconds into the video, Dayna explains the "science

4    behind Sensa" as follows:

5        "Alright, now let me tell you about the science behind Sensa.  *This*
*weight loss revelation is the result of 25 years of research and*
*testing by the world's leading expert on the science of taste and*
*smell, Dr. Alan Hirsch.*  Dr. Hirsch has written 7 books on the
subject, conducted and published more than 180 research studies, and
holds multiple patents relating to the science of smell and taste.  His
research has been cited in major publications, including the New York
Times, Time Magazine, and USA Today.  And he's been a guest on
TV programs such as the Today Show, Dateline NBC, CNN, The
CBS Early Show, Good Morning America, and Extra.  During the
course of his pioneering research Dr. Hirsch discovered the
groundbreaking secret behind Sensa that's changed the way the world
looks at weight loss.  He tested more than 4,000 tastants to determine
the specific combinations that promoted maximum weight loss."

6

7

8

9

10

11

12

13        Approximately 8 minutes into the video, Dr. Alan Hirsch appears and states:

14        "I've found that hunger isn't controlled by your stomach; it's
controlled by your brain.  We don't overeat just because we're
hungry, it's because we love to eat, and diets don't stop you from
wanting to eat.  They just stop you from eating what you want, and
that's a recipe for failure."

15

16        Approximately 9 minutes into the video, a Dr. Nancy Zamora appears and claims:

17

18        "Sensa is different than a diet because you sprinkle it on your
food, and this then makes you feel fuller faster, and therefore
you're eating smaller portions."

19

20        At the end of the video "real users" share their experience with Sensa.  Roger Shultz

states:

21

22        "I have lost 75 pounds with Sensa…I've always liked food, it's
food, fun and football on Friday, Saturday and Sunday.  So now
with Sensa I found something where I can continue to eat the food
that I like, and I am shaking Sensa on my food…you just take it
sprinkle on your food and that's it"

23

24        Wendy explains:

25

26        "I've lost 125 pounds with Sensa.  I tried everything before Sensa,
and nothing had worked.  Then, I got brave and decided to try one
more thing.  When I started Sensa, I didn't change my eating habits.
I just sprinkled Sensa, and I lost 7 pounds the first month.  With
Sensa I could eat wherever I wanted, I love Mexican food."

27

28

CLASS ACTION COMPLAINT                                                          16

Tim shares:

"I've lost 67 pounds using Sensa … I ordered Sensa and just carried on with my normal life, only I was sprinkling Sensa on all my food at every meal that I had.  At the end of 9 months, I had lost 67 pounds… Sensa really works."

Finally, Dorris concludes:

"I've lost 45 pounds with Sensa ... and I'm back in the saddle."

52.     Sensa is promoted and sold through the Sensa Website, www.sensa.com, and Try Sensa Website, www.trysensa.com.

53.     During the class period, visitors to the Try Sensa, www.trysensa.com, were greeted by a video featuring Dayna Devon, depicted in the image below[11]:



---

[11]    Now available on Sensa's Official YouTube channel at http://www.youtube.com/watch?v=sp2PA0rNJvE.

Dayna states:

"Hi, I'm Dayna Devon.  I've been a reporter and broadcast journalist for more than 20 years.  So when my producers asked me to do a story on a weight loss product called Sensa, I thought, hmmmm, this product sounds too good to be true.  You may have read about Sensa in the New York Times and Time Magazine or seen it on Dateline NBC.  Sensa's been getting lots of media attention because of a landmark 6-month research study [onscreen graphic: "Doctor Formulated!  1436 men and women lost an average of 30 lbs"] in which 1,436 people lost an average of over 30 pounds.  And here's the really amazing part: they did it without taking pills, stimulants, or counting calories.  Sounds too good to be true right?  Yep, I thought so too, until I tried Sensa for myself.  It's just one of those things that you have to try to see how easy it is to lose weight.  That's why we put together an absolutely incredible offer.  For a limited time, we'll send you the complete Sensa starter kit to try for 30 days with no obligation to buy.  Hundreds of thousands of people have said yes to this offer.  And you know what?  They've lost over a million pounds. [Onscreen graphic]



Look at these before and after shots.  These are all people who have lost lots of weight with Sensa.  Look at them!
[Onscreen graphics]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16

They're almost unrecognizable from their before photos.  Sensa worked for them, and it will work for you, too.  Satisfaction guaranteed.  In fact, we are so confident that you'll lose weight with Sensa, we don't want you to pay for it unless you see the results you want.  That's an offer you won't find anywhere else.  You've got nothing to lose, except unwanted pounds.

54.     During the class period, visitors to the Sensa Website, www.sensa.com, found Octavia Spencer "Award-Winning Actress" who claims, "Sensa® changed my life, not my lifestyle. I lost 20 pounds."  Below Octavia Spencer's endorsement, the website states that Sensa is "Easy," "Effective," and "Doctor Formulated."



55.     GNC promotes Sensa, Sensa for Men, and Sensa Slim with a prominent in-store display.



GNC endorses Sensa and the representations about the Sensa Weight-Loss System by tagging the display with the GNC LIVE WELL logo.  GNC's display lures consumers toward Sensa products by stating in large bold letters, "SUCCESS Get the Body You've Always Wanted."  GNC's display characterizes the "SENSA Weight-Loss System" as a "[h]ighly effective program clinically shown to help you lose up to 30lbs or more in just 5 months."

56.     GNC also publishes and distributes a pamphlet that awards the Sensa Weight Loss System "GNC #1 Diet Product Innovation 2010 Winner."  The GNC pamphlet states "Lose 30+ Pounds Without Dieting."  The GNC pamphlet promotes Sensa, Sensa for Men, Sensa Quench, and Sensa Chews to "Increase Your Results."  The GNC pamphlet also proclaims that the Sensa Weight Loss System is:

> "CLINICALLY PROVEN In one of the largest studies ever conducted on a non-prescription weight-loss system, 1,436 men and women lost an average of 30.5 pounds in just 6 months without changes to their existing diet or exercise program."

Under the "Clinically Proven Header," the pamphlet depicts a bar chart showing that the Sensa group lost 30.5 LBS while the Control group only lost 2lbs.  The pamphlet asks "Why Is Sensa Different?" and explains:

> "Sensa is different from all other weight-loss programs because it helps you to lose weight without food restrictions, stimulants or pills. (1) IT'S PROVEN EFFECTIVE: Based on 25 years of research & testing; Tested in multiple clinical studies; 30.5 pounds average weight loss (2) IT'S NOT A DIET: No pre-packaged meals; Calorie, Sugar and sodium-free; No pills, stimulants or diuretics (3) EASY TO USE: Sprinkle onto meals; Fits in purse or pocket; No drastic change in lifestyle."  (emphasis in original.)

The pamphlet also includes "Raves From Sensa Users" and bikini clad Sensa users next to claims that "Tammy Lost 35 LBS" and "Caleb Lost 25 LBS."  A true and correct copy of GNC's Sensa Pamphlet is attached hereto as Exhibit B.

57.     In addition to GNC displays and pamphlets, Sensa's packaging, television commercials, and two websites, Sensa is also promoted through email.  For example, in September,

October and November 2012, an email entitled "Look Great Naked" arrived in inboxes across the country.  Upon opening the email, next to the "Sensa-Weight Loss System" logo, bold text appears stating: "Clinically Proven to Help You Lose 30 Pounds" and "Jennifer has lost 58 pounds using SENSA® in the last year."  The email provides a link to a free trial of Sensa.  Spam Emails promoting Sensa from September 28, 2012, September 29, 2012, October 1, 2012, October 2, 2012, and November 20, 2012 are attached hereto as Exhibit C.

58.    Similar emails entitled "Eat Yourself Skinny" arrived in inboxes in November 2012. The body of the email states, "The Easiest Diet Ever? TRY SENSA FREE. Thousands of Women are Dropping Pounds with SENSA®.  Studies show avg. weight loss of 30.5 lbs in 6 months."  This Sensa spam Email from November 2012 is attached hereto as Exhibit D.

**THE ADVERTISING OF SENSA IS DESIGNED TO BESTOW SENSA CRYSTALS WITH A FALSE AURA OF SCIENTIFIC AND MEDICAL CREDIBILITY**

59.    During the class period, Sensa's websites included detailed information on two purported clinical studies that supposedly support Sensa's advertising.  The "Success Stories" section of the Sensa Website refers to "Studies" showing an average weight loss of "30.5 lbs in 6 months."[12]  But no reliable randomized study has been conducted using Sensa crystals.

60.    After reviewing the reports from both purported "studies," an independent expert concluded that neither "study" is scientifically credible, and neither "study" supports the claims that Sensa crystals are effective for weight loss.  In fact, both studies are unreliable and invalid.

61.    When addressing claims that these kinds of weight-loss product have been shown effective in clinical studies, the FTC Staff Report on Weight Loss Advertising comments: "Although some advertisements briefly describe the results, and provide some information about the methodology of a particular study, such as the study's duration and number of participating subjects, most of the advertisements fail to give consumers sufficient detail about a study to allow consumers to verify the advertiser's representations."  FTC Staff Report at 17.

---

[12] *See* Success Stories, Sensa.com, http://www.sensa.com/success-stories.htm (last visited April 30, 2013).

62.     As demonstrated by the recent FTC suit against Sensa, neither the advertisements nor the additional materials available through the website provide sufficient information to determine the validity of the Sensa study.  In fact, the FTC recently condemned Defendants' claim that Sensa was clinically proven and their claim that studies were conducted by an independent laboratory, stating the claims were "false" and "deceptive act[s] or practice[s]."  *See* FTC Complaint, *FTC v. Sensa Products, LLC., et al*, Case No. 14-cv-71, attached hereto as Exhibit E, at 17-19.

63.     The FTC's claims are well supported.  For example, the one-page poster of the purported "Double-Blind Placebo-Controlled Lab Study" does not identify an author or the facility where the study was done.  It does not provide any information on how many participants were assigned to the test and control groups, nor does it provide any information about what statistical tests, if any, were done to analyze the data.  However, prior to filing this complaint, Plaintiffs' counsel requested that Defendants provide more detailed data from the studies.  Plaintiff's counsel subsequently provided the data to an independent expert for review.  That expert concluded that the data was not scientifically credible and does not support claims that Sensa crystals are effective for weight loss.

64.     Apparently, the Sensa Medical Advisory Board "brings extensive knowledge of obesity and its related issues to [the Sensa] program."  However, none of the advisory board "medical doctors" have researched Sensa, and none participated in the formulation of Sensa.  Their biographies are included in Sensa promotional materials to create an illusion that doctors in the medical community, other than Dr. Hirsch, support the claims that Sensa causes weight loss.

## DR. HIRSCH'S "GROUND BREAKING RESEARCH STUDY" IS FATALLY FLAWED, INVALID, AND UNRELIABLE

65.     During the class period, the main page of the Sensa Website, www.sensa.com, included the phrase "DOCTOR FORMULATED" and the image below.  Similarly, the website Try Sensa, www.trysensa.com, included the phrase "CLINICALLY PROVEN" along with the text and image below:





66.     The main page of the Sensa website also includes a tab entitled "OUR FOUNDER," which links to a page entitled "DOCTOR FORMULATED."[13]   During the class period, below the title "DOCTOR FORMULATED," the website included detailed information about Dr. Alan Hirsch, the "Creator of the SENSA® Weight-Loss System," as well as a bar chart that depicts the supposed results of "Dr. Hirsch's Ground-Breaking Research Study."



---

[13] *See* Doctor Formulated, http://www.sensa.com/doctor-formulated.htm (last visited Jan. 15, 2014).

With regard to the creator of Sensa, the website states:

"Award-winning neurologist Dr. Alan Hirsh has devoted 25 years of research to the science of smell and taste, leading him to develop the patented technology behind SENSA®.

He has published over 200 research studies exploring how smell and taste affect human behaviors.

His awards and appointments include receiving the prestigious Peter Bassoe Award from The Chicago Neurological Society and serving as the Honorary Chairman of the Physician's Advisory Board to the National Republican Congressional Committee.

- Board-certified neurologist and psychologist
- Director of the Smell & Taste Treatment and Research Foundation in Chicago
- Nation's leading authority on the science of smell and taste
- Author of 8 books on the science of smell and taste
- Featured on Dateline NBC, CNN and Good Morning America."

*See id.* These statements are designed to bestow Sensa crystals with an aura of scientific and medical credibility.

67. Further down on the page, below the heading "Dr. Hirsch's Ground-Breaking Research Study, the text states:

"During his career, Dr. Hirsch observed that many patients who had lost their sense of smell due to head trauma frequently gained 20-30lbs. This prompted him to hypothesize that if losing one's sense of smell could lead to weight gain, could the opposite be true … **could enhancing one's sense of smell lead to weight loss?**

After painstaking research and testing, Hirsch created a blend of edible "Tastants" that he believed would enhance the smell and taste of food and eventually lead to weight-loss. He then tested those sprinkles in one of the largest research studies ever conducted on a non-prescription weight-loss product.

During his study, 1436 women and men sprinkled the scented, flavorless "Tastants" on everything they ate during a 6 month period and they lost an average of 30.5 pounds. Those in the control group lost only 2 pounds, on average.

Now, Dr. Hirsch's breakthrough "Tastants" are available to everyone as SENSA® and hundreds of thousands of people have lost weight on the system"

*See* a copy of the webpage attached hereto as Exhibit F.  These statements are accompanied by a bar chart, shown below, depicting the "results" of the purported clinical study that compared Sensa crystals to a placebo.



68.    The page also provides a link labeled "View the 1436-person research study" that links to an "Abstract Poster of Use of Stimuli for Weight Loss" instead of a full version of the purported research study.  That Abstract is attached hereto as Exhibit G.

69.    The Abstract merely recites the statements included on the website and does not provide any additional information that could be used to test the validity of the study.  The Abstract again states that "[o]ne thousand four hundred and thirty-six patients completed this study," and "[t]he average weight loss for the test group was 30.5 pounds."

70.    Rather than seeking to evaluate the hypothesis that using edible Tastants results in weight loss, the Abstract states that the research was conducted to reach the desired outcome: showing that Tastants cause weight loss.  In that connection, the abstract states that the "[t]he objective of this study is to demonstrate that non-caloric tastant crystals sprinkled on food prior to consumption will enhance gustatory evoked satiety, reduce consumption, and represent itself by a reduction in weight."  Dr. Hirsch's "objective" study indicates that he intended to support the claims about Sensa, the product he created, and that he did not set out to perform credible research or to test a hypothesis.

71.    The Abstract also states that only 100 subjects were included in the non-treated, placebo group while 2,437 overweight or obese subjects were given "tastant crystals."  In other words, the study compares a test group that is over 24 times the size of the control group.  The

Abstract also does not state whether the control subjects were overweight or obese like the test group.  The study's methodology and the study groups used are invalid.

72.     Based on available information, an independent expert concluded that Dr. Hirsch's study is fatally flawed and unreliable.

**THE STUDY CONDUCTED BY THIRD PARTY BATTS LABORATORIES IS EITHER FAKE OR THE PRODUCT OF GROSS INCOMPETENCE**

73.     During the class period, the Try Sensa website, www.trysensa.com, also included a tab entitled "CLINICALLY PROVEN," which links to information on a purported clinical study conducted by a third party.  A true and correct copy is attached hereto as Exhibit H.



74.     The "Double Blind, Placebo-Controlled Lab Study" was conducted by BATTS Laboratories, and it purportedly supports Dr. Hirsch's flawed research.

75.     The BATTS study, co-authored by Charlotte Kiosea and Dr. Marlowe Schneidkraut, is riddled with false statements and errors.

76.     The Study Director, Charlotte Kiosea, admitted in her deposition on December 14, 2011, that **all of BATTS' paper files had been shredded and used by Ms. Kiosea's cats as kitty litter** in April or May of 2011.  *See* 12/14/2011 Deposition of Charlotte Kiosea, attached hereto as Exhibit I, at 235:12-18.  According to Ms. Kiosea, the electronically stored documents were lost because they were all on one computer that "crashed" in 2009.  *Id.* at 282:9-25.

77.     Charlotte Kiosea, the "Study Director," was the sole author of the protocol used for the study, and the "single point of study control…with ultimate responsibility for the overall scientific conduct of the study."  *Id.* at 133:14-24.  But Ms. Kiosea is not a scientist:

> Q:     So you would not describe yourself as a scientist?
> A:     No.

*Id.* at 134:19-21.  She admits that she is not qualified, by training or experience, to conduct a study according to the FDA's Good Laboratory Practices (GLP) or Good Clinical Practices (GCP) standards.  *Id.* at 130:6-8 ("I will never be a study director on a GLP study.  I cannot be one, because my background does not qualify me to be one … I don't have the experience and formal education to do a GLP study *in vitro* or *in vivo*."); *id.* at 157:5-10 ("Q: You are not qualified by education, training, or experience to be an investigator in a clinical study … Is that accurate? …  A: Yes.  It is accurate…").

78.     Ms. Kiosea has no training or experience that would qualify her to conduct a clinical study.  She has the equivalent of a bachelor's degree in economics from the Academii de Studii Economise in Buchareset, Romania.  *Id.* at 15:8-14.  From 1994 through 1998, she worked as a receptionist and manager at a veterinary hospital.  *Id.* at 22:18-23.  From 1998 through 2003, she worked as a travel agent, first at Bertelsmann Industries, then for a variety of small airlines.  *Id.* at 24:20-21; 26:12-16.

79.     BATTS Laboratories was founded by Ms. Kiosea's husband, Matai Kiosea.  Matai Kiosea made his son, Nick Codim Kiosea, a partner in BATTS Laboratories after he graduated.  Charlotte Kiosea joined her husband's company in 2003 as a "volunteer."  *Id.* at 29:2.  She was "handling all the operations from cleaning the floors and monitoring the construction to everything."  *Id.* at 29:14-19.  Eventually, her husband gave her the title of "chief of operations." *Id.*  ("My husband said you should probably be in charge of operations; and that's what it was.")

80.     No medical doctors were involved in the BATTS study.  *Id.* at 159:15-20.  Ms. Kiosea took the medical history for each participant.  *Id.* at 102:3-5.  The BATTS report makes reference to an "Institutional Review Board (IRB)."  *Id.*  at 155:16-24.  But Ms. Kiosea admits there was no IRB.  *Id.* at 156:5 ("Correct, there was no IRB …").  The BATTS report makes reference to

"[m]onthly clinic visits" and "clinic controlled weighing processes."  *Id.* at 222:10-19; 242:1-4.  But

Ms. Kiosea admits there was no clinic:

> Q:     Where was the clinic?
>
> A:     Well, if I would have said performed human control weighing
>        process, it doesn't sound the way it's supposed to sound.  …
>
> Q:     Okay.  So even though there's a reference to clinic here, there
>        was no clinic involved in this study, right?
>
> [Objection omitted.]
>
> THE WITNESS:     Of course, not.

*Id.* at 222:20-223:9.

      81.     Based on her reports and the other written materials available, Ms. Kiosea could not

determine the number of participants enrolled in the study.  Nor was she able to determine how

many participants completed the study.  *Id.* at 185:9-16.  The first paragraph of her report states that

78 volunteers completed the first four months of the study.  The second paragraph states that 81

completed a two month extension, consisting of "47 and 32 for the placebo and test article groups

respectively."  *Id.* at 195:10-22.  Ms. Kiosea admits that 47 +32 = 79, not 81, and not 78.

> Q:     So we know that this 47 plus 32 is 79.
>
> A:     Right.
>
> Q:     That still doesn't match up to the 78 in the first paragraph.
>
> A:     Right.

*Id.* at 196:18-22.  Elsewhere Ms. Kiosea's report states 100 participants were enrolled, and 7

dropped out.  *Id.* at 235:24-236:9.  These figures suggest 93 completed the study, not 78, 79, or 81,

as other figures in the report suggest.

      82.     Ms. Kiosea had no explanation for these discrepancies.  *See id.* at 250:20-256:10.

Instead she admitted her report was riddled with errors and that she was unqualified to do the study:

> "[Y]eah, there were mistakes, okay.   I didn't verify the data
> because I didn't have it anymore.   I might be an idiot,
> nonqualified, and not a scientist to do this test, but there were so

many entities around me that didn't see the mistakes, I wonder who in QVC,[14] in my report, didn't see the mistakes." *Id.* at 263:8-13.

83.     Ms. Kiosea's daughter, Dolly Kiosea, is a paralegal who is not formally employed at BATTS. *Id.* at 71:1-2.  However, she played a number of interesting roles in this study.  She was a participant in the study.  *Id.* at 209:1-18 ("I even paid her.  She was huge.").  She performed some of the statistical analysis of the data.  *Id.* at 269:9-10 ("[S]he helped me with the calculation of the statistical data.").  She communicated with the sponsor about the calculations.  *Id.* at 269:14-17 ("I think she knows a little better to express herself in English than myself.").  Finally, she gave a testimonial for Sensa after the study was done.  *Id.* at 327:3-6 ("Q:  Did your daughter ever give a testimonial for Sensa?  A:  Oh, yes.  She landed a husband after Sensa.  She was happy.").

84.     After Charlotte Kiosea collected the data, and Dolly Kiosea performed the statistical analysis of the data, Luis Munoz verified the statistical analysis emailed to him by Charlotte Kiosea. *Id.* at 313: 6-11.

85.     After reviewing the reports from the research study, an independent expert retained by counsel for Plaintiffs concluded that the "study" is not scientifically credible, and it did not support claims that Sensa crystals are effective for weight loss.

**THE SENSA MEDICAL ADVISORY BOARD IS DESIGNED TO LEGITIMIZE SENSA'S FALSE ADVERTISING AND TO DECEIVE CONSUMERS**

86.     During the class period, the Sensa Website also included a tab at the top labeled "MEDICAL ADVISORS," which links to the page about the "Sensa Advisory Panel."  Sensa Advisory Panel, Sensa.com, http://www.sensa.com/advisory-panel.htm, attached hereto as Exhibit J. Below the headline "SENSA® MEDICAL ADVISORY BOARD," the text states:

> "The SENSA® Medical Advisory Board consists of leading medical doctors from across the country who provide independent counsel on a range of health and weight-loss related issues.  Each member brings extensive knowledge of obesity and its related issues to our program."

[14]     QVC is a television shopping channel that was receiving interim reports of the data from the BATTS study.  *See id.* at 125:15-20; *see also id.* at 124:18-21 ("They [the Sensa company] were pestered, as I remember, by QVC or Home Shopping Network, but one of these, and it was an ongoing study.  My agreement with this company was that they are provided with the data, so I sent the data.").

1  Beneath the text are headshots and biographies of the members of the so-called "Medical Advisory

2  Board."



### DEFENDANTS DISREGARD A PERMANENT INJUNCTION BY CONTINUING TO MAKE FALSE AND MISLEADING REPRESENTATIONS BASED ON INCOMPETENT AND UNRELIABLE SCIENTIFIC EVIDENCE

87.    The People of the State of California, represented by the District Attorneys for the counties of Santa Cruz, Alameda, Marin, Monterey, Orange, Napa, Santa Clara, Solano, and Sonoma  filed a civil complaint in the Santa Cruz County Superior Court against Defendant Sensa Products, LLC and Sensa, Inc. (formerly Intelligent Beauty Inc).  The People alleged that the defendants engaged in unfair competition, as defined in CA Bus. and Prof. Code Section 17200, and in violations of Business and Professions Code Section 17500.

88.    On November 20, 2012, Defendants stipulated to entry of final judgment in *People of the State of California v. Sensa Products, LLC et. al.*, Case No. CV 175655 (CA Superior Court, Santa Cruz County).  The Final Judgment Pursuant to Stipulation is attached hereto as Exhibit K.

89.     Defendants stipulated to the permanent injunction with no intention of changing their practices.

90.     The Final Judgment Pursuant to Stipulation states the following in relevant part:

> "Defendants, in connection with the manufacturing, labeling, advertising, offering for sale, sale, or distribution of any NUTRITIONAL SUPPLEMENT, are hereby permanently enjoined and restrained …from engaging in, directly or indirectly, any of the following acts or practices: …
>
> (B) [M]aking and/or disseminating any representation, either directly or indirectly, about the effects, efficacy, or safety of any NUTRITIONAL SUPPLEMENT unless a the time of making and/or disseminating such representation, it is true, not misleading, and Defendants already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE that substantiates such representation;
>
> (C) Making and/or disseminating any representation, either directly or indirectly, that misrepresents the existence, contents, validity, results, conclusions, or interpretations of any test, study or research relied upon that substantiates such representation;…
>
> (E) Making and/or disseminating any representation, either directly or indirectly, that any NUTRITIONAL SUPPLEMENT: (1) causes, assists, or contributes to weight loss and/or fat loss; (2) causes, assists, or contributes to any increase in metabolism and/or fat burning; unless, at the time of making and/or disseminating such representation, it is true, not misleading, and Defendants already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE – concerning the NUTRITIONAL SUPPLEMENT, or an ESSENTIALLY EQUIVALENT PRODUCT for which the claims are being made and/or disseminated – that substantiates such representation;
>
> (F) Making and/or disseminating any representation, either directly or indirectly, that the health benefits, performance, efficacy, safety or any aspect of any NUTRTIONAL SUPPLEMENT has been clinically proven or clinically tested, unless, at the time of making or disseminating such representation, it is true and not misleading, and Defendants already have in their possession and rely on COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE – that includes at least one adequate and well-controlled human clinical study that is randomized, double-blind, placebo-controlled, and conducted by persons qualified by training and experience to conduct such study performed on the NUTRITIONAL SUPPLEMENT, or on an ESSENTIALLY EQUIVALENT PRODUCT for which the claims are being made and/or disseminated – that substantiates such representation."
>
> (G) Enrolling any customer in any automatic shipment program without first providing the customer with a clear and conspicuous

disclosure of the customer's obligation under the program, and obtaining the customer's affirmative consent to the agreement to enroll the customer in the program and assume the obligations of the program at the time the automatic shipment program is ordered by the customer;

(H) Violating Civil Code § 1584.5, which provides in pertinent part, no person, firm, partnership, association, or corporation, or agent of employee thereof, shall in any manner, or by any means, offer for sale of goods, wares, merchandise, or services, where the offer includes the voluntary and unsolicited sending or providing of goods, wares, merchandise, or services not actually ordered, requested by the recipient, either orally or in writing. The receipt of any goods, wares, merchandise, or services shall for all purposes be deemed an unconditional gift to the recipient who may use or dispose of the goods, wares, merchandise, or services in any manner he or she sees fit without any obligation on his or her part to the sender or provider;

(I) Continuing to bill after shipping direct sale products to a customer after a customer's request has been made, consistent with California law and the instructions on Defendants' website or with the ordered products, to be taken off Defendants' shipping list or to cancel the customer's continuity order; provided however, if Defendant reverses such billing, within 30 days, the billing shall not constitute a violation of this paragraph."

91.     Defendants continue to violate Subparagraph (B) by making false and misleading representations about the efficacy of Sensa and by relying on incompetent and unreliable scientific evidence.  Defendants have no evidence that substantiates their representations about the efficacy of Sensa.

92.     Defendants claim that BATTS Laboratories and Dr. Hirsch have conducted valid research that substantiates their claims about the efficacy of Sensa.  Those claims are false. Defendants continue to rely on junk science in violation of Subparagraph (C).

93.     Defendants continue to violate Subparagraph (E) because they still make and disseminate representations that Sensa "causes, assists, or contributes to weight loss and/or fat loss," even though Defendants do not "already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE."

94.     Defendants' practices also violated Subparagraph (F).  Defendants represent that Sensa has been "clinically proven" to cause weight loss and that Sensa has been "clinically tested" such that studies show an average weight loss of 30lbs in 6 months.  Defendants have no scientific

1    evidence.  Nor do Defendants have scientific evidence "that includes at least one adequate and well-

2    controlled human clinical study that is randomized, double-blind, placebo controlled, and conducted

3    by persons qualified by training and experience to conduct such study performed on [Sensa]."

4    BATTS Laboratories' so-called double-blind, randomized study was turned into kitty litter by

5    "Study Director," Charlotte Kiosea, who has experience as a travel agent and as a receptionist but

6    no experience that would qualify her to perform a well-controlled clinical study.  The available

7    information on Dr. Hirsch's study demonstrates that his study was not double-blind, or well-

8    controlled, and is entirely inadequate.

9        95.      Even though, under Subparagraph (G), Defendant Sensa LLC is enjoined from

10   "[e]nrolling any customer in an automatic shipment program without first providing the customer

11   with a clear and conspicuous disclosure of the customer's obligation under the program, and

12   obtaining the customer's affirmative consent to the agreement to enroll the customer in the program

13   and assume the obligations of the program," Defendants offer a "30 day free trial offer" with a

14   catch:  after customers sign up for a 30 day free trial, customers are sent Sensa month number one,

15   and, unexpectedly, Sensa month number two.  Defendants do not conspicuously notify customers

16   that if the second month of Sensa is not sent back, an automatic charge for both months will follow.

17       96.      When a customer calls and asks for the free trial to be cancelled, Defendants do not

18   cancel the "customer's continuity," as required by Subparagraph (I).  Because Defendants provide

19   no conspicuous notification, customers are surprised to learn that the second month of Sensa must

20   be sent back, or an automatic charge for both month one and month two will follow.

21       97.      In violation of Subparagraph (H) and Cal. Civil Code § 1584.5, the second month of

22   Sensa is anything but an "unconditional gift," because Defendants claim customers are obligated to

23   send Sensa month two back or be charged.  Even if Sensa is sent back, customers still pay shipping

24   for the "free trial."

25       98.      The People of the State of California took Defendants Sensa Products, LLC and

26   Sensa, Inc. to task for their false advertising and spurious science, and California entered into an

27   agreement with Defendants permanently enjoining them from engaging in unfair competition.  But

28

1    Defendants had no intention of changing their practices.  Indeed, Defendants did not change their

2    marketing strategy.  Instead, Defendants continue to claim that "studies show average weight loss of

3    30lbs" with Sensa.

4    **THE FTC RECENTLY ENTERED INTO A STIPULATED JUDGMENT FOR
     $46.5 MILLION AGAINST DEFENDANTS FOR CONTINUING TO MAKE FALSE AND**

5    **MISLEADING REPRESENTATIONS BASED ON INCOMPETENT AND UNRELIABLE**

6    **SCIENTIFIC EVIDENCE**

7            99.     On January 7, 2014, the FTC brought suit against Defendants for unfair or deceptive

8    practices and false advertisement in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C.

9    §§45(a) and 52.  Like the plaintiffs in this case, the FTC claimed Sensa does not work.  The FTC

10   asserted that Sensa is ineffective at producing weight loss without diet, exercise, or feeling hunger,

11   as Defendants' claim.  The FTC further claimed Defendants' assertion that Sensa is "clinically

12   proven" is categorically false, and Defendants' representation that the product was proven effective

13   in an independent study was also false, misleading, and deceptive.  Additionally, the FTC claimed

14   Defendants acted deceptively and falsely advertised Sensa by failing to disclose "material

15   connections" with consumer endorsers.  This includes the fact that endorsers received incentives to

16   appear in advertisements, including monetary compensation, free trips, and TV appearances.

17           100.    With respect to Defendant Hirsch, the FTC claimed he provided "unsubstantiated

18   expert endorsement claims."  Amongst other allegations, Hirsch deceptively and falsely represented

19   that Sensa causes substantial weigh loss without diet and exercise, that users will lose the weight

20   without feeling hungry, and that Sensa is "clinically proven" to result in 30 pounds of weightloss in

21   six months.  The FTC further claimed that Hirsch provided Defendants with deceptive and

22   misleading scientific, promotional, and other materials for the marketing and sale of Sensa,

23   therefore supplying them with the means and instrumentalities for commission of deceptive acts and

24   practices.

25           101.    As a result of these claims, the FTC and Defendants entered into a stipulated

26   judgment for $46.5 million.  The Stipulated Final Judgment is attached hereto as Exhibit L.  The

27   judgment also enjoined Defendants from making misleading claims that Sensa causes or helps

28

---

CLASS ACTION COMPLAINT                                                                                  35

weight loss.  Unlike the junk science Defendants relied upon and that is described in this complaint, Defendants agreed that all future representations surrounding Sensa's efficiency must be backed by "competent and reliable" scientific research.

## CLASS ACTION ALLEGATIONS

102.   Plaintiffs Delaney, Dobbins, and Retcofsky seek to represent a class defined as all persons in the United States who purchased Sensa crystals at any time from August 22, 2012 to the present (the "National Class").  Excluded from the Class are governmental entities, Defendants, Defendants' affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators, and anyone who purchased Sensa crystals for resale.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

103.   Plaintiffs Dobbins and Delaney also seeks to represent a subclass defined as all members of the Class who purchased Sensa crystals from within the state of California (the "California Subclass") at any time from August 22, 2012 to the present.

104.   Plaintiff Retcofsky seeks to represent a subclass defined as all members of the Class who purchased Sensa crystals from within the state of Pennsylvania (the "Pennyslvania Subclass") at any time from August 22, 2012 to the present.

105.   Members of the Class, the California Subclass, and the Pennsylvania Subclass are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery of Defendants' records.  Class members may be notified of the pendency of this action by mail, email, and/or publication.

106.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to:

        a.      Whether the marketing and advertisements for Sensa included false, misleading and unsubstantiated statements;

        b.      Whether Defendants' conduct violated the Magnuson-Moss Warranty Act;

     c.       Whether Defendants' conduct violated the CLRA;

     d.       Whether Defendants' conduct violated the FAL;

     e.       Whether Defendants' conduct violated the UCL's unlawful, unfair, and fraudulent and deceptive prongs;

     f.       Whether Defendants' conduct violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law;

     g.       Whether Defendants' conduct breached express or implied warranties; and

     h.       Whether Defendants made negligent misrepresentations.

107.   Plaintiff Dobbins's, Delaney's, and Retcofsky's claims are typical of the claims of the proposed Class and of each of the Subclasses they seek to represent (California and Pennsylvania).  Each Class member was subjected to the same illegal conduct, was harmed in the same way, and has claims for relief under the same legal theories.

108.   Plaintiffs Dobbins, Delaney, and Retcofsky are adequate representatives of the Class and of each of the Subclasses they seek to represent (California and Pennsylvania) because their interests do not conflict with the interests of the Class members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class and Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

109.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of a defendant's liability.  Class treatment

1   of the liability issues will ensure that all claims and claimants are before this Court for consistent

2   adjudication of the liability issues.

3          110.     Unless a class is certified, Defendants will retain monies received as a result of their

4   conduct that were taken from Plaintiffs and proposed Class members.  Unless a class-wide

5   injunction is issued, Defendants will continue to commit the violations of law alleged, and the

6   members of the Class and the general public will continue to be harmed thereby.

7                                                  **COUNT I**

8                    **Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.***

9          111.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth

10  above as though fully set forth herein.

11         112.     Plaintiffs bring this claim individually and on behalf of the members of the proposed

12  Class against Defendants.

13         113.     The Sensa Weight Loss System is a consumer product within the meaning of the

14  Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

15         114.     Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-

16  Moss Warranty Act, 15 U.S.C. § 2301(3).

17         115.     Defendants are both "suppliers" and a "warrantors" within the meaning of the

18  Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4) and (5).

19         116.     Defendants' statements as alleged herein (including, *inter alia*, statements that Sensa

20  is a "new, clinically proven method of losing weight," "backed up by scientific proof," with "more

21  than 2 decades of research," and "exclusive tastant technology [] proven in clinical testing to

22  produce an average weight loss of 30.5 pounds in just 6 months") are "written warranties" within

23  the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)(A).

24         117.     As alleged herein, Defendants have breached this written warranty by selling

25  consumers the Sensa Weight Loss System, which is not in fact "clinically proven," "backed up by

26  scientific proof," supported by "more than 2 decades of research," or "proven in clinical testing to

27  produce an average weight loss of 30.5 pounds in just 6 months" as warranted, thus failing to

28

conform to the written warranty, violating the Magnuson-Moss Warranty Act, and causing Plaintiffs and the Class injury and damage.

## COUNT II

### Breach of Express Warranty

118.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

119.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

120.    Plaintiffs, and each member of the Class, formed a contract with Defendants at the time Plaintiffs and the other members of the Class purchased Sensa.  The terms of that contract include the promises and affirmations of fact made by Defendants in advertisements and the packaging of Sensa as described above.  This product packaging and advertising constitutes express warranties, became part of the basis of the bargain, and is part of a standardized contract between Plaintiffs and the members of the Class on the one hand, and Defendants on the other.

121.    All conditions precedent to Defendants' liability under this contract have been performed by Plaintiffs and the Class.  Defendants breached the terms of this contract, including the express warranties, with Plaintiffs and the Class by not providing a product that was scientifically proven to provide the promised weight-loss benefits.

122.    As a result of Defendants' breach of warranty, Plaintiffs and the Class have been damaged in the amount according to proof.

## COUNT III
### Breach of Implied Warranties

123.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

124.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

125.     Defendants knew that Plaintiffs and other Class members were buying Sensa for a particular purpose – to lose weight – and that Plaintiffs and other Class members relied on Defendants' skill and judgment to select goods fit for that purpose.

126.     Sensa is not fit for this purpose because it does not produce the results that it promises, despite the promises that Defendants made on their advertising, labeling, and packaging. For the same reasons, Sensa was unmerchantable at the time it left the location where it was created, and remains unmerchantable at all times after that.  This unmerchantability is inherent in the product.

127.     Plaintiffs notified Defendants of the acts constituting breach of the implied warranties of fitness for a particular purpose and merchantability, both for themselves and the Class. Plaintiffs and other Class members suffered injury as a result of these breaches of warranty, for which Plaintiffs hereby pray, because they paid for and received Sensa that was not as warranted.

<u>**COUNT IV**</u>

**Violation of California's Consumers Legal Remedies Act,**
**California Civil Code § 1750,** *et seq.*

128.     Plaintiffs Dobbins and Delaney incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

129.     Plaintiff Dobbins and Delaney bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

130.     Defendants violated Civil Code § 1770(a)(2), (5), (7), (9), and (14) by making false, and misleading statements regarding Sensa crystals.

131.     Plaintiffs Dobbins and Delaney and the members of the Class and California Subclass have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for Sensa crystals that they otherwise would not have incurred or paid.

132.     On February 23, 2011, prior to the filing of this Complaint, a CLRA notice letter was served on Defendants Sensa Products, LLC, Sensa, Inc. (formerly known as Intelligent Beauty, Inc.), Hirsch, and GNC which complies in all respects with California Civil Code §1782(a). Plaintiffs' counsel sent Defendants a letter via certified mail, return receipt requested, advising

CLASS ACTION COMPLAINT                                                                          40

Defendants that they are in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.

133.    Pursuant to Civil Code § 1780, Plaintiffs seek an order of this Court permanently enjoining Defendants from continuing to engage in their unlawful conduct as alleged herein.  Plaintiffs also seek an order of this Court requiring Defendants to:

a.    Pay damages according to proof;

b.    Immediately cease the conduct alleged herein;

c.    Make full restitution of all monies wrongfully obtained;

d.    Disgorge all ill-gotten revenues and/or profits; and

e.    Pay punitive damages.

## COUNT V

**Violation of California's False Advertising Law ("FAL"),**
**Business & Professions Code § 17500 *et seq*.**

134.    Plaintiffs Dobbins and Delaney incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

135.    Plaintiffs Dobbins and Delaney bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

136.    Defendants violated Business & Professions Code § 17500 by publicly disseminating false, misleading and unsubstantiated advertisements regarding Sensa crystals.

137.    Defendants' false, and misleading advertisements were disseminated to increase the sales of Sensa.

138.    Defendants knew or should have known that their advertisements for Sensa crystals were false, misleading, and unsubstantiated, and those advertisements would induce consumers to purchase Sensa crystals.

139.    Furthermore, Defendants publicly disseminated the false, and misleading advertisements as part of a plan or scheme with the intent to sell an unproven, ineffective, and worthless product.

140.    Plaintiffs Dobbins and Delaney and the members of the Class and California Subclass have suffered harm as a result of these violations of the FAL because they have incurred charges and/or paid monies for Sensa crystals that they otherwise would not have incurred or paid.

141.    Pursuant to Bus. & Prof. Code § 17500, Plaintiffs Dobbins and Delaney seek an order of this Court permanently enjoining Defendants from continuing to publicly disseminate false, misleading, or unsubstantiated advertisements for Sensa crystals as alleged herein.  Plaintiffs Dobbins and Delaney also seek an order requiring Defendants to:

         a.    make full restitution for all monies wrongfully obtained; and

         b.    disgorge all ill-gotten revenues and/or profits.

## COUNT VI

**Unlawful Business Practices In Violation of California's Unfair Competition Law ("UCL"), Business & Professions Code §§ 17200 *et seq*.**
**(Unlawful Practices)**

142.    Plaintiffs Dobbins and Delaney incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

143.    Plaintiffs Dobbins and Delaney brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

144.    Defendants violated the unlawful prong of the UCL by violating Civil Code § 1770(a)(2), (5), (7), (9), and (14) and Business & Professions Code § 17500 as described above.

145.    Defendants also violated the unlawful prong of the UCL by violating the FTC Act, 15 U.S.C. § 45(n) because false, misleading, and unsubstantiated claims concerning the clinically proven efficacy of Sensa crystals are likely to deceive reasonable consumers and are likely to cause injury to consumers by enticing them to purchase a worthless and ineffective product.  These claims are also likely to incur charges and/or pay monies for Sensa crystals that they otherwise would not have incurred or paid.  These injuries are substantial, and are not reasonably avoidable by consumers who in most cases would be unable to debunk Defendants' bogus claims about the purported efficacy of Sensa crystals.  Furthermore, "[t]he FTC typically requires claims about the efficacy or safety of dietary supplements to be supported with 'competent and reliable scientific

1    evidence,' defined in FTC cases as 'tests, analyses, research, studies, or other evidence based on the

2    expertise of professionals in the relevant area, that have been conducted and evaluated in an

3    objective manner by persons qualified to do so, using procedures generally accepted in the

4    profession to yield accurate and reliable results.'"[15]  Such support was lacking here, thus

5    Defendants' claims concerning the efficacy of Sensa crystals were unsupported and deceptive in

6    violation of the FTC Act.

7    146.    Plaintiffs Dobbins and Delaney and the members of the Class and California

8    Subclass have suffered harm as a result of these violations of the unlawful prong of the UCL

9    because they have incurred charges and/or paid monies for Sensa they otherwise would not have

10   incurred or paid.

11   147.    Pursuant to Business & Professions Code § 17203, Plaintiffs Dobbins and Delaney

12   seek an order of this Court permanently enjoining Defendants from continuing to engage in their

13   unlawful conduct as alleged herein.  Plaintiffs Dobbins and Delaney also seeks an order requiring

14   Defendants to:

15               a.    immediately cease the conduct described herein;

16               b.    make full restitution of all monies wrongfully obtained; and

17               c.    disgorge all ill-gotten revenues and/or profits.

18   ## COUNT VII

19   **Unlawful Business Practices In Violation Of California's Unfair Competition Law ("UCL"),
     Business & Professions Code §§ 17200 *et seq*.**

20   **(Unfair Practices)**

21   148.    Plaintiffs Dobbins and Delaney incorporate by reference and re-allege each and

22   every allegation set forth above as though fully set forth herein.

23   149.    Plaintiffs Dobbins and Delaney bring this claim individually and on behalf of the

24   members of the proposed California Subclass against Defendants.

---

[15] Federal Trade Commission, *Dietary Supplements: An Adverting Guide for Industry*, p. 9, *available at* http://business.ftc.gov/sites/default/files/pdf/bus09-dietary-supplements-advertising-guide-industry.pdf  ("FTC Advertising Guide").

150.     Defendants' conduct, described herein, violated the unfair prong of the UCL because such conduct violated various laws and policies recognized by the California Legislature and the California courts, including without limitation, the CLRA and FAL, because the utility of Defendants' conduct is significantly outweighed by the gravity of the harms it imposed on consumers, and because Defendants' business practices described herein are oppressive, unscrupulous or substantially injurious to consumers.

151.     Plaintiffs Dobbins and Delaney and the members of the California Subclass have suffered harm as a result of these violations of the unfair prong of the UCL because they have incurred charges and/or paid monies for Sensa they otherwise would not have incurred or paid.

152.     Pursuant to Business & Professions Code § 17203, Plaintiffs Dobbins and Delaney seek an order of this Court permanently enjoining Defendants from continuing to engage in their unfair and unlawful conduct as alleged herein.  Plaintiffs Dobbins and Delaney also seek an order requiring Defendants to:

a.     immediately cease their unfair and unlawful acts and practices;

b.     make full restitution of all monies wrongfully obtained; and

c.     disgorge all ill-gotten revenues and/or profits.

### COUNT VIII

**Unlawful Business Practices In Violation of California's Unfair Competition Law ("UCL"), Business & Professions Code §§ 17200 *et seq*. (Fraudulent and Deceptive Practices)**

153.     Plaintiffs Dobbins and Delaney incorporate by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

154.     Plaintiffs Dobbins and Delaney bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

155.     Defendants violated the fraudulent and deceptive prong of the UCL by disseminating false, misleading and unsubstantiated advertisements and marketing materials regarding the effectiveness of Sensa.

156.    Plaintiffs Dobbins and Delaney and the members of the California Subclass have suffered harm as a result of these violations of the fraudulent and deceptive prong of the UCL because they have incurred charges and/or paid monies for Sensa they otherwise would not have incurred or paid.

157.    Pursuant to Business & Professions Code § 17203, Plaintiffs Dobbins and Delaney seek an order permanently enjoining Defendants from continuing to engage in their fraudulent and deceptive conduct alleged herein.  Plaintiffs Dobbins and Delaney also seek an order requiring Defendants to:

a.    immediately cease their fraudulent and deceptive acts and practices;

b.    make full restitution of all monies wrongfully obtained; and

c.    disgorge all ill-gotten revenues and/or profits.

## COUNT IX
### Negligent Misrepresentation

158.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

159.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

160.    To make a claim for negligent misrepresentation, Plaintiffs must show the following:

a.    Defendants made representations in the course of their business;

b.    Defendants supplied "false information" for the guidance of others in their business;

c.    Defendants did not exercise reasonable care or competence in obtaining or communicating the information; and

d.    Plaintiffs suffered pecuniary loss by justification relying on the misrepresentation.

161.    All these factors exist here. Defendants advertised and made false, misleading, and deceptive claims about Sensa.  Namely, Defendants claimed that Sensa tastants are sprinkled onto

food and the tastants "trigger your 'I feel full' signal, so you eat less and feel more satisfied." Defendants claim that Sensa will allow a consumer to "Lose 30 Pounds Without Dieting" by "[e]at[ing] your favorite foods," with "no restrictive dieting," "no calorie counting," and "no sacrifice."

162.    Defendants' representations were not true, and Defendants did not exercise reasonable care or competence in obtaining or communicating this information.  In fact, Defendants' claims in connection with Sensa are inconsistent with and/or conflict with the guidelines and/or statements of the FDA which, in an effort to promote real weight loss and to prevent Americans from being defrauded by "miracle pills," instructs that "[t]he only proven way to lose weight is either to reduce the number of calories you eat or to increase the number of calories you burn off through exercise."

163.    Plaintiffs and the Class relied on Defendants' representations of a guaranteed weight loss without dieting or exercise upon purchasing Sensa.  There would be no other reason to purchase a weight-loss product other than for weight-loss.  As a result, Plaintiffs and the Class were damaged by their purchase of Sensa.

## COUNT X

### Unlawful Business Practices In Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law
### 73 P.S. §§ 201-1, *et seq*.

164.    Plaintiff Retcofsky incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

165.    Plaintiff Retcofsky brings this claim individually and on behalf of the members of the proposed Pennsylvania Subclass against Defendants.

166.    Defendants' false advertising of Sensa directly affected Plaintiff Retcofsky and other consumers in Pennsylvania

167.    Defendants' conduct, described herein, constitutes unfair methods of competition and deceptive practices as described in 73 P.S. § 201-2(4)(ii), (v), (vii), (ix), and (xxi) because

1   Defendants made false and misleading statements to promote Sensa, and had no intention of selling

2   Sensa as advertised.

3   168.   Defendants' practices also constitutes unfair methods of competition as described in

4   73 P.S. § 201-2(4)(xiv) because Sensa does not perform as warranted.

5   169.   The unfair methods of competition, and unfair deceptive practices employed by

6   Defendants are unlawful under 73 P.S. § 201-3.

7   170.   As a direct and proximate result of Defendants' violations of Pennsylvania's Unfair

8   Trade Practices and Consumer Protection Law, Plaintiff Retcofsky and the Pennsylvania Subclass

9   have suffered economic loss.

10   171.   Pursuant to 73 P.S. § 201-4.1, Plaintiff Retcofsky seeks an order of this Court

11   permanently enjoining Defendants from continuing to engage in violations of the UTPCPL and for

12   payment of costs and restitution.

13   172.   Pursuant to 73 P.S. § 201-9.2, Plaintiff Retcofsky is entitled to a judgment in an

14   amount up to three times the actual damages sustained, but not less than one hundred ($100.00), and

15   is entitled to reimbursement for all reasonable attorney's fees and costs incurred.  Also, the Court

16   may provide such additional relief as it deems necessary and proper, including punitive damages.

**PRAYER FOR RELIEF**

17

18   WHEREFORE, Plaintiffs pray for judgment and relief as follows:

19   A.   An order certifying that this lawsuit is properly maintainable as a class action and

20   certifying Plaintiffs Delaney, Dobbins, and Retcofsky as the representatives of the Class; Plaintiffs

21   Dobbins and Delaney as the representatives of the California Subclass; and Plaintiff Retcofsky as

22   the representative of the Pennsylvania Subclass.

23   B.   For all forms of relief set forth above;

24   C.   Damages against Defendants in an amount to be determined at trial, together with

25   pre- and post-judgment interest at the maximum rate allowable by law on any

26   amounts awarded;

27   D.   Restitution and/or disgorgement in an amount to be determined at trial;

28

CLASS ACTION COMPLAINT                                                                                    47

E.      Punitive damages;

F.      An order enjoining Defendants from continuing to engage in the unlawful conduct and practices described herein;

G.      Reasonable attorneys' fees and costs;

H.      Granting such other and further relief as may be just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 23, 2014                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *   /s/ Annick M. Persinger*
        Annick M. Persinger

L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
Annick M. Persinger (State Bar No. 272996)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          swestcot@bursor.com
          apersinger@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
888 Seventh Avenue
New York, NY 10019
Telephone:  (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT                                                              48

I, Mollie Delaney, declare as follows:

1.      I am a plaintiff in this action and a citizen of the State of California residing in Daly City.  I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California.  While living in the Northern District of California, I purchased Sensa crystals in 2012 after seeing advertisements claiming the crystals were clinically proven to help people lose weight without dieting.  The representations made in those advertisements were substantial factors influencing my decision to purchase Sensa crystals.  If I had not seen those representations, I would not have purchased Sensa crystals.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on January 18, 2014 at Daly City , California.

_____
Mollie Delaney

I, Angela Dobbins, declare as follows:

1.     I am a plaintiff in this action and a citizen of the State of California residing in Alameda County. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California. While living in the Northern District of California, I purchased Sensa crystals in 2012 after seeing advertisements claiming the crystals were clinically proven to help people lose weight without dieting or exercise. The advertisements also stated that people using Sensa crystals could eat whatever they want and still lose weight. The representations made in those advertisements were substantial factors influencing my decision to purchase Sensa crystals. If I had not seen those representations, I would not have purchased Sensa crystals.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on January 18, 2014 at _____Alameda_____, California.

_____
Angela Dobbins

**EXHIBIT A**

INTERNET ARCHIVE
WayBackMachine

http://www.trysensa.com/    Go

346 captures
17 May 08 - 11 Jan 14.

APR **MAY** JUN Close
◄ **17** ►
2007 2008 2009 Help

# SENSA®

WHAT IS SENSA? |

HOW DOES IT WORK? |

Where's the Proof?

How to Get Started?



## What is Sensa?

### Quite possibly the most important weight-loss discovery of the 21st century

Forget everything you know about weight loss. Your days of yo-yo dieting, deprivation and frustration are over. Get ready to lose weight the Sensa way— without pills, without the inconvenience and expense of pre-packaged foods, and without having to give up your favorite foods.

Sensa is not a diet. It's an entirely NEW, clinically proven method of losing weight, and it's unlike any other weight-loss program in three very important ways:

- There are no food restriction, and no change in lifestyle. There's no counting points and you can continue to eat all your favorite foods!
- At the heart of the Sensa program is patent-pending Tastant Technology based on more than 20 years of intensive research. Sensa Tastants use your senses of smell and taste as allies in weight loss by speeding up sensory-specific satiety — the biological mechanism that tells you it's time to stop eating!
- Sensa's exclusive Tastant Technology is proven in clinical testing to produce an average weight loss of 30.5 pounds in just 6 months! Sensa is the ONLY weight-loss system with this revolutionary technology and these amazing clinical results.

Based on more than 2
decades of research
**See why there's**
**nothing else like it**

30 pounds average weight loss – more
than any other weight loss program
**Read more**
**amazing results**

Just sprinkle it on...
Feel full faster...
Eat less...
And lose weight...
**Discover how it works**

WHAT IS SENSA? | HOW DOES IT WORK? | WHERE'S THE PROOF? | HOW DO I GET STARTED?

2301 Rosecrans Avenue | Suite 4100 | Manhattan Beach, CA 90245-4967 | (866) 514-2554

**EXHIBIT B**

# EVERYBODY IS TALKING ABOUT SENSA®

## SENSA® IN THE NEWS:

   

The Washington Post  EXTRA  FOX  SELF  NBC  CBS

## SENSA® COMMUNITY SUPPORT:

Find free tools and support in the SENSA® Community to help you reach your weight-loss goals! Go to mysensa.com/community to take advantage of these exclusive benefits and your FREE membership!

# RAVES FROM SENSA® USERS...

"It's been 6 weeks and I've lost 13 pounds so far. It's so easy. I don't have to say NO when invited out. I can still go out to dinner. No special food. LOVE IT!" – J.V.

"SENSA® has transformed me and my body. I have lost 18 pounds and several inches. Everyone at work has noticed the difference and I've been giving out the DVD so others can have the same success." – B.E.

"I took a chance with SENSA®. To my extreme delight it has worked far beyond what I ever imagined. I've said it before... this to me is not a diet. I'm far too happy and content. I'm down 17 pounds from my starting weight." – E.W.

## INCREASE YOUR RESULTS!

### SENSA® QUENCH
Enjoy healthy, sugar-free and delicious SENSA® QUENCH, with ingredients to help you feel energized and increase metabolism.

### SENSA® CHEWS
Delicious chews help you feel full and satisfied in between meals.





**TAMMY LOST 35 LBS†**

**CALEB LOST 25 LBS†**

*Studies show average weight loss of 30.5 lbs in 6 months. Tammy used SENSA® with a sensible diet and exercise. †SENSA® Cash Prize Winner.



Scan to watch a SENSA® video!

The SENSA® Weight-Loss System and additional SENSA® products are available at GNC and GNC.com.



GNC.COM  SKU #SSMIS0016  GNC. 5. 2012



SENSA WEIGHT-LOSS SYSTEM

# LOSE 30+ POUNDS **WITHOUT DIETING**

REAL USER. REAL RESULTS.
Dayna Devon
Award-Winning TV Journalist

Doesn't change the taste of your food!

GNC
#1 DIET PRODUCT INNOVATION
2010 Winner

**NO** Pills
**NO** Diuretics
**NO** Stimulants



GNC.COM

# WHAT IS SENSA?

SENSA® is a clinically proven 6-month weight-loss system. Simply sprinkle it on everything you eat to safely and effectively curb your appetite and lose weight without feeling deprived. SENSA® uses science and your sense of smell to help you lose weight. It contains a patent-pending blend of salty and sweet-scented crystals known as Tastants that are clinically proven to help you eat less and lose weight.

✔ **NO** Pills      ✔ **NO** Sugar

✔ **NO** Diuretics      ✔ **NO** Calories

✔ **NO** Stimulants      ✔ **NO** Gluten

✔ **NO** Sodium      ✔ **NO** MSG

# WHY IS SENSA® DIFFERENT?

SENSA® is different from all other weight-loss programs because it helps you to lose weight without food restrictions, stimulants or pills.



**IT'S PROVEN EFFECTIVE**
Based on 25 years of research & testing
Tested in multiple clinical studies
30.5 pounds average weight loss



**IT'S NOT A DIET**
No pre-packaged meals
Calorie, sugar and sodium-free
No pills, stimulants or diuretics



**EASY TO USE**
Sprinkle onto meals
Fits in purse or pocket
No drastic changes in lifestyle



In one of the largest studies ever conducted on a non-prescription weight-loss system, 1,436 men and women lost an average of 30.5 pounds in just 6 months, without changes to their existing diet or exercise program.

# HOW DOES IT WORK?

## SENSA® USES SCIENCE AND YOUR SENSE OF SMELL TO HELP YOU LOSE WEIGHT.

Sprinkle SENSA® on your food before you eat. As you eat, the taste and smell of SENSA® activates the hunger control switch in the satiety center of your brain.



SPRINKLE.



EAT.

SENSA® helps reduce your appetite helping you feel full and satisfied faster without changing the taste or texture of your food.



FULL = LOSE.

Each month contains a different, patent-pending formula designed to promote maximum weight loss.

MONTHS 

No other weight loss product has such extraordinary results!

# THE SENSA SYSTEM



SENSA® is a 6-month weight-loss system with each month containing a new proprietary blend of Tastants. GNC carries both SENSA® and SENSA® FOR MEN. The men's version is specifically formulated to work with men's sense of smell and taste.

## Months ❶ & ❷

Start with the 60 Day Weight-Loss Program: Months 1 & 2. Includes How-To DVD and Usage Guide.



## Months ❸ & ❹

At the end of the 60 days, move on to the second 60-Day Kit: Months 3 & 4.



## Months ❺ & ❻

Continue with the third 60-Day Kit: Months 5 & 6.



**EXHIBIT C**



## Look Great Naked

1 message

**SENSA** <contact@wantthickcould.net>                                Fri, Sep 28, 2012 at 4:55 PM
Reply-To: SENSA <contact@wantthickcould.net>



*Harper's Bazaar* is just the latest publication to catch on to the diet that's sweeping the nation...SENSA®! You've expressed interest in trying SENSA®, but maybe the timing wasn't right, perhaps you weren't ready to commit to another weight-loss system, to another year of hard work at dropping the pounds.

SENSA®forces no restrictions on your diet. Don't change what you eat.

You heard it first from *Harper's Bazaar*: There are NO restrictions continue to eat what you want, when you want. Just sprinkle with SENSA® and **WATCH THE POUNDS DISAPPEAR**.
Click here to Try SENSA® Free!*
SENSA® is clinically proven! In one of the largest weight-loss studies of its kind.1,436 participants lost an average of 30.5 lbs over 6 months.†



**Limited Time Offer**
TRY SENSA® FREE*
CLICK HERE

GET CONNECTED

Become a fan ▶    Follow Us ▶    Watch Us ▶    Blog ▶    SENSA Community ▶

Do you have a question, problem or just need some help?
**Click here to contact us.**

*30 day free trial; S&H apply
† Studies show average weight loss of 30.5  bs in 6 months. Jennifer used SENSA for 10 months with a sensible diet. SENSA Cash Prize Winner
If you wish to unsubscr be from these emails, please click here.
SENSA, 1590-D Rosecrans Ave., # 255, Manhattan Beach, CA 90266

Click here to stop emails or send a letter to:
Response Manager
PO Box 10188 #81361, Newark, NJ 07101-3188



## Look Great Naked

1 message

**SENSA** <contact@countvalleynoon.net>                              Sat, Sep 29, 2012 at 3:02 PM
Reply-To: SENSA <contact@countvalleynoon.net>



*Harper's Bazaar* is just the latest publication to catch on to the diet that's sweeping the nation...SENSA®! You've expressed interest in trying SENSA®, but maybe the timing wasn't right, perhaps you weren't ready to commit to another weight-loss system, to another year of hard work at dropping the pounds.

SENSA®forces no restrictions on your diet. Don't change what you eat.

You heard it first from *Harper's Bazaar*: There are NO restrictions continue to eat what you want, when you want. Just sprinkle with SENSA® and **WATCH THE POUNDS DISAPPEAR**.

Click here to Try SENSA® Free!*

SENSA® is clinically proven! In one of the largest weight-loss studies of its kind.1,436 participants lost an average of 30.5 lbs over 6 months.†



**Limited Time Offer**

## TRY SENSA® FREE*

CLICK HERE

## GET CONNECTED

Become a fan ▶   Follow Us ▶   Watch Us ▶   Blog ▶   SENSA Community ▶

Do you have a question, problem or just need some help?
**Click here to contact us.**

*30 day free trial; S&H apply

† Studies show average weight loss of 30.5  bs in 6 months. Jennifer used SENSA for 10 months with a sensible diet. SENSA Cash Prize Winner

If you wish to unsubscr be from these emails, please click here.

SENSA, 1590-D Rosecrans Ave., # 255, Manhattan Beach, CA 90266

Click here to stop emails or send a letter to:
Response Manager
PO Box 10188 #81361, Newark, NJ 07101-3188



## Look Great Naked

1 message

**SENSA** <contact@comesummerfind.net>          Mon, Oct 1, 2012 at 5:59 PM
Reply-To: SENSA <contact@comesummerfind.net>



*Harper's Bazaar* is just the latest publication to catch on to the diet that's sweeping the nation...SENSA®! You've expressed interest in trying SENSA®, but maybe the timing wasn't right, perhaps you weren't ready to commit to another weight-loss system, to another year of hard work at dropping the pounds.

SENSA®forces no restrictions on your diet. Don't change what you eat.

You heard it first from *Harper's Bazaar*: There are NO restrictions continue to eat what you want, when you want. Just sprinkle with SENSA® and **WATCH THE POUNDS DISAPPEAR**.

Click here to Try SENSA® Free!*

SENSA® is clinically proven! In one of the largest weight-loss studies of its kind.1,436 participants lost an average of 30.5 lbs over 6 months.†



**Limited Time Offer**

**TRY SENSA® FREE***

**CLICK HERE**

GET CONNECTED

Become a fan ▶   Follow Us ▶   Watch Us ▶   Blog ▶   SENSA Community ▶

Do you have a question, problem or just need some help?
**Click here to contact us.**

*30 day free trial; S&H apply

† Studies show average weight loss of 30.5  bs in 6 months. Jennifer used SENSA for 10 months with a sensible diet. SENSA Cash Prize Winner
If you wish to unsubscr be from these emails, please click here.
SENSA, 1590-D Rosecrans Ave., # 255, Manhattan Beach, CA 90266

Click here to stop emails or send a letter to:
Response Manager
PO Box 10188 #81361, Newark, NJ 07101-3188



**Eat Yourself Skinny**

**SENSA** <contact@comesummerfind.net>                    Mon, Oct 1, 2012 at 10:15 AM
Reply-To: SENSA <contact@comesummerfind.net>



publication to catch on to the diet that's sweeping the nation...SENSA®! You've expressed interest in trying SENSA®, but maybe the timing wasn't right, perhaps you weren't ready to commit to another weight-loss system, to another year of hard work at dropping the pounds.

Don't change what you eat.

You heard it first from *Harper's Bazaar*: There are NO restrictions continue to eat what you want, when you want. Just sprinkle with SENSA® and **WATCH THE POUNDS DISAPPEAR**.
Click here to Try SENSA® Free!*
SENSA® is clinically proven! In one of the largest weight-loss studies of its kind.1,436 participants lost an average of 30.5 lbs over 6 months.†



**Limited Time Offer**
TRY SENSA® FREE*
CLICK HERE

GET CONNECTED

Become a fan ▶    Follow Us ▶    Watch Us ▶    Blog ▶    SENSA Community ▶

Do you have a question, problem or just need some help?
**Click here to contact us.**

*30 day free trial; S&H apply
† Studies show average weight loss of 30.5 bs in 6 months. Jennifer used SENSA for 10 months with a sensible diet. SENSA Cash Prize Winner
If you wish to unsubscr be from these emails, please click here.
SENSA, 1590-D Rosecrans Ave., # 255, Manhattan Beach, CA 90266

Click here to stop emails or send a letter to:
Response Manager
PO Box 10188 #81361, Newark, NJ 07101-3188



**Look Great Naked**
1 message

SENSA <contact@downdestroyanother.net>                              Tue, Oct 2, 2012 at 11:02 AM
Reply-To: SENSA <contact@downdestroyanother.net>





*Harper's Bazaar* is just the latest publication to catch on to the diet that's sweeping the nation...SENSA®! You've expressed interest in trying SENSA®, but maybe the timing wasn't right, perhaps you weren't ready to commit to another weight-loss system, to another year of hard work at dropping the pounds.

SENSA®forces no restrictions on your diet. Don't change what you eat.

You heard it first from *Harper's Bazaar*: There are NO restrictions continue to eat what you want, when you want. Just sprinkle with SENSA® and **WATCH THE POUNDS DISAPPEAR**.
Click here to Try SENSA® Free!*
SENSA® is clinically proven! In one of the largest weight-loss studies of its kind.1,436 participants lost an average of 30.5 lbs over 6 months.†

## GET CONNECTED

Become a fan ▶

Follow Us ▶

Watch Us ▶

Blog ▶

SENSA Community ▶

Do you have a question, problem or just need some help?
**Click here to contact us.**

*30 day free trial; S&H apply
† Studies show average weight loss of 30.5  bs in 6 months. Jennifer used SENSA for 10 months with a sensible diet. SENSA Cash Prize Winner
If you wish to unsubscr be from these emails, please click here.
SENSA, 1590-D Rosecrans Ave., # 255, Manhattan Beach, CA 90266

Click here to stop emails or send a letter to:
Response Manager
PO Box 10188 #81361, Newark, NJ 07101-3188



## Eat Yourself Skinny

1 message

**SENSA** <contact@triesstationfurther.com>                                    Tue, Nov 20, 2012 at 7:58 AM
Reply-To: SENSA <contact@triesstationfurther.com>



If you wish to no longer receive emails, Unsubscribe here.
SENSA, 1590-D Rosecrans Ave., # 255, Manhattan Beach, CA 90266

**EXHIBIT D**



**Eat Yourself Skinny**
1 message

**SENSA** <contact@triesstationfurther.com>                                    Tue, Nov 20, 2012 at 8:04 PM
Reply-To: SENSA <contact@triesstationfurther.com>



*Harper's Bazaar* is just the latest publication to catch on to the diet that's sweeping the nation...SENSA®! You've expressed interest in trying SENSA®, but maybe the timing wasn't right, perhaps you weren't ready to commit to another weight-loss system, to another year of hard work at dropping the pounds.

SENSA® doesn't ask you to make drastic lifestyle changes in order to lose weight.

You heard it first from *Harper's Bazaar*. There are no restrictive meal plans, no counting calories, no prepackaged meals. You can continue to eat your favorite foods! Just sprinkle with SENSA® and **WATCH THE POUNDS DISAPPEAR**.

Click here to Try SENSA® Free!*

SENSA® is backed by science! In one of the largest weight-loss studies of its kind 1,436 participants lost an average of 30.5 lbs over 6 months.†



**GET CONNECTED**

Become a fan ▶     Follow Us ▶     Watch Us ▶     Blog ▶     SENSA Community ▶

Do you have a question, problem or just need some help?
**Click here to contact us.**

*30 day free trial; S&H apply

† Studies show average weight loss of 30.5 lbs in 6 months. Jennifer used SENSA for 10 months with a sensible diet. SENSA Cash Prize Winner

If you wish to unsubscribe from these emails, please click here.

SENSA, 1590-D Rosecrans Ave., # 255, Manhattan Beach, CA 90266

Click here to stop emails or send a letter to:
Response Manager
PO Box 10188 #81361, Newark, NJ 07101-3188

**EXHIBIT E**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case Number: 14-cv-72 |
| Plaintiff, | |
| v. | |
| SENSA PRODUCTS, LLC, a limited liability company,<br>SENSA, INC., formerly known as INTELLIGENT BEAUTY, INC., a corporation,<br>ADAM GOLDENBERG,<br>and<br>DR. ALAN R. HIRSCH, | |
| Defendants. | |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), for its Complaint alleges:

1.    The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with the labeling, advertising, marketing, distribution, and sale of Sensa, a powdered substance sprinkled on food that purportedly causes weight loss.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b), (c), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      Plaintiff FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

5.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

## DEFENDANTS

6.      Defendant Sensa Products, LLC ("Sensa Products") is a Delaware limited liability company with its principal place of business at 2301 Rosecrans Avenue, El Segundo, California 90245.  Sensa Products transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Sensa Products has labeled, advertised, marketed, distributed, or sold Sensa and Sensa for Men (collectively, "Sensa") to consumers throughout the United States.

- 2 -

7.      Defendant Sensa, Inc., formerly known as Intelligent Beauty, Inc. ("Sensa, Inc."), is a Delaware corporation with its principal place of business at the same location as Sensa Products.  Sensa, Inc. owns ninety percent and is the managing member of Sensa Products. Sensa, Inc. transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Sensa, Inc. has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

8.      Defendant Adam Goldenberg is the Chief Executive Officer of Sensa, Inc. and a member of its four-member Board of Directors.  He also is a member of Sensa Products' four-member Board of Managers.  Until 2012, he was a Co-Chief Executive Officer of Sensa Products.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Goldenberg, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

9.      Defendants Sensa Products and Sensa, Inc. (collectively, "the Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices alleged below.  They have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations.  Because the Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendant Goldenberg has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that

constitute the common enterprise.  (The Corporate Defendants and Defendant Goldenberg

collectively are referred to hereinafter as "the Sensa Defendants.")

10.     Defendant Dr. Alan R. Hirsch is the creator of Sensa and owns ten percent of

Sensa Products.  His principal place of business is at 845 North Michigan Avenue, Chicago,

Illinois 60611.  Acting alone or in concert with others, he has provided the means and

instrumentalities for the acts and practices set forth in this Complaint.  He has also participated

in the promotion of Sensa by, among other means, authoring promotional materials and

providing endorsements for Sensa in advertisements and promotional materials.  Defendant

Hirsch resides in this district and, in connection with the matters alleged herein, transacts or has

transacted business in this district and throughout the United States.

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

12.     Since at least 2008, the Sensa Defendants have labeled, advertised, marketed,

distributed, and sold Sensa, a powdered weight-loss product created and endorsed by Defendant

Hirsch, to consumers and retailers.  Defendant Hirsch has licensed to one or both of the

Corporate Defendants the rights to market and sell Sensa to consumers.  The Sensa Defendants

have advertised Sensa through long-form television commercials ("infomercials"), short-form

television commercials, radio spots, magazine ads, freestanding newspaper inserts, online ads,

and other advertising and promotional materials.  Defendants have represented, among other

things, through express claims and consumer endorsements, that Sensa causes consumers to lose

30, 40, 90 pounds, and more without dieting or exercise.  Relying on research conducted by Defendant Hirsch and by a purportedly independent laboratory, Defendants have also represented that Sensa is clinically proven to cause substantial weight loss without dieting or exercise, averaging 30 pounds in six months.

13.    Defendants sell Sensa directly to consumers for $59.00 plus shipping and handling for a one-month supply and, if signed up for a continuity plan, $89.95 plus shipping and handling for a two-month supply.  Sales of Sensa in the United States from 2008 through 2012, minus returns, totaled nearly $364 million.

14.    To induce consumers to purchase Sensa, the Sensa Defendants have disseminated, or caused to be disseminated, advertisements for Sensa, including, but not limited to, the attached Exhibits A through H.  These advertisements contain the following statements and depictions, among others:

A.    Excerpts from Sensa infomercial (Transcript attached as Exhibit A; DVD recording submitted as Exhibit A.1)

> MICHELLE FERNANDEZ:  Everything you've ever heard about dieting is wrong.  You don't need to diet to lose weight.  There's a better way and you've just found it.
>
> MALE NARRATOR:  If you've tried to lose weight, there's something you already know.  No matter what diets, programs or products you've tried, they've all had one thing in common, they didn't work.  But there's something new that does.
>
> ON SCREEN:  [Before and after photos of consumer endorser]
>
> # Amanda **lost 50 pounds!**
> Studies show average weight loss 30 lbs. in 180 days.
>
> ON SCREEN:  [Before and after photos of consumer endorser]

# Dorothy **lost 64 pounds!**

Studies show average weight loss 30 lbs. in 180 days.  Dorothy used Sensa for 9 months with a sensible diet and exercise program.

ON SCREEN:  [Before and after photos of consumer endorser]

# David **lost 93 pounds!**

Studies show average weight loss 30 lbs. in 180 days.  David used Sensa for 8 months with a sensible diet and exercise program.

MALE NARRATOR [ON SCREEN depictions, including consumer endorsement, omitted]:  Right now hundreds of thousands of people are already losing millions of pounds without dieting.  They've discovered the most revolutionary weight-loss breakthrough of the 21st century.  It's called Sensa, the amazing new clinically proven sensation that you sprinkle on to take the weight off.  Whether you need to lose 10 pounds, 50 pounds or more, now you can, without dieting.  Simply sprinkle Sensa on, eat all the foods you love, and watch the pounds come off.  It's that easy.  You'll lose weight faster and easier than you ever dreamed possible.

ON SCREEN:  [Before and after photos of consumer endorser]

# Joey **lost 120 pounds!**

Studies show average weight loss 30 lbs. in 180 days.  Joey used Sensa for 12 months with a sensible diet and exercise program.

JOEY:  I lost over 120 pounds with Sensa.  [Ex. A, pp. 4-7.]

\*     \*     \*

MICHELLE FERNANDEZ [ON SCREEN depiction omitted]:  So, how does Sensa work?  Well, at the heart of the Sensa program is a revolutionary technology that's based on 25 years of research and testing.  It was discovered by a brilliant research scientist and my hero, Dr. Alan Hirsch.  Dr. Hirsch holds five medical board certifications and is recognized as the world's leading expert on the science of smell and taste.  He's appeared on Oprah, Good Morning America, Dateline, Extra, the CBS Early Show, CNN, and in hundreds of magazines and newspapers around the world.  During the course of his pioneering research, Dr. Hirsch discovered the ground-breaking secret behind Sensa that has changed the way the world looks at weight loss forever.

DR. ALAN HIRSCH [ON SCREEN depiction omitted]:  After 25 years of research, I finally figured out why diets don't work.  Most diets focus on what you eat.  They have it all wrong.  Sensa looks at why you overeat and the

biological mechanisms that prevent you from overeating.  It uses the body's natural physiology to prevent you from overeating.  I've found that hunger isn't controlled by your stomach; it's controlled by your brain.  We don't overeat just because we're hungry.  It's because we love to eat.  And diets don't stop you from wanting to eat, they just stop you from eating what you want.  And that's a recipe for failure.  The key is a medical phenomena called sensory specific satiety.  As you eat, Sensa works with your senses to activate your body's natural control switch and triggers your body into thinking you've eaten more than you have.  So, you begin to lose weight without having to think about it.  The reason Sensa works when diets don't is because it lets you do what no diet can.  It lets you lose weight while still eating the foods you love most without ever feeling hungry or deprived.  [Ex. A, pp. 18-20.]

*   *   *

MALE NARRATOR [ON SCREEN depiction omitted]:  If this sounds too good to be true, just listen to this.  In one of the largest clinical studies ever conducted for a non-pharmaceutical weight-loss product, over 1,400 people were given Sensa and told not to diet and not to change their exercise routine.  All they did was sprinkle, eat, and lose weight.  And lose weight they did.

ON SCREEN: Over 1400 people!
**SENSA®**
**WEIGHT-LOSS SYSTEM**
**average weight-loss**
**30.5**
**pounds**
Results based on 180 day study period.

MALE NARRATOR [ON SCREEN depiction omitted]:  In fact, the average weight loss was an incredible 30 and a half pounds.  And in the same study, the group that was not given Sensa lost an average of only two pounds.  [Ex. A, pp. 26-27.]

B.      Email (Exhibit B)

**. . . Lose More Weight for Less Money "GUARANTEED" With Sensa's FREE Trial!**

Sensa is breaking the mold of high-priced, high-risk weight-loss programs by offering customers the chance to <u>try Sensa for free</u>.  We realize that you might be somewhat skeptical, even jaded by a weight-loss industry spread thick with misleading claims, which is why we are offering a <u>free trial</u>.  And we back it up with a **30-day weight-loss guarantee**.

- 7 -

***If you don't lose weight, you owe us nothing for the product.***

It is a huge financial risk to us, but we have good reason to be confident that you will lose weight because Sensa has been tested and **proven effective in multiple clinical studies**. In fact, no other weight-loss product has such amazing clinical results. In one of the largest clinical weight-loss studies ever conducted, **1,436 people lost an average of 30.5 pounds – nearly 15% of their total body weight** in just 6 months. And all they did was sprinkle Sensa on their food. No counting calories, no back-breaking exercise, no boxed meals.

C.        Radio advertisement (Exhibit C)

MVO: You already know that going to the gym will get you rock hard abs, ripped arms, and a completely toned body. But what if there was a way you could get all of that without ever stepping foot into a gym again? . . .

Introducing Sensa for Men. Specifically designed for men, by men, to help you shed thirty pounds or more so you can build that beach body in no time. Get started on your six-pack abs today with a free 30 day trial of Sensa. Call 1-800-XXX-XXXX.

Sensa does not require any dieting, pills or change in lifestyle. It's a clinically proven way to lose thirty pounds or more. And because it's created for men, by men, results are guaranteed.

If you want to lose more than THIRTY pounds, call now for your free trial and get those six-pack abs you've always wanted. . . .

D.        Print advertisement (Exhibit D)

# "Eat Yourself Skinny!"

Mother of 5 reveals how she **lost 58 pounds in 10 months WITHOUT Dieting** . . . and WITHOUT depriving herself of all of her favorite foods – plus it was as easy as shaking 'salt n pepper' on her meals . . .

Based on Dr. Hirsch's 25 years of research and testing, SENSA® works with your sense of smell to trigger the "I feel full" signal in your brain which means you eat less and feel more satisfied . . . ultimately you lose weight. In one of the largest studies ever conducted on a non-prescription weight-loss system, 1,436 men and women lost an average of 30.5 pounds in just 6 months, without changing their diets or exercise routines.

Considering all the science behind SENSA®, I was relieved to see it wasn't another one of those fad diets or quick fixes.  I knew I had to try it.  After all, the only thing I had to lose was my unwanted weight! . . .

I have been using SENSA® for ten months now, and I've lost 58 pounds*! . . .

[Accompanied by before and after photos of a consumer endorser.  At the bottom of the page is the following in small print text:  "*Studies show average weight loss of 30.5 lbs in 6 months.  Jennifer used SENSA® for 10 months with sensible diet.  Jennifer is a SENSA® contest winner."]

E.      Print advertisement (Exhibit E)

[The background of the ad is a photograph of a thin and fit woman's torso with visible hip bones and visibly cut stomach muscles]

**NEED TO LOSE
30 POUNDS?**
Try SENSA® FREE!*

SENSA® is clinically proven to help you
lose 30 lbs without dieting or spending
all your time working out.**  Just sprinkle
on your food, eat and lose weight!

**GET A GYM BODY
WITHOUT GOING TO THE GYM**

*      *      *

CLINICALLY PROVEN.  100% SATISFACTION GUARANTEED.

*      *      *

*Product is Free to try for 30 days!  Pay only a small shipping and handling fee.  ** In one of the largest studies ever conducted on a non-prescription weight-loss system, 1436 people lost an average 30.5 pounds in just 6 months without changing their diet or exercise regime.

F.      Print advertisement (Exhibit F)

[The background of the ad is a photograph of a fit man's torso with visibly cut stomach, chest, and arm muscles, along with an inset photograph of a plate with a hamburger and French fries and two Sensa packages.]

- 9 -

**NEW**
Get in Shape with
SENSA® FOR MEN

G.      Website at www.trysensa.com [depictions omitted] (Exhibit G)

Do You Want to Lose Weight, But Hate Dieting?
Join the Sensa Weight-Loss Revolution!
Michelle
lost 40 pounds
Results not typical.  Individual results may vary.

                           *     *     *

TOP TEN REASONS TO TRY SENSA
1.      It's NOT a diet
2.      There are no stimulants, fat blockers or side effects
3.      You can still eat all of your favorite foods (life's too short to deprive
yourself of the things you love)
4.      You don't have to spend money on bland, pre-packaged meals
5.      The patent-pending technology is based on 25 years of scientific
research
6.      It's proven effective in one of the largest clinical weight-loss studies
7.      Average weight loss is 30.5 pounds!
8.      It's as easy to use as salt & pepper.  Just sprinkle it on … and watch
the weight come off.
9.      You'll have 30 DAYS to try Sensa, and your satisfaction is
GUARANTEED.
10.     You can try it FREE.*

                           *     *     *

# NO OTHER WEIGHT-LOSS PRODUCT HAS SUCH EXTRAORDINARY CLINICAL RESULTS.

Over the course of 25 years, Sensa creator Dr. Alan Hirsch has conducted
ongoing research on the effects of smell and taste on eating habits, ultimately
leading him to spearhead one of the largest studies ever conducted on weight loss.
 Over a 6 month period, 1,436 women and men sprinkled scented, flavorless
"Tastant" crystals on everything they ate.  Participants were instructed not to
change their existing diet or exercise program.

                           - 10 -

The 1,436 people in the treatment group who completed the program **lost an average of 30.5 pounds** — nearly 15% of their total body weight.  Those in the control group lost only 2 pounds, on average.

This was followed by a double-blind, placebo-controlled study conducted by an independent laboratory, in which participants lost 27.5 pounds and about 14% of their body mass, on average.  Participants were instructed not to change their existing diet or exercise program.  Those in the control group gained half a pound, on average.

**Sensa was proven effective in one of the largest clinical studies ever performed on a non-prescription weight-loss product.**

H.      Print Advertisement (Exhibit H)

WENDY LOST 125 LBS* . . .

And Wendy is not alone.  SENSA® was tested in one of the largest weight-loss studies of its kind ever conducted.  Over 1,400 men and women who sprinkled SENSA® on their food for 6 months, lost an average of 30.5 lbs.  And participants were told not to change anything about their current diet or exercise habits.  . . .

[In small print:  *SENSA® advocates a healthy lifestyle with regular exercise and portion control.  Study shows 30.5 lbs average weight loss in 6 months.  Compensated for excellent results.  Wendy used SENSA® for 36 months with exercise and sensible diet.]

15.     To induce consumers to purchase Sensa, Defendants have disseminated, or caused to be disseminated, promotional materials for Sensa, including, but not limited to, the attached Exhibit I (excerpts from "Sensa Weight-Loss Program – The Accidental Discovery That's Transforming the Way People Lose Weight" by Dr. Alan Hirsch).  These promotional materials contain the following statements and depictions, among others:

    • Eat all your favorite foods
    • Clinically proven results
    • No restrictive dieting

*      *      *

- 11 -

The use of the Sensa Tastant System was created to kick start your weight loss.  This system allows you to eat all of your favorite foods, lose weight, and doesn't require any change in your lifestyle.  The clinical studies have shown that just the use of these Tastants alone can result in a healthy weight loss of 1 to 2 pounds per week. . . .

\*     \*     \*

We conducted an initial pilot study with 92 subjects over a six month period in 2002. . . . Using these Tastants resulted in substantial weight loss.  Compared to a control group that used no Tastants, those who used Tastants lost an average of 34 pounds over a six-month period (approximately 2.1% body mass per month)!  The greatest results were seen in those participants with the normal ability to smell and taste.

In 2004, I wanted to test this process on a much larger population base.  In this next clinical trial, 1,436 people finished the study.  A non-treatment control group of 100 individuals were randomly selected to not use the Tastants.  Both groups were instructed not to change their eating or exercise routines over the course of the study.  Weight and body mass index (BMI) was measured for both groups before and after the study.  **The test group using the Tastants experienced an average weight loss of 30.5 pounds, and an average BMI decrease of 5 points, over a period of six months**.  The control group who used nothing lost an average of only 2 pounds, with an average BMI decrease of 0.3 points over the same period.

\*     \*     \*

Most recently, and most notable is an independent double blind placebo controlled study. . . . [T]he act of sprinkling something on the food . . . could make someone more cognizant of what they are eating and thus stimulate them to eat less and/or lower calorie foods.  In order to eliminate the act of sprinkling as a cause of weight loss, we consulted an independent, third-party laboratory.  In this study both groups received Tastants to use, but only the active group was given the Sensa Tastants. . . . **Participants using the active Tastants experienced an average weight loss of 27.5 pounds in six months.  Participants in the placebo group actually gained an average of nearly one-half pound in the same time period.**  . . . This last study proved conclusively that the weight loss was caused specifically by the individual formulations of the active Tastants.

\*     \*     \*

**Where can I purchase the Sensa Tastants?**
The Sensa Tastants are available as part of the Sensa Weight-Loss System.

- 12 -

Please visit www.trysensa.com to order.

\* \* \*

**Dina C.**                                    **Lost 37 pounds in eight months**

[Before and after pictures, personal story, and footnote stating, "Results not typical.  Individual results may vary."]

**Adriana J.**                                **Lost 12 pounds in one month**

[Before and after pictures, personal story, and footnote stating, "Results not typical.  Individual results may vary."]

\* \* \*

Resources

Sensa Weight-Loss System
(www.trysensa.com)
Visit the Sensa website for more detailed information on how to use and purchase the Sensa Tastants.

\* \* \*

Special Reader Offer!
Get 15% off on your first purchase of the Sensa
Weight-Loss System Tastants.

Go to www.sensabookoffer.com
and follow instructions.

16.     In numerous instances, consumer endorsers of Sensa were offered the possibility of monetary compensation and other incentives, such as a free trip or appearing on television, for providing their endorsement.  For example, Defendants ran numerous promotions in which they offered consumers $1000 or $5000 and other incentives, such as trips to Los Angeles or the chance to be on television, to enter contests, such as "Be Our Next Sensa Success Story," "Sensa Weight Loss Contest:  Your Chance to be on TV!" and "The Sensa Weight-Loss Challenge," by sending in their endorsement, including "before" and "after" pictures.  Numerous consumer

- 13 -

endorsers of Sensa were compensated hundreds or thousands of dollars for their endorsement.
In numerous instances, Defendants did not disclose these incentives, or did not disclose them
adequately, in the advertisements in which such endorsements appeared.

17.    Defendants have represented that clinical studies conducted on Sensa prove that it
causes an average weight loss of 30 pounds in six months.  Defendant Hirsch conducted two
purported weight-loss studies on Sensa and an allegedly independent lab, Best American
Toxicology Testing Services, LLC ("BATTS"), conducted a third.

18.    The first study Defendant Hirsch conducted on Sensa (Gallant-Shean, M., Hirsch,
A.R., *Use of Tastants to Facilitate Weight Loss*) ("Hirsch 1") purportedly was a six-month study
with 108 test subjects (92 who completed the study), compared to a purported control group of
100 persons.

19.    Defendant Hirsch reported the results of Hirsch 1 in an abstract printed and
distributed by The Association for Chemoreception Sciences at its 25th Annual Meeting (April
9-13, 2003).  The distributed abstract states that the 92 completers lost an average of 5.6 pounds
over six months, while the control group gained an average of 1.1 pounds.

20.    Defendant Hirsch filed four separate patent applications discussing Hirsch 1 with
the United States Patent and Trademark Office (2002 and 2009) that also report that the 92
completers lost an average of 5.6 pounds over six months, while the control group gained an
average of 1.1 pounds.  Two patents issued in 2012 report the same data.

21.    Defendants state in promotional material that Hirsch 1 shows that the 92
completers lost an average of 33.6 pounds in six months.

22.    Hirsch 1 was an open-label study, which means it was not blinded because the
researchers and the subjects knew what treatment was being administered; it also was not

- 14 -

randomized or placebo-controlled; there was no intent-to-treat analysis of the subjects who

dropped out of the study; the subjects self-reported their weights; the subjects' diet and exercise

were not monitored; and the underlying data are unavailable for verification.

23.     The second study Defendant Hirsch conducted on Sensa (Hirsch, A.R., *Use of*

*Gustatory Stimuli to Facilitate Weight Loss*) ("Hirsch 2") purportedly was a six-month study

with 2437 enrolled test subjects (1436 who completed the study), compared to a purported

control group of 100 persons.  Defendants state in advertising and promotional material that

Hirsch 2 shows that the 1436 completers lost an average of 30.5 pounds over six months, and the

control group lost an average of two pounds.

24.     Hirsch 2 was an open-label study, which means it was not blinded because the

researchers and the subjects knew what treatment was being administered; it also was not

randomized or placebo-controlled; the subjects self-reported their weight; the test subjects were

encouraged to diet and exercise; the subjects' diet and exercise were not monitored; and the

underlying data are unavailable for verification.

25.     The third study on Sensa, by BATTS (*Efficacy Determination of Weight Loss*

*Through Use of Crystal Tastants*) ("BATTS study"), purportedly was a six-month study

conducted by an independent lab with 46 test subjects and 32 control subjects who completed the

study.  Defendants have stated in advertising and promotional material that the 46 test subjects

lost an average of 27.5 pounds over six months, while the control group gained an average of .34

of a pound.  The Corporate Defendants funded the BATTS study and participated in or exercised

control over the design, conduct, and report of the study.

26.     The BATTS study was not adequately randomized; five test subjects (JA, LC,

MB, MIC, and MS) were duplicates; some test subjects did not lose the weight reported in the

- 15 -

data; there was no intent-to-treat analysis of the subjects who dropped out of the study, including five reported and seventeen unreported subjects; and the subjects' diet and exercise were not monitored. In addition, on one or more occasions, BATTS or its contractors sent the subjects' purported monthly weight data to the Corporate Defendants and a third party in advance of weighing the subjects. Moreover, owners of BATTS or their family members appeared as endorsers in Sensa advertising.

## VIOLATIONS OF THE FTC ACT

27.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits unfair or deceptive acts or practices in or affecting commerce.

28.     Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

29.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.

30.     For the purposes of Section 12 of the FTC Act, Sensa is either a "food" or "drug" as defined in Section 15(b) and (c) of the FTC Act, 15 U.S.C. § 55(b), (c).

## COUNT I

## FALSE OR UNSUBSTANTIATED EFFICACY CLAIMS

31.     Through the means described in Paragraphs 14 and 15, Defendants have represented, directly or indirectly, expressly or by implication, that:

A.     Sensa causes substantial weight loss without dieting or exercise, averaging 30 pounds in six months; and

B.     Sensa enables users to lose substantial weight without ever feeling hungry.

- 16 -

32.     Through the means described in Paragraph 14, the Sensa Defendants have represented, directly or indirectly, expressly or by implication, that Sensa enables users to obtain toned, physically fit looking bodies without exercise.

33.     The representations set forth in Paragraphs 31 and 32 are false or were not substantiated at the time the representations were made.

34.     Therefore, the making of the representations as set forth in Paragraphs 31 and 32 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**COUNT II**

**FALSE PROOF CLAIMS**

35.     Through the means described in Paragraphs 14 and 15, Defendants have represented, directly or indirectly, expressly or by implication, that:

A.     Sensa is clinically proven to cause substantial weight loss without dieting or exercise, averaging 30 pounds in six months; and

B.     A clinical study of more than 1400 people proves that Sensa causes users to lose an average of 30.5 pounds in six month, without changing their diets or exercise routines.

36.     The representations set forth in Paragraph 35 are false.

37.     Therefore, the making of the representations as set forth in Paragraph 35 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT III

### FAILURE TO DISCLOSE MATERIAL CONNECTIONS
### WITH CONSUMER ENDORSERS

38.     Through the means described in Paragraphs 14 and 15, Defendants have represented, directly or indirectly, expressly or by implication, that consumers appearing in advertisements for Sensa are satisfied users of Sensa.

39.     In numerous instances in which Defendants have made the representations set forth in Paragraph 38, they have failed to disclose or disclose adequately that certain of the consumers appearing in their advertisements were offered incentives, such as possible monetary compensation, free trips, or television appearances, to provide an endorsement, or have been compensated in connection with their endorsement.  These facts would have been material to consumers in deciding whether to purchase Sensa.

40.     Defendants' failure to disclose or disclose adequately the material information described in Paragraph 39, in light of the representation described in Paragraph 38, constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**COUNT IV**

**FALSE CLAIM OF STUDY INDEPENDENCE**

41.     Through the means described in Paragraphs 14 and 15, Defendants have represented, directly or indirectly, expressly or by implication, that a clinical study conducted by a laboratory independently of Defendants proves Sensa's efficacy for weight loss.

42.     The representation set forth in Paragraph 41 is false.  The Corporate Defendants funded the study and participated in or exercised control over the design, conduct, and report of the study.

43.     Therefore, the making of the representation as set forth in Paragraph 41 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

**COUNT V**

**UNSUBSTANTIATED EXPERT ENDORSEMENT CLAIMS
BY DEFENDANT HIRSCH**

44.     Through the means described in Paragraphs 14 and 15, Defendant Hirsch, appearing as an expert endorser, has represented, expressly or by implication, that:

A.     Sensa causes substantial weight loss without dieting or exercise, averaging 30 pounds in six months;

B.     Sensa enables users to lose substantial weight without ever feeling hungry;

C.     Sensa is clinically proven to cause substantial weight loss without dieting or exercise, averaging 30 pounds in six months; and

D.     A clinical study of more than 1400 people proves that Sensa causes users to lose an average of 30.5 pounds in six month, without changing their diets or exercise routines.

- 19 -

45.     Defendant Hirsch did not possess and rely upon a reasonable basis for the representations set forth in Paragraph 44 at the time the representations were made.  Moreover, Defendant Hirsch did not exercise his purported expertise in the field of weight loss in the form of an examination or testing of Sensa and its purported scientific proof that was at least as extensive as an examination or testing that an expert in that field would normally conduct, in order to support the conclusions presented in his endorsements.

46.     Therefore, the making of the representations set forth in Paragraph 44 constitutes a deceptive practice, and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT VI

## MEANS AND INSTRUMENTALITIES
## BY DEFENDANT HIRSCH

47.     Defendant Hirsch has provided the Sensa Defendants with scientific, promotional, and other materials and services to assist the Sensa Defendants' marketing and sale of Sensa, including, but not limited to:

A.     Studies purporting to show that Sensa causes substantial weight loss without dieting or exercise, averaging 30 pounds in six months;

B.     His deceptive endorsement claims regarding Sensa; and

C.     Deceptive promotional materials.

48.     By providing the Sensa Defendants with these materials and services, Defendant Hirsch has provided the Sensa Defendants with the means and instrumentalities for the commission of deceptive acts and practices.

49.     Therefore, Defendant Hirsch's practices described in Paragraph 47 constitute

- 20 -

deceptive acts or practices, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

50.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

      C.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

                    Respectfully submitted,

                    JONATHAN E. NUECHTERLEIN
                    General Counsel

Dated:  January 7, 2014          KAREN MANDEL
                    MICHAEL OSTHEIMER
                    Federal Trade Commission
                    600 Pennsylvania Avenue, NW
                    Washington, D.C. 20580
                    Tel.:  202-326-2491, -2699
                    Fax:  202-326-3259
                    Email: kmandel@ftc.gov, mostheimer@ftc.gov

                    s/Guy G. Ward
                    GUY G. WARD
                    Federal Trade Commission
                    55 W. Monroe Street, Suite 1825
                    Chicago, Illinois 60603
                    Tel.:  312-960-5612
                    Fax:  312-960-5600
                    Email:  gward@ftc.gov

                    Attorneys for Plaintiff
                    FEDERAL TRADE COMMISSION

**EXHIBIT F**

INTERNET ARCHIVE
WaybackMachine
9 captures
13 Oct 12 - 15 Nov 13

http://www.sensa.com/doctor-formulated.htm    Go

JAN  MAY  AUG  Close
◄  12  ►
2012  2013  2014  Help

SENSA®
WEIGHT-LOSS SYSTEM

EMAIL SIGN-UP  |  LOGIN  |  SHOPPING CART: 0 items

HOW IT WORKS ⌄    SUCCESS STORIES ⌄    OUR FOUNDER    MEDICAL ADVISORS    PRESS    🛒 SHOP ⌄    👤 mySENSA

# DOCTOR FORMULATED

## Meet the Creator of the SENSA® Weight-Loss System

Award-winning neurologist Dr. Alan Hirsch has devoted 25 years of research to he science of smell and taste, leading him to develop the patented technology behind SENSA®.

He has published over 200 research studies exploring how smell and taste affect human behaviors.

His awards and appointments include receiving the prestigious Peter Bassoe Award from The Chicago Neurological Society and serving as the Honorary Chairman of he Physician's Advisory Board to the National Republican Congressional Committee.

- Board-certified neurologist and psychologist
- Director of the Smell & Taste Treatment and Research Foundation in Chicago
- Nation's leading au hority on the science of smell and taste
- Au hor of 8 books on he science of smell and taste
- Featured on Dateline NBC, CNN and Good Morning America

To learn more about Dr. Hirsch, visit www.SmellandTaste.org

## Dr. Hirsch's Ground-Breaking Research Study

During his career, Dr. Hirsch observed that many pa ients who had lost their sense of smell due to head trauma frequen ly gained 20-30lbs. This prompted him to hypothesize hat if losing one's sense of smell could lead to weight gain, could the opposite be true... **could enhancing one's sense of smell lead to weight loss?**

After painstaking research and tes ing, Hirsch created a blend of edible "Tastants" that he believed would enhance he smell and taste of food and eventually lead to weight-loss. He then tested those sprinkles in one of the largest research studies ever conducted on a non-prescrip ion weight-loss product.

During his study, 1436 women and men sprinkled he scented, flavorless "Tastants" on everything they ate during a 6 month period and they lost an average of 30 5 pounds.

Those in the control group lost only 2 pounds, on average.

Now, Dr. Hirsch's breakthrough "Tastants" are available to everyone as SENSA® and hundreds of thousands of people have lost weight on the system.

View the 1436-person research study

### ▌ 1,436-Person Research Study Results
**OVER A 6 MONTH PERIOD**





**Community**

Forums
Groups
Meal Plan
Tools & Calculators
Blog
Facebook
Twitter
YouTube
Newsletters

**About SENSA®**

How the Free Trial Works
Shop
SENSA® Quench
How It Works
Success Stories
Doctor Formulated
Press
FAQ
Sensa Reviews

**Company**

Contact Us
Get Help
My Account
Corporate Wellness
Site Map
Privacy Policy
Terms of Use







FACEBOOK    TWITTER    YOUTUBE    BLOG    MOBILE



SENSA® advocates a heal hy lifestyle with regular exercise and por ion control.
*30 day free trial period wi h sa isfaction guarantee. Shipping and handling fees apply.
**Compensated for excellent results.
† In one of the largest studies ever conducted on a non-prescription weight-loss
system, 1436 men and women lost an average of 30 5 pounds in just 6 months.
© SENSA Products, LLC. All Rights Reserved 2012
Manhattan Beach, CA 90245-4967  |  (866) 514-2554






**EXHIBIT G**

# Use of Gustatory Stimuli to Facilitate Weight Loss

Dr. Alan R. Hirsch, MD, F.A.C.P.; Smell & Taste Treatment and Research Foundation, Chicago, IL

Mercy Hospital and Medical Center, Chicago, IL

## INTRODUCTION

Excess weight is a risk factor for myriad illnesses including diabetes and cerebrovascular disease. Despite its ubiquity, treatment is, for the most part, ineffective and focuses on conscious, draconian self-deprivation efforts including portion control, fasting, hedonic sacrifice, or initiation of a rigorous, often painful, exercise program.

The single greatest health problem which plagues all developed countries is the proliferating pandemic of excess accumulation of body fat, as manifest by overweight and obesity. In the US, almost two-thirds of the population is overweight, with approximately one-fourth meeting the criteria for obesity and one-tenth morbidly obese. Due to the morbidity and mortality from obesity-associated conditions, treatment of this disorder has become a public health imperative.

Despite a number of weight loss strategies, a lack of effective modalities has been delineated. Application of chemosensory stimuli in modulation of ingestion and thus weight has been the subject of research and testing. Olfactory stimulation through intermittent odor presentation has previously been demonstrated to have efficacy. Through taste and retronasal olfaction, powdered tastant crystals were demonstrated to induce weight loss in 108 people over six months. In order to determine the replicability of that study, with a larger subject size, the current investigation was undertaken.

## STUDY OBJECTIVE

The objective of this study is to demonstrate that non-caloric tastant crystals sprinkled on food prior to consumption will enhance gustatory evoked satiety, reduce consumption, and represent itself by a reduction in weight.

## METHOD

Two thousand four hundred thirty-seven overweight or obese subjects, over a six-month period, sprinkled a variety of savory or sweet tastant crystals onto their food prior to eating. Pre and post study weights were obtained and compared to a one hundred person non-treated control group.

## RESULTS

One thousand four hundred and thirty-six patients (87.4% female, 12.6% male, with an average initial weight of 208 pounds, and BMI of 34.2), completed this study. The average weight loss for the test group was 30.5 pounds, 5 BMI. The control group indicated a weight loss of 2 pounds, 0.3 BMI ($p<0.05$). The average percent reduction in weight over the six-month trial was 14.7% (male=16%, female=14.4%).

Compared to the control, statistically significant weight loss was seen (2-tailed z test: $z>1.96$; $p<0.05$) for the experimental group as a whole and both genders.

|  | TEST | MALE | FEMALE | CONTROL |
|---|---|---|---|---|
| Participants | 1436 | 181 | 1255 | 100 |
| Avg initial wt (lbs) | 208 | 217 | 207 | 218 |
| Avg initial BMI | 34.2 | 33 | 34.4 | 34.1 |
| Avg wt loss (lbs) | 30.5 | 34.8 | 29.9 | 2.0 |
| Avg final wt (lbs) | 177 | 182 | 177 | 216 |
| Avg final BMI | 29.3 | 27.7 | 29.5 | 33.8 |
| Avg monthly wt loss (lbs) | 5.1 | 5.8 | 5.0 | 0.3 |



6 Month Average Weight Loss

## CONCLUSION

The use of tastant crystals was effectively demonstrated for the promotion of weight loss.

## REFERENCES

Weight Reduction through Inhalation of Odorants, A.R. Hirsch and A. Gomez, The Journal of Neurological and Orthopedic Medicine and Surgery, Vol. 16, No. 1, 1995.

Rev 031609

**EXHIBIT H**

INTERNET ARCHIVE
WaybackMachine BETA     http://www.trysensa.com/clinical-study.htm     Go     MAR   JAN   FEB     Close
13 captures     ◄   6   ►     Help
7 Aug 08 - 6 Jan 10     2008   2010   2011

**SENSA®**
WEIGHT-LOSS SYSTEM

e-mail   password   **LOGIN**

Don't have a SENSA account? Sign up for one now! Forget your password?

MY SHOPPING BAG     TV Offer: Try Sensa FREE* ❯

| HOME | HOW IT WORKS | CLINICALLY PROVEN | IN THE NEWS | SUCCESS STORIES | SHOP | COMMUNITY |

Clinically Proven   |   About Dr. Hirsch   |   Sensa Advisory Panel

# NO OTHER WEIGHT-LOSS PRODUCT HAS SUCH EXTRAORDINARY CLINICAL RESULTS.

Over the course of 25 years, Sensa creator Dr. Alan Hirsch has conducted ongoing research on the effects of smell and taste on eating habits, ul imately leading him to spearhead one of he largest studies ever conducted on weight loss. Over a 6 month period, 1,436 women and men sprinkled scented, flavorless "Tastant" crystals on everything hey ate. Participants were instructed not to change their existing diet or exercise program.

The 1,436 people in he treatment group who completed the program lost an average of 30 5 pounds - nearly 15% of their total body weight. Those in he control group lost only 2 pounds, on average.

This was followed by a double-blind, placebo-controlled study conducted by an independent laboratory, in which participants lost 27.5 pounds and about 14% of  heir body mass, on average. Participants were instructed not to change their existing diet or exercise program. Those in the control group gained half a pound, on average.

**Sensa was proven effective in one of the largest clinical studies ever performed on a non-prescription weight-loss product.**

❯ **1,436-Person Clinical Study Results**
   OVER A 6 MONTH PERIOD



❯ **Double-Blind, Placebo-Controlled Lab Study**
   OVER A 6 MONTH PERIOD




Click here to view the 1,436-person clinical study
Click here to view the Double-Blind 3rd-party study
To learn more, go to www.SmellandTaste.org

Sign up for the
Sensa Skinny Newsletter

**TRY SENSA FREE***

CLICK HERE

**EXHIBIT I**

# In The Matter Of:

*IN RE: SENSA WEIGHT LOSS SYSTEM LITIGATION*

_____

*CHARLOTTE KIOSEA - Vol. 1*
*December 14, 2011*

_____

# *CONFIDENTIAL*

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 15

1   major in international business and minor in biology, I

2   got into toxicology, and that's how I got to work in this

3   field.  I love it, pretty much.

4        Q    Okay.  So why don't I try to come at it this

5   way.

6            You described your -- a little bit about your

7   education.

8            Where did you do your undergraduate degree?

9        A    In Bucharest, Romania.

10       Q    Bucharest, Romania.

11           And what was the name of the undergraduate

12  institution?

13       A    Okay.  I have to spell, Academia de Studii

14  Economise.

15       Q    Okay.  That's not -- it's not a name is not

16  easily translated into English?

17       A    Yes.  It's the Academy for Economical Studies.

18       Q    And you got a --

19       A    Subsection.  They had a lot -- were.  Now, it's

20  restructured.  My subsection was international business

21  and because one of the sections used part of toxicology,

22  like merciology, which is the preparedness, safety,

23  storage of every single item that comes in contact with

24  the human beings.  Then I took units in biology, so

25  that -- you know, so that's how my degree came.

Page 22

1  then these people are going to be reintegrated in a

2  modified job based on the medical report on each

3  accident.

4        It was easy to take the job because I was

5  speaking all these languages, and people that are -- I

6  don't know, know a little bit of English, do better with

7  somebody that speaks their own language.  So that's how I

8  got the job.  And I had no knowledge about labor law when

9  I got it.

10       In 1994, when I was laid off, the labor changed.

11  The Americans with Disability Law came in, the budgets

12  were restricted.  And the company I was working for

13  offered me a job in Irvine, and at that point I was

14  living in Palmdale, and it was not feasible for me.  So I

15  said better I take unemployment, if possible, which I

16  did, for about three months.  And then I managed whatever

17  job was good.

18       1994 was bad for employment.  With two kids in

19  private school and dependents over two continents, it was

20  tough, I would take anything.  So I went back to $5 an

21  hour because that is what I found.

22       Q   Doing what?

23       A   As a receptionist at a vet hospital.

24       Q   Was that still in 1994?

25       A   Yes.  And from receptionist, I got to be a

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 24

1    A    In a year, within the year.

2    Q    Around '95?

3    A    Yes.

4    Q    Okay.  And then how long did you stay at the --

5  it was the Avenue 26 Hospital?

6    A    I didn't stay long because the drive was

7  unpleasant, pretty much.  And also, I had a two-hour

8  lunch break, which was bad.  It didn't fit my work style.

9  And I was looking for anything.  Biotech, nobody wanted

10  to look at me, because I had no American experience in

11  biotechnology.  It didn't matter.

12        Applied with the City of Los Angeles until

13  kingdom come for a job.  It never came.  Police

14  department, that was my -- I like that.  And -- but I

15  couldn't take the drive anymore, it was too much.

16        So I found a job with Bertelsmann Industries in

17  Valencia.

18    Q    What year was that?

19    A    That was 1998.

20    Q    And what was your job at Bertelsmann Industries?

21    A    I was a travel agent.

22    Q    Just for the -- in-house travel agent for the

23  Bertelsmann employees?

24    A    No, no, no, no, no.  Bertelsmann was taking

25  care - I don't know if it still is - of a fidelity

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 26

1     A    Yeah, but they don't play football.

2     Q    Okay.

3     A    Anyways...

4     Q    So -- but I was not aware that there was a

5  business in 1999 that used pirates.

6     A    Oh, yes, but we are using pirates on a daily

7  basis.

8     Q    Okay.

9     A    Anyways, yeah.

10     Q    So can you tell us how that worked with the

11  pirate thing?

12     A    It worked fabulous, because from one charter

13  airline, which was this one, I ended up working with Air

14  Solomon, Air Vanua Vatu, Air Nuru.  Air Nauru, Vanua

15  Vatu, Air Solomon, Air Cameroon, Air Afrique and, of

16  course, Corsair.

17     Q    And were you working as a travel agent still?

18     A    It was a little bit more than a travel agent,

19  pretty much I was managing these airlines.  Oh, I forgot

20  Air Seychelles.

21     Q    Air Seychelles?

22          Were you managing their loyalty programs, their

23  frequent-flier programs?

24     A    They had no frequent-flier programs, they had no

25  loyalty programs.  Some of these airlines didn't have a

Page 29

1    Laboratories formally in 2003, did you have a title?

2         A   I had no title.   I was a volunteer.

3         Q   Okay.  How many people worked at BATTS

4    Laboratories at that time?

5         A   Five.

6         Q   We're talking about 2003 now, right?

7         A   Yes.

8         Q   Okay.  And there were five employees and you

9    were a volunteer?

10        A   I had no choice.  They had no money to pay me.

11        Q   Okay.  And at some point did you become more

12   than just a volunteer?  Did you get like a title at the

13   company?

14        A   Yeah, because I was --

15        Q   When did --

16        A   -- handling all the operations from cleaning the

17   floors and monitoring the construction to everything.  My

18   husband said you should probably be in charge of

19   operations, and that's what it was.

20        Q   Okay.  Was that later in 2003?

21        A   Yes.

22        Q   So you were chief of operations?

23        A   Right.

24        Q   And --

25        A   Since he had no money to pay me a salary, then

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 71

1      Q    Does Dolly work at your company?

2      A    No.   She's a paralegal.

3      Q    For whom does she work?

4      A    Oh, right now I don't know the name of the

5    company.  I know it's near Wilshire.  They do something

6    that you don't know.  They are bankruptcy, something like

7    that.

8      Q    Okay.  All right.  So it's June 2008, you're in

9    El Segundo, in Sensa's conference room, with Mr. Ressler,

10   Mr. Whittier and your daughter, and you're having a

11   meeting.

12         Who speaks first?

13     A    Who speaks first?  Don, I think, spoke first.

14   Mr. Ressler, I think, spoke first.

15     Q    Right.  And what did he say?

16     A    "I think we want to go ahead and pay for this

17   study.  We want to have a large number of participants."

18   For me, that doesn't mean a thing large.  I wanted to

19   pinpoint what would be the exit number.  I wanted to know

20   what is their schedule, how long it's going to be.

21         I always remind the participants and sponsors of

22   one thing always, keep in mind holidays, summertime,

23   outside factors that might influence.  Then we negotiate

24   a price, and we -- for me, the price is important,

25   because the more I can pay the participants, the merrier,

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 102

1    don't take it, end of story.

2         Q    Right.

3              But my question is:   Who was the person at BATTS

4    Laboratories that would take the medical history?

5         A    I was.

6         Q    Okay.  And did you have a medical history form

7    that you used to do that?

8         A    Yes.  The medical history form is a form that

9    comprises the limitation of the protocol.  It's not brain

10   surgery.  What the protocol dictates, what the creator of

11   the product wants from you, that's what you relate to the

12   participant.  And you make sure that he's not going to

13   try to be part of the study, even if he doesn't qualify.

14             And probably you are as aware of me that when

15   somebody tells you they suffer of something, and you have

16   a strong smell in the room and you can verify the smell

17   and the sense, when you are in doubt, you cannot see,

18   anybody can see that.

19             The interviewing room has three smells, always.

20   One is from the back of the lab that smells like animal

21   or very strong detergent.  Around me is my favorite

22   flavor of the day, I don't know.  And the other way is

23   the kitchen, you smell like the kitchen.  So you see

24   somebody whiffing, you know what it is.  You see somebody

25   that goes straight to the end where it smells not so

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 124

1    a big one, a huge one, I can tell you.

2    BY MR. BURSOR:

3         Q    What was your big hurdle?

4         A    We got a virus in the lab.

5         Q    During the time of the Sensa study?

6         A    In March.  It was done -- I was done with the

7    study.

8         Q    Did you do an interim report after four months

9    of the study?

10        A    I was sending them table and updates all the

11   time.

12        Q    Did you do any report that had analysis four

13   months into the study?

14             MR. RICHARDSON:  Objection as to form.

15             THE WITNESS:  Analysis?  I sent them the tables.

16   BY MR. BURSOR:

17        Q    You sent only raw data?

18        A    They were pestered, as I remember, by QVC or

19   Home Shopping Network, but one of these, and it was an

20   ongoing study.  My agreement with this company was that

21   they are provided with the data, so I sent the data.  I

22   didn't do anything that was not on the agreement, let me

23   put it this way.

24             Yeah, it's not something that you want to be

25   bothered all the time.  And I had no agreement with Home

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 125

1    Shopping Network, but my client required because they had

2    the marketing thing, so I sent to my client to do

3    whatever they want.

4              What more than that can I tell you?

5         Q    Can you tell me how you came to learn that the

6    Sensa Company was being pestered by the Home Shopping

7    Network or QVC?

8              MR. RICHARDSON:  Objection to form.

9              THE WITNESS:  I didn't say they were.  I was.  I

10   was pestered.  I didn't say they were.  I have no idea

11   what their relationship was.  But came to me like a

12   surprise, and I said you know what, it doesn't cost me a

13   thing.  I sent it.

14   BY MR. BURSOR:

15        Q    Now, QVC is also some kind of a television

16   shopping network, right?

17        A    You're asking me?

18        Q    Yeah, I'm asking you.

19        A    Yes, I presume.

20        Q    Okay.  So...

21             THE VIDEOGRAPHER:  Sorry, ma'am, you're -- thank

22   you.

23   BY MR. BURSOR:

24        Q    Were you providing data to QVC as well as the

25   Home Shopping Network?

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 130

1    pointing here to me, but these guidelines do refer to

2    this part of research.  I would love to apply what is

3    here for Sensa, but you might want to underline some

4    generalities, but does not refer to an efficacy study in

5    humans.

6            So I will never be a study director on a GLP

7    study.  I cannot be one, because my background does not

8    qualify me to be one.

9        Q    Why not?

10       A    Okay.  First of all, because I don't have the

11   experience and formal education to do GLP study in vitro

12   or in vivo.  When I do a GLP, which I do only in vitro,

13   like a safety test, which are all GLP, I have somebody

14   else working with me that is a specialist.  My part will

15   be just reviewing the math part or the chemical part or

16   the way the study takes place.

17           So, yes, I know the document.  Yes, I'm familiar

18   because I verify protocols and I do proofreading and

19   editing of final reports and SOPs, but this document

20   cannot apply to Sensa.  I'm sorry to say so.

21           If, for example, the previous tox study done on

22   the pre-efficacy test was GLP, then this document would

23   apply one hundred percent to whatever you have.  Even in

24   the opening pages and statement of the document you

25   provided me, which, again, I'm familiar of, it will

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 133

1    "study director" that would apply to a clinical study?

2         A    Yes.

3         Q    Where would one find that?

4         A    If the study is GCP, in GCP practices manual.

5         Q    Okay, you can set aside Exhibit 2.

6              Well, actually, before you set it aside, let me

7    ask you this.

8         A    Ask me.

9         Q    Do you see -- can you turn to page 207.

10        A    Sure.

11        Q    Do you see there's a heading there in bold type

12   "The role of the study director"?

13        A    Sure.

14        Q    And the first sentence underneath that says,

15   "The study director represents the single point of study

16   control" --

17        A    Yes.

18        Q    -- "with ultimate responsibility for the overall

19   scientific conduct of the study."

20             Do you see that?

21        A    Of course.

22        Q    Was that the role that you had in the Sensa

23   study?

24        A    Yes.

25        Q    So in that respect, the role of the study

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 134

1    director described here is the role that you had in

2    Sensa?

3        A    Correct.

4             MR. RICHARDSON:  Objection as to form.

5             THE WITNESS:  As to what?

6             MR. RICHARDSON:  Form.  It's just our --

7             THE WITNESS:  Oh, I'm sorry.

8    BY MR. BURSOR:

9        Q    Do you see the second full paragraph starts:

10            "In this regard, the study director

11            serves to assure that the scientific

12            administrative and regulatory aspects

13            of the study are controlled"?

14       A    Right.  I see, and that's pretty much defining

15   that you are a controller, in my case, more than a

16   scientist.

17       Q    Okay.

18       A    Because this refers, again, to a preclinical.

19       Q    So you would not describe yourself as a

20   scientist.

21       A    No.

22            MR. RICHARDSON:  Objection as to form.

23   BY MR. BURSOR:

24       Q    Okay.  And can you go down to the fourth

25   paragraph underneath "The role of the study director."

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 155

1          MR. BURSOR:  Okay.  Did you get an answer?

2     Q   So you followed GCP guidelines?

3          MR. RICHARDSON:  Objection as to form.

4          THE WITNESS:  Yes.  With the exception of hiring

5     the QA and having an IRB commission and having at least

6     five members in the IRB that are nonparticipating as

7     monitoring, supervising the study or being directly

8     involved in the study, which is exactly what the law

9     says.

10    BY MR. BURSOR:

11    Q   Okay.  I want to just -- since these were

12    followed as guidelines, I want to try to identify where

13    they were followed and where they were not.

14    A   Please.

15    Q   So can you turn to page 10.

16         Do you see there's a heading at the top of page

17    10 entitled "Institutional Review Board/Independent

18    Ethics Committee, IRB/IEC"?

19    A   I do.

20    Q   And then there are a number of sections

21    discussing the responsibilities of the IRB or IEC, right?

22    A   Also, it should include the number of members,

23    their qualifications, length of time in the field, and

24    board certifications, if I'm not wrong.

25    Q   Right.  There's a lot of requirements in here,

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 156

1    right?

2         A    Yes.

3         Q    But you didn't follow any of these because there

4    was no IRB for the Sensa study, right?

5         A    Correct, there was no IRB, because it was not

6    required to be an IRB.  So, again, I'm sorry to point out

7    to you, if this was a million-and-a-half, $2 million

8    study, it would have been in a clinic with an IRB.

9         Q    Okay.

10        A    Does it answer your question?

11        Q    Yes, it does.

12        A    Okay.

13        Q    Can you turn to page 13.

14        A    Sure.

15        Q    Do you see on page 13 a little more than half of

16   the way down there's a --

17        A    Records?

18        Q    -- heading number 4, "Investigator"?

19        A    Right.

20        Q    And there's a subheading "4.1, Investigator's

21   Qualifications and Agreements."

22             Do you see that?

23        A    Correct.

24        Q    And it begins:  "An investigator should be

25   qualified by education, training and experience to assume

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 157

1    responsibility for the proper conduct of the trial" --

2         A    Right.

3         Q    -- and it goes on.

4         A    Sure.

5         Q    You are not qualified by education, training or

6    experience to be an investigator in a clinical study.

7         A    Based on what?  On what you're telling me?

8         Q    I'm asking, is that accurate.

9              MR. RICHARDSON:  Objection as to form.

10             THE WITNESS:  Yes.  It is accurate, I have over

11   ten years of research under my belt.  I worked in

12   research overseas.  And let me tell you, I am the one

13   that is really looking over every single law or governing

14   institution that is involved in what we do in my

15   laboratory.  The fact that you disqualify me doesn't

16   affect me in any color, shape or form.

17             And, again, I have to refer to you that you

18   placed in front of me a document that is not related to

19   the efficacy study done on Sensa.

20   BY MR. BURSOR:

21        Q    Right.  But you are not a person whose

22   qualifications would meet the requirements of this

23   provision.

24             MR. RICHARDSON:  Objection as to form.

25             THE WITNESS:  Of a GCP.

Page 159

1    the Sensa study, right?

2         A    Why would it have been a qualified physician?   I

3    sound redundant, or maybe this is a technique in taking

4    deposition, but what you are showing me, again, pertains

5    an IND.   An IND, an investigation for a new drug.   This

6    is not a new drug.   This is a food supplement.

7              So I totally agree with you.   And I love this

8    little booklet, which probably first time I read it about

9    15 years ago.   I learned it by heart because I was part

10   in a clinical trial.   Okay?   It does not go to where we

11   are with Sensa.

12             I'd love to spend five days with you, but we are

13   beating a -- I'm sorry to say, a dead horse.

14        Q    Yeah.

15             My question was just:   There were no medical

16   doctors involved, right?   So this part of GCP was not

17   followed.

18             MR. RICHARDSON:   Objection as to form.

19             THE WITNESS:   No.   Did you see a signature of a

20   medical doctor on my report?

21   BY MR. BURSOR:

22        Q    I did not.

23        A    Thank you.

24        Q    Right.

25             Okay.   Let me ask you to turn to page 17.

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 185

1    person that I talked to when I worked with this company

2    that is now Sensa Company, or something like that,

3    because people failed to let me know.

4            Intelligent Beauty was the name of this company

5    at that time.

6    BY MR. BURSOR:

7        Q   Can you turn to page 2, please.

8        A   Yes, please.

9        Q   Do you see that there's a heading "Abstract" at

10   the top of the page?

11       A   Yes.

12       Q   And it begins by saying, "A total of 78 normal

13   healthy volunteers were randomly divided between a

14   placebo control group" --

15       A   Yes.

16       Q   -- "and a test article group."

17       A   Yes.

18       Q   And you give an end of 32 for the placebo group

19   and 46 for the test group?

20       A   Yes.

21       Q   Were there -- how many patients were enrolled in

22   the study?

23           MR. RICHARDSON:  Objection to form.

24           THE WITNESS:  I think we had, initially, after

25   the advertising, 305.  And then more than half were

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 195

1   making more money, even the one that skipped.  But this

2   one, the one that you have here are the ones that

3   accepted money in the end.  I don't know what happened

4   with the drop-off, but no money came to them, so probably

5   they came for the money.  What do I know?

6           So you have them all?

7       Q   Okay.  Now, let me ask you this.

8           Second paragraph of the abstract.

9       A   Uh-huh.

10      Q   I want to look at the same statement again and

11   ask you a different question about it.  Okay?

12          So the second paragraph begins:

13          "At the request of the sponsor, the

14          study was continued 60 days with the

15          same subjects continuing to

16          self-administer either the test

17          article or a placebo.  A total of 81

18          subjects completed this extension (n

19          equals 47 and 32 for the placebo and

20          test article groups respectively)."

21          Do you see that?

22      A   Yes.

23      Q   Can you add 47 and 32?

24      A   79.

25      Q   What happened to the other two people?  Were

Merrill Corporation - San Francisco

800-869-9132                                www.merrillcorp.com/law

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 196

1    they in some group other than placebo or test?

2         A   No.  I have no idea.

3         Q   Does it look like there's a mistake there?

4         A   There definitely is.  That's why you should have

5    a QA, always, when you do a test and it's supposed to be

6    clinical, and it's more expensive and people don't want

7    to do it.

8         Q   All right.  But you didn't have that here, did

9    you?

10        A   No, I didn't.

11        Q   Because the sponsor wouldn't pay for it, right?

12            MR. RICHARDSON:  Objection to form.

13            THE WITNESS:  Yes.

14            MR. RICHARDSON:  You've asked the same question

15   six or eight times.

16            THE WITNESS:  He likes that question.

17   BY MR. BURSOR:

18        Q   So we know that this 47 plus 32 is 79.

19        A   Right.

20        Q   That still doesn't match up to the 78 in the

21   first paragraph.

22        A   Right.

23        Q   Do you know how many people completed the study?

24        A   I presume 78.

25        Q   If we wanted to know how many people actually

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 209

1       Q   Was your husband or your daughter --

2       A   My daughter.

3       Q   -- a participant in the study?

4       A   Yeah.  I even paid her.  She was huge.

5       Q   So your daughter was a participant.

6           Was your husband also a participant?

7       A   No.  He refused.  He took it with me when I

8   tried before the study the product, during my vacation.

9   And for me, I mean, it cut me completely out of the

10  world.  I cannot afford to lose much weight.  His

11  response started after about ten days mildly, and then he

12  said he doesn't want to be part of anything.

13      Q   So was your daughter -- what is your daughter's

14  name?

15      A   Dolly.

16      Q   Was Dolly one of the 78, or however many that

17  completed the study?

18      A   Oh, she went all the way, yes.

19      Q   Do you know if Dolly was a member of the placebo

20  or the test group?

21      A   I think she was on the test group.  Yeah, she

22  must have been on the test group.  But my daughter, you

23  know, she could have been also on the placebo here

24  (indicating).  If the motivation gets here (indicating),

25  you can give her water and she will.

1    label.  I could taste only the strawberry, the rest I

2    couldn't sense.

3        Q   So you were able to taste the flavor of the

4    Sensa crystals?

5        A   On only one of them.

6            MR. RICHARDSON:  Objection to form.

7            THE WITNESS:  But I'm a smoker, so my sense of

8    taste and smell is not one hundred percent.  But I did

9    sense strawberry.

10   BY MR. BURSOR:

11       Q   And then the next sentence continues, it says:

12   "The test will," and then there are a series of bullet

13   points.

14           Do you see that?

15       A   Yeah.

16       Q   And the last bullet point says:  "Perform clinic

17   controlled weighing processes."

18           Do you see that?

19       A   Right.

20       Q   Where was the clinic?

21       A   Well, if I would have said performed human

22   control weighing process, it doesn't sound the way it's

23   supposed to sound.  Again, normally, whenever you test a

24   product for efficacy or whatever else in humans, it's

25   called clinical, quotation marks, if you want.

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page  223

1        It's a little bit offensive to say animals and

2   humans pretty much -- I mean, you treat them as

3   volunteers, not as test subjects.  It's part of the

4   efficacy of what you do, not to treat them like garbage.

5        Q   Okay.  So even though there's a reference to

6   clinic here, there was no clinic involved in this study,

7   right?

8            MR. RICHARDSON:  Objection as to form.

9            THE WITNESS:  Of course, not.

10   BY MR. BURSOR:

11        Q   Can you turn to page 3, please.

12        A   Yes.

13        Q   Do you see a little bit below the -- halfway

14   down the page, there's a heading called:  "Test Materials

15   Evaluations Prerequisite."

16            Do you see that?

17        A   Yes.

18        Q   And it says:  "All test materials must comply

19   with FDA regulations for human consumption and

20   ingestion."

21        A   Right.

22        Q   "All ingredients of both tastant product and

23   placebo must be compliant with the Code of Federal

24   Regulations Policy as described."

25            Do you see that?

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 235

1              Do you see that?

2        A    Correct.

3        Q    Are they available at your premises?

4        A    Yes, for two and a half years.

5        Q    Okay.  And what happened to them after two and a

6    half years?

7        A    They are destroyed.  I waited six months post

8    what I was supposed to destroy.

9        Q    When were they destroyed?

10       A    All the hard copies, I think in April or May.

11       Q    Of this year?

12       A    May.  Yeah.  I have a shredder.  That's where

13   they go.  Afterwards, they go to my cats as cat litter.

14   So nobody has access to who was who, when, how fat, how

15   slim, how happy, how angry, what they wrote in their

16   personal journal.  Nothing goes to the press, the

17   Internet, nothing.  Otherwise, if I don't shred them, who

18   knows who go through the garbage.

19             I had my identity stolen four times.

20       Q    Okay.  If you turn to page 5.

21             Do you see there's a heading, "Demographics"?

22       A    Right.  It's compulsory.  It was.  Now it's no

23   longer compulsory.

24       Q    And then it says:  "Number of participant

25   enrolled," and you have "100."

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 236

1          Do you see that?

2      A   Right.  That's what I recalled a little bit,

3   about two hours ago.  I said it must have been about one

4   hundred.

5      Q   Okay.  And do you think that number is accurate?

6      A   Probably.

7      Q   Did you change it in the final report to 83?

8      A   As enrolled?

9      Q   Yeah.

10         MR. RICHARDSON:  Objection to form.

11         THE WITNESS:  I don't remember.

12   BY MR. BURSOR:

13     Q   All right.

14     A   Could have, should have, I don't know.

15     Q   What would be the reason for changing that

16   number between this February 18 report and the March 9

17   report?

18     A   You go to counting all those tables on the Excel

19   file a gazillion times, you have to make sure.  That's

20   why you have one, two, three, four, five, because you

21   look for mistakes constantly.  God knows, I cannot hire

22   more than what I did for this study because the money was

23   not there.  So I corrected what I saw.

24         I know for sure I had something like around one

25   hundred.  Usually about 15, 20 percent drop off, but you

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 242

1          The fourth bullet under "Procedure," do you see

2     where it says:   "Monthly clinic visits will be required

3     for all participants for on-site weight measurements,

4     review with study organizers"?

5          Do you see that?

6     A   Right.

7     Q   Where were the monthly clinic visits?

8     A   Well, here it should have been laboratory.

9     Q   So it should have been monthly laboratory

10    visits --

11    A   Right.

12    Q   -- because there was no clinic?

13    A   No clinic, right.

14    Q   And then if we go down --

15    A   You want to know why it's identical of similar

16    clothing?

17    Q   No.  I want to ask you about the photography

18    that will be performed on day zero, day 90 and day 180

19    front and side.

20         Do you see that?

21    A   Right.  That was a proposal that was done.  We

22    did the pictures, front and side, and ultimately they

23    were not used or attached to the report because the

24    sponsor didn't want to use it.  The reason behind it is

25    that not everybody is losing weight in the same areas.

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 250

 1      Q    And it says:  "One participant had an unplanned

 2    pregnancy drop-off."

 3           Do you see that?

 4      A    Right.  She got pregnant.

 5      Q    "Two participants received out-of-state offers

 6    of employment"?

 7      A    Yes.

 8      Q    And they dropped out, right?

 9      A    Yes, because the idea of sending me the

10    information constantly -- that was very early.

11      Q    And then:

12           "Four participants called to withdraw

13            from the study because they couldn't

14            see any weight loss and realized that

15            either they are part of placebo or the

16            test product has no effect on them."

17      A    Uh-huh.

18      Q    Do you see that?

19      A    Yes.

20      Q    All right.  So that's seven dropouts?

21      A    Yes.

22      Q    Is that how many dropouts there were?

23      A    That's the one that I noted, so I presume.

24      Q    Is that an important thing to keep track of, how

25    many people drop out?

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 251

1      A   The important thing is that a drop out due to

2   adverse effect might occur.  A lot of studies don't even

3   mention.  But if somebody disappears, you know, and close

4   to the end of the study, they have to have a reason.

5   What is important is your end number.

6      Q   Do you --

7      A   But the moment you mention dropout, you have to

8   say why.  If I had dropouts that disappeared completely

9   and didn't want to be called or didn't respond, then

10  those I have no -- nothing on them.

11     Q   You don't think it would be significant to note

12  the number of dropouts?

13     A   Sure, it would be significant.

14     Q   Okay.

15     A   On a GCP study, absolutely.  Here --

16     Q   What --

17     A   Hmmm?

18     Q   What was the number of the --

19         MR. RICHARDSON:  I'm not sure she was finished.

20  BY MR. BURSOR:

21     Q   Oh, go ahead.  I'm sorry.

22     A   I'm done.

23         MR. RICHARDSON:  Okay.

24  BY MR. BURSOR:

25     Q   Well, what was the number of dropouts in this

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 263

1  I'm just interested in the communications, for right now,

2  with Home Shopping Network or QVC.  Did you look for

3  those?

4      A   I looked for everything, because I really -- I

5  don't enjoy this.  And I came here very happy because it

6  was funny, but right now, pushing me to remember stuff

7  that I don't, it's not pleasant, number one.

8          Number two, yeah, there were mistakes, okay.  I

9  didn't verify the data because I didn't have it anymore.

10  I might be an idiot, nonqualified, and not a scientist to

11  do this test, but there were so many entities around me

12  that didn't see the mistakes, I wonder who in QVC, in my

13  report, didn't see the mistakes.

14          So I really would like to know what, in fact, do

15  you want for me, straightforward, because I don't know,

16  and I'm very tired, and I'm looking at six hours of work

17  at the bench now.

18      Q   Well, I just want to try to see if we can find

19  the e-mails that go back --

20      A   I would have been more than happy to give you

21  everything and be left in peace.  If I had it, you would

22  have had it.  Whatever I had, I gave to the sponsor, what

23  was not destroyed.  Should I have more or find more when

24  I'm doing my annual review for the NIH, because I have to

25  do it and go in the storage, my pleasure, I will forward

Page 269

1    having nothing in it, and I forgot that I made a folder

2    like that.

3              I made a Sensa 180 because it was 180 days, 180

4    days.

5         Q    Now, is Dolly Kiosea - sorry, Kiosea - is that

6    your daughter who was also a participant in the study?

7         A    Yes.

8         Q    Did she also do work on the study?

9         A    Yeah.  When the study was done, she helped me

10   with the calculation of the statistical data prior to

11   sending it to the guy that is a specialist.

12        Q    And she then had communications with the sponsor

13   about the calculations, right?

14        A    Yeah.  Prior to sending the calculations to the

15   sponsor, I had to tell them Dolly is going to help me.

16   Plus, I think she knows a little better to express

17   herself in English than myself, considering all her

18   schooling was here.

19        Q    And Dolly is employed as a paralegal now?

20        A    Uh-huh, yes.

21        Q    Did she have training in statistics?

22        A    Yes.

23        Q    And what's her educational background?

24        A    She has a degree in social studies and she has

25   another degree in political sciences, and now she's

CONFIDENTIAL
CHARLOTTE  KIOSEA - 12/14/2011

Page 282

1      A   Yes.

2      Q   And do you see in the body of -- do you see

3    where it shows that it's from Mr. Richardson?

4      A   I see on the top, because it's encrypted in the

5    bottom.

6      Q   Yeah, I'm not sure why that bottom part is

7    garbled, but I'm only asking you about the top e-mail.

8      A   Yes.

9      Q   And do you see Mr. Richardson said:

10           "Tim, as I mentioned yesterday, I

11           understand from Charlotte Kiosea that

12           her computer crashed due to a virus in

13           2009 and that most of BATTS' files

14           regarding the Sensa study were lost as

15           a result."

16           Do you see that?

17     A   I do.

18     Q   Were most of BATTS' files regarding the Sensa

19   study stored on your laptop computer?

20           MR. RICHARDSON:  Objection as to form.

21           THE WITNESS:  That's what I was using.  I using

22   one -- I don't know if it was -- I think it was my laptop

23   because that's what I was carrying with me.  Usually I

24   work from home or in the car, whenever I get the chance.

25   The problem is that that died, and I lost it.

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 313

1    But usually --

2        Q    Thank you.

3        A    -- when I get something from her, I ask her,

4    because at that time was working over there and helping

5    me out.  I said, "I don't know."

6        Q    So if I understand you correctly, you're saying

7    your daughter performed the statistical analysis of the

8    data?

9        A    Some preliminary.  Some preliminary, yes.

10       Q    Which was subsequently verified by Mr. Munoz?

11       A    Yes, sir.

12            MR. RICHARDSON:  Objection to form.

13   BY MR. MAYA:

14       Q    Can you explain how that -- what -- how did that

15   happen?

16       A    Well, all these tables, every data that is

17   entered there, you -- first, you take at the end of the

18   study, everybody.  You divide one more time everybody

19   into active and placebo.  Then there is one more person

20   that verify the split on the participants, and then you

21   have to perform the statistical analysis that is going

22   on.

23            The first thing you do, you do an average.

24       Q    Okay.

25       A    But you do --

CONFIDENTIAL
CHARLOTTE KIOSEA - 12/14/2011

Page 327

1       A   I think Martha was.   The rest of them, I don't

2   know.   I know Jackie refused due to husband.

3       Q   Did your daughter ever give a testimonial for

4   Sensa?

5       A   Oh, yes.   She landed a husband after Sensa.   She

6   was happy.

7       Q   Did she give a testimonial to Sensa, the

8   company, for them to use in advertising or otherwise?

9       A   Yes, she did.

10       Q   She did?

11       A   Yeah.   I can show you pictures before and after.

12   Non-advertised.

13       Q   Moving on, let's flip in that Exhibit 5 to page

14   27.

15       A   7.   Got it.

16       Q   Actually, let's skip on -- well, beginning here,

17   it appears that there's a number of -- can you tell me

18   what, generally, these and the following pages reflect.

19       A   Oh, that's a questionnaire at the end of the

20   study.

21       Q   And --

22       A   In lieu of going through the diaries or the

23   notes that people -- it was a huge amount of work.   I

24   think Sensa was preparing a campaign, and they wanted it

25   to be done.   I don't remember exactly, but must be

**EXHIBIT J**



http://www.sensa.com/advisory-panel.htm   Go

WaybackMachine

6 captures
16 Jan 13 - 15 Nov 13

JAN  APR  JUN  Close
◄  **30**  ►   Help
2012  2013  2014




SENSA®
WEIGHT-LOSS SYSTEM

EMAIL SIGN-UP | LOGIN | SHOPPING CART: 0 Items

🏠   HOW IT WORKS ⌄   SUCCESS STORIES ⌄   OUR FOUNDER   **MEDICAL ADVISORS**   PRESS   🛒 SHOP ⌄   👥 mySENSA

# SENSA® MEDICAL ADVISORY BOARD

The SENSA® Medical Advisory Board consists of leading medical doctors from across the country who provide independent counsel on a range of health and weight-loss related issues. Each member brings extensive knowledge of obesity and its related issues to our program.



### Hilton Hudson II, M.D.
Chief of Cardiothoracic Surgery



Dr. Hudson is concerned about he growing epidemic of obesity and its negative effect on heart heal h. He has dedicated his life's work to providing underserved communities wi h the information hey need to live long, healthy lives. READ MORE

### Carl M. Wahlstrom, Jr., M.D.
Board-Certified Psychiatrist



In his private prac ice, Dr. Wahlstrom specializes in the treatment of a wide variety of mental conditions, including eating disorders. He is par icularly interested in he evolutionary drive to overeat. READ MORE

### Nancy Zamora, M.D.
Board-Certified Internist



Dr. Zamora has observed a correlation between he increase in obesity and he rise in weight-related condi ions and diseases. She believes that portion control is one of the best ways to successfully achieve long-term weight loss. READ MORE

### Jason Gruss, M.D.
Physician Specializing in Bariatric Medicine



As a prac itioner of bariatric medicine, Dr. Gruss is concerned about the growing obesity epidemic and its nega ive impact on the musculoskeletal system as well as mobility. READ MORE

### Richard Bone, M.D.
Board-Certified Gastroenterologist



Dr. Bone has observed that weight loss may help eliminate non-alcoholic fatty liver disease. In addition, he has found that obesity can lead to an increased risk of diabetes, hypertension and heart disease. READ MORE

### Sanford Sherman, M.D.
Neurologist and Stroke Program Director



As a neurologist, Dr. Sherman has observed the connec ion between weight and stroke prevention. He has no iced that many weight-related conditions such as Type 2 diabetes, high blood pressure and high cholesterol are factors hat can lead to stroke and cogni ive impairments. READ MORE

### Paul Jones, M.D.
Chairman of Department of Cardiovascular Services



Dr. Jones has observed the alarming prevalence of obesity and its adverse impact on the cardiovascular system. Insulin resistance, sleep apnea, hypertension and heart disease are all potentially obesity-related cardiovascular conditions. READ MORE


CONNECT

**Community**
Forums
Groups
Meal Plan
Tools & Calculators
Blog
Facebook
Twitter
YouTube
Newsletters

**About SENSA®**
How the Free Trial Works
Shop
SENSA® Quench
How It Works
Success Stories
Doctor Formulated
Press
FAQ
Sensa Reviews

**Company**
Contact Us
Get Help
My Account
Corporate Wellness
Site Map
Privacy Policy
Terms of Use



TRY SENSA® FREE*

**CLICK HERE ❯**

Sensa Weight Loss | Lose Weight with Sensa



FACEBOOK

TWITTER



YOUTUBE
BLOG
MOBILE

SENSA® advocates a healthy lifestyle wi h regular exercise and por ion control.
*30 day free trial period with satisfaction guarantee. Shipping and handling fees apply.
**Compensated for excellent results.
† In one of the largest studies ever conducted on a non-prescription weight-loss
system, 1436 men and women lost an average of 30.5 pounds in just 6 mon hs.
© SENSA Products, LLC. All Rights Reserved 2012
Manhattan Beach, CA 90245-4967   |   (866) 514-2554






**EXHIBIT K**

FILED

NOV 20 2012

ALEX CALVO, CLERK
BY DEBORAH ROJAS
DEPUTY, SANTA CRUZ COUNTY

1   BOB LEE, DISTRICT ATTORNEY
2   Kelly Walker, Assistant District Attorney
    State Bar Number 95538
3   County of Santa Cruz
    701 Ocean Street, Room 200
4   Santa Cruz, CA  95060
5   Tel: (831) 454-2559
    Fax:  (831) 454-2227
6
7   (For list of additional plaintiff's counsel,
    see attached Exhibit 1)
8
9   Attorneys for Plaintiff

10              SUPERIOR COURT OF CALIFORNIA

11            IN AND FOR THE COUNTY OF SANTA CRUZ

12   PEOPLE OF THE STATE OF CALIFORNIA,   )   CASE No.   CV 175 655
13                                        )
14                            Plaintiff,  )   STIPULATION FOR ENTRY
                                          )   OF FINAL JUDGMENT
15   vs.                                  )
                                          )   BY F of
16                                        )
17   SENSA PRODUCTS, LLC, a Delaware Limited )
     Liability Company, INTELLIGENT BEAUTY )
18   INC., a Delaware corporation.        )
                                          )
19                                        )
                             Defendants.  )
20                                        )
21   _____  )

22       Plaintiff, the People of the State of California, appears through its attorneys:  Bob

23   Lee, District Attorney of Santa Cruz County, by Kelly J. Walker, Assistant District Attorney;

24   Nancy E. O'Malley, District Attorney of Alameda County, by Scott D. Patton, Deputy

25   District Attorney; Edward S. Berberian, District Attorney of Marin County, by Andres H.

26   Perez, Deputy District Attorney; Dean Flippo, District Attorney of Monterey County, by

27   John F. Hubanks, Deputy District Attorney; Gary Lieberstein, District Attorney of Napa

28   County, by Catherine Borsetto, Deputy District Attorney; Tony Rackauckas, District

29   Attorney of Orange County, by Tracy E. Hughes, Deputy District Attorney; Jeffrey F. Rosen,

                                    1

District Attorney of Santa Clara County, by Yen B. Dang, Deputy District Attorney; Donald

A. du Bain, District Attorney of Solano County, by Diane M. Taira, Deputy District

Attorney; and Jill R. Ravitch, District Attorney of Sonoma County, by Matthew T. Cheever,

Deputy District Attorney.

Defendants, Sensa Products, LLC, a Delaware limited liability company, with its

principal place of business at 2301 Rosecrans Avenue, Suite 1150, El Segundo, CA 90245,

Intelligent Beauty, Inc., a Delaware corporation, with its principal place of business at 2301

Rosecrans Avenue, Suite 5100, El Segundo, CA 90245, appear through their attorneys, Mitchell

Silberberg & Knupp, LLP, by Jeffrey L. Richardson, Seth E. Pierce, and Valentine Shalamitski.

**IT IS HEREBY STIPULATED** and agreed as follows:

1. That the proposed Final Judgment, a copy of which is attached hereto as Exhibit A, and by this reference made a part hereof, may be entered in the above-entitled matter and that said entry of judgment may be ordered by a Judge of the Superior Court.

2. That defendants acknowledge that they have been represented by legal counsel throughout the negotiations which preceded the execution of this stipulation, and that they have executed this stipulation with the consent and on the advice of such counsel.

3. That defendants hereby waive the right to appeal, to attempt to set aside or vacate, or otherwise to attack, directly or collaterally, the attached proposed judgment between the People and the defendants entered pursuant to this stipulation.

4. That nothing in this stipulation shall be construed as or deemed to be an admission by defendants of any unlawful conduct by defendants or their affiliates and the defendants expressly deny liability of any kind whatsoever.

5. That the limited liability company defendant agrees to be bound as of the date of its officer's signature on this stipulation, the corporate defendant agrees to be bound as of the date of its officer's signature on this stipulation, by the provisions of the proposed judgment as though ordered by the Court, and defendants, and each of them, waive any further notice or service of this Final Judgment.

6. That the filing of this Stipulation and Final Judgment may be made by the ex-parte

2

1  appearance of plaintiff without notice to defendants.

2        7.  That this stipulation may be signed by counsel and by the parties in counterpart.

3

4  For the People:

5  Date: 11/8/12

6                                              Bob Lee
                                               Santa Cruz County District Attorney

7

8  By: _____

9                                              Kelly J. Walker
                                               Assistant District Attorney

10

11  Date: 11/9/2012

12                                             Nancy E. O'Malley
                                               Alameda County District Attorney

13

14  By: _____

15                                             Scott D. Patton
                                               Deputy District Attorney

16

17  Date: 11/8/12

18                                             Edward S. Berberian
                                               Marin County District Attorney

19

20  By: _____

21                                             Andres H. Perez
                                               Deputy District Attorney

22

23

24  Date: 11/15/12

                                               Dean Flippo
25                                             Monterey County District Attorney

26

27  By: _____

28                                             John F. Hubanks
                                               Deputy District Attorney

29

                                       3

Dated: 11·8·2012

Gary Lieberstein
Napa County District Attorney

By: _____
Catherine Borsotto
Deputy District Attorney

Date: 11/15/12

Tony Rackauckas
Orange County District Attorney

By: _____
Tracy E. Hughes
Deputy District Attorney

Date: 11/8/12

Jeffrey F. Rosen
Santa Clara County District Attorney

By: _____
Yen B. Dang
Deputy District Attorney

Dated: _____

Donald A. du Bain
Solano County District Attorney

By: _____
Diane M. Taira
Deputy District Attorney

4

Dated: 11-5-2012

Gary Lieberstein
Napa County District Attorney

By: _____
Catherine Borsetto
Deputy District Attorney

Date: _____

Tony Rackauckas
Orange County District Attorney

By: _____
Tracy E. Hughes
Deputy District Attorney

Date: 11/8/12

Jeffrey F. Rosen
Santa Clara County District Attorney

By: _____
Yen E. Dang
Deputy District Attorney

Dated: 11/13/12

Donald A. du Bain
Solano County District Attorney

By: _____
Diane M. Taira
Deputy District Attorney

4

Dated: 11/8/12

Jill R. Ravitch
Sonoma County District Attorney

By: Matthew T. Cl
Matthew T. Cheever
Deputy District Attorney

For Defendants:

Dated: 11/8/12

Sensa Products, LLC, a Delaware limited
liability company, Defendant

By: Brett Brewer, CEO

Dated: _____

Intelligent Beauty, Inc., a Delaware
corporation, Defendant

By: _____
Matt Fojut, General Counsel

Dated: _____

Mitchell Silberberg & Knupp, LLP
Attorneys for Defendants

By: _____
Jeffrey L. Richardson

5

1

2  Dated: 11|8|12

3

4

5  By: _Matthew T. Ch_____

6  Matthew T. Cheever

7  Deputy District Attorney

8  For Defendants:

9

10  Dated: _____

11

12  By: _____

13  Brett Brewer, CEO

14

15

16  Dated: 11/09/12

17

18  By: _Matt Fojut_____

19  Matt Fojut, General Counsel

20

21  Dated: _____

22

23  By: _____

24  Jeffrey L. Richardson

25

26

27

28

29

Jill R. Ravitch
Sonoma County District Attorney

Sensa Products, LLC, a Delaware limited
liability company, Defendant

Intelligent Beauty, Inc., a Delaware
corporation, Defendant

Mitchell Silberberg & Knupp, LLP
Attorneys for Defendants

5

1

2    Dated: 11/8/12                          Jill R. Ravitch
                                             Sonoma County District Attorney
3

4

5                                            By: _____
6
                                             Matthew T. Cheever
7                                            Deputy District Attorney

8    **For Defendants:**

9

10   Dated: _____                       Sensa Products, LLC, a Delaware limited
11                                           liability company, Defendant

12
                                             By: _____
13                                           Brett Brewer, CEO

14

15

16   Dated: _____                       Intelligent Beauty, Inc., a Delaware
17                                           corporation, Defendant

18                                           By: _____
19                                           Matt Fojut, General Counsel

20

21   Dated: 11/8/12                          Mitchell Silberberg & Knupp, LLP
22                                           Attorneys for Defendants

23
                                             By: _____
24                                           Jeffrey L. Richardson
25                                                              Bar
26                                                              167274

27

28

29

                                    5

EXHIBIT A

1  BOB LEE, DISTRICT ATTORNEY
2  Kelly Walker, Assistant District Attorney
3  State Bar Number 95538
   County of Santa Cruz
4  701 Ocean Street, Room 200
   Santa Cruz, CA 95060
5  Tel: (831) 454-2559
6  Fax: (831) 454-2227

7  (For list of additional plaintiff's counsel,
8  see attached Exhibit 1)

9  Attorneys for Plaintiff
10
11              SUPERIOR COURT OF CALIFORNIA
12           IN AND FOR THE COUNTY OF SANTA CRUZ
13  PEOPLE OF THE STATE OF CALIFORNIA,      ) CASE No.
                                            )
14                            Plaintiff,    ) FINAL JUDGMENT
15  vs.                                     ) PURSUANT TO STIPULATION
                                            )
16                                          )
    SENSA PRODUCTS, LLC, a Delaware Limited )
17  Liability Company, INTELLIGENT BEAUTY INC., )
18  a Delaware corporation.                 )
                              Defendants.   )
19                                          )
                                            )
20  ─────────────────────────────────────  )

21       Plaintiff, the People of the State of California, appears through its attorneys:  Bob Lee,
22  District Attorney of Santa Cruz County, by Kelly J. Walker, Assistant District Attorney; Nancy
23  E. O'Malley, District Attorney of Alameda County, by Scott D. Patton, Deputy District Attorney;
24  Edward S. Berberian, District Attorney of Marin County, by Andres H. Perez, Deputy District
25  Attorney; Dean Flippo, District Attorney of Monterey County, by John F. Hubanks, Deputy
26  District Attorney; Gary Lieberstein, District Attorney of Napa County, by Catherine Borsetto,
27  Deputy District Attorney; Tony Rackauckas, District Attorney of Orange County, by Tracy E.
28  Hughes, Deputy District Attorney; Jeffrey F. Rosen, District Attorney of Santa Clara County,
29  by Yen B. Dang, Deputy District Attorney; Donald A. du Bain, District Attorney of Solano

6

1  County, by Diane M. Taira, Deputy District Attorney; and Jill R. Ravitch, District Attorney of
2  Sonoma County, by Matthew T. Cheever, Deputy District Attorney.

3      Defendants, Sensa Products, LLC, a Delaware limited liability company, with its
4  principal place of business at 2301 Rosecrans Avenue, Suite 1150, El Segundo, CA 90245,
5  Intelligent Beauty, Inc., a Delaware corporation, with its principal place of business at 2301
6  Rosecrans Avenue, Suite 5100, El Segundo, CA 90245, (hereinafter "Defendants"), appear
7  through their attorneys, Mitchell Silberberg & Knupp, LLP, by Jeffrey L. Richardson, Seth E.
8  Pierce, and Valentine Shalamitski.

9      It appears to the Court that the parties hereto have stipulated and consented to the entry
10  of this Final Judgment without the taking of proof and without this Final Judgment constituting
11  evidence or an admission by Defendants regarding any issue of fact alleged in the complaint,
12  and with Defendants denying any wrongdoing or liability alleged therein, and with the People
13  having agreed that this Final Judgment shall not be used in any action or proceeding as
14  evidence or an admission by Defendants of any wrongdoing or liability or of any fact alleged in
15  the complaint, and the Court having considered the matter and the pleadings, and good cause
16  appearing therefore,

17      **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

18

19                                    **I. INTRODUCTION**
20      1. In this action, the People filed a civil complaint (the "Complaint") in Santa Cruz
21  County Superior Court against Defendants. The Complaint alleges that Defendants engaged in
22  unfair competition, as defined in Business and Professions Code Section 17200, and engaged in
23  violations of Business and Professions Code Section 17500. Defendants deny these allegations.

24

25                                    **II. JURISDICTION**
26      2. Pursuant to the parties' stipulation, this Court has jurisdiction over Defendants and the
27  subject matter of this action.

28                                    **III. APPLICABILITY**
29      3. The provisions of this Final Judgment are applicable to Defendants, and to each of

7

them, and to all of their agents, servants, employees, representatives, officers, directors, managers, members, principals, successors and assigns, and to any and all persons, employees, corporations, and other entities who are acting in concert or participating with Defendants.

4. The following phrases in this Final Judgment have the meaning set forth below:

(A)    "COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE" means tests, analyses, research, studies, or other evidence based upon the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the scientific community to yield accurate and reliable results.

(B)    "NUTRITIONAL SUPPLEMENT" means a food or dietary supplement (as defined in 21 USC §321 (ff)) sold, offered for sale or distributed to consumers by Defendants.

(C)    "ESSENTIALLY EQUIVALENT PRODUCT" means a product that contains the identical ingredients, except for inactive ingredients (e.g., binders, colors, fillers, excipients), in the same form and with the same route of administration (e.g., orally, sublingually), as the dietary supplement or food for which Defendants are making claims.

## IV. INJUNCTION

5. Beginning no later than 90 days after entry of the Judgment, Defendants, in connection with the manufacturing, labeling, advertising, offering for sale, sale, or distribution of any NUTRITIONAL SUPPLEMENT, are hereby permanently enjoined and restrained, pursuant to Business and Professions Code §§17203 and 17535, from engaging in, directly or indirectly, any of the following acts or practices:

(A)    Violating any of the provisions of Health and Safety Code §§110760, 110675, and/or 110770, which provisions relate to the manufacturing, selling, delivering, proffering for delivery, holding, advertising or offering for sale any NUTRITIONAL SUPPLEMENT that is misbranded;

(B)    Except as set forth in Subparagraphs E and F, below, making and/or disseminating any representation, either directly or indirectly, about the effects, efficacy, or safety of any NUTRITIONAL SUPPLEMENT unless at the time of

8

making and/or disseminating such representation, it is true, not misleading, and Defendants already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE that substantiates such representation;

(C)    Making and/or disseminating any representation, either directly or indirectly, that misrepresents the existence, contents, validity, results, conclusions, or interpretations of any test, study or research relied upon that substantiates such representation;

(D)    Making and/or disseminating any representation in the form of a testimonial in violation of any of the provisions of 16 C.F.R §255.2(a); 16 C.F.R. §255.0(b); 16 C.F.R. §255.1(A); and/or 16 C.F.R. §255.1(C);

(E)    Making and/or disseminating any representation, either directly or indirectly, that any NUTRITIONAL SUPPLEMENT: (1) causes, assists, or contributes to weight loss and/or fat loss; (2) causes, assists, or contributes to a reduction, control of or suppression of appetite; and/or (3) causes, assists, or contributes to an increase in metabolism and/or fat burning; unless, at the time of making and/or disseminating such representation, it is true, not misleading, and Defendants already have in their possession and rely upon COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE – concerning the NUTRITIONAL SUPPLEMENT, or on an ESSENTIALLY EQUIVALENT PRODUCT for which the claims are being made and/or disseminated –that substantiates such representation;

(F)    Making and/or disseminating any representation, either directly or indirectly, that the health benefits, performance, efficacy, safety or any aspect of any NUTRITIONAL SUPPLEMENT has been clinically proven or clinically tested, unless, at the time of making or disseminating such representation, it is true and not misleading, and Defendants already have in their possession and rely on COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE – that includes at least one adequate and well-controlled human clinical study that is randomized, double-blind, placebo-controlled, and conducted by persons qualified by training

9

and experience to conduct such study performed on the NUTRITIONAL
SUPPLEMENT, or on an ESSENTIALLY EQUIVALENT PRODUCT for
which the claims are being made and/or disseminated – that substantiates such
representation.

(G)   Enrolling any customer in any automatic shipment program without first
providing the customer with a clear and conspicuous disclosure of the customer's
obligation under the program, and obtaining the customer's affirmative consent
to the agreement to enroll the customer in the program and assume the
obligations of the program at the time the automatic shipment program is ordered
by the customer.

(H)   Violating Civil Code §1584.5, which provides in pertinent part, no person,
firm, partnership, association, or corporation, or agent of employee thereof, shall,
in any manner, or by any means, offer for sale of goods, wares, merchandise, or
services, where the offer includes the voluntary and unsolicited sending or
providing of goods, wares, merchandise, or services not actually ordered
requested by the recipient, either orally or in writing.  The receipt of any goods,
wares, merchandise, or services shall for all purposes be deemed an
unconditional gift to the recipient who may use or dispose of the goods, wares,
merchandise, or services in any manner he or she sees fit without any obligation
on his or her part to the sender or provider.

(I)   Continuing to bill after shipping direct sale products to a customer after a
customer's request has been made, consistent with California law and the
instructions on Defendants' website or with the ordered products, to be taken off
Defendants' shipping list or to cancel the customer's continuity order; provided
however, if Defendant reverses such billing, within 30 days, the billing shall not
constitute a violation of this paragraph.

(J)   Advertising a refund or return policy unless Defendants also clearly and
conspicuously discloses in close proximity to the policy any and all exclusions to
the policy. A clear and conspicuous copy of the refund policy shall also be

10

included in the packaging with all shipments of direct sale products to customers by Defendants or shall be readily and easily available on Defendants' Websites.

(K)  Willfully failing to abide by any term of Defendants' advertised refund policy.

6.  Any amended statute or regulation, successor statute or regulation or renumbered statute or regulation will have the same force and effect as the statutes and regulation cited in this Final Judgment.

## V. PENALTIES AND COSTS

7.  Pursuant to Business and Professions Code §§17203, 17206 and 17536, Defendants, collectively, shall pay the sum of Eight Hundred Thousand Dollars ($800,000) pursuant to the following terms:

(A)  Simultaneously with the filing of this Final Judgment pay to the Santa Cruz County District Attorney's Office, pursuant to Business and Professions Code §§17206 and 17536, civil penalties in the sum of Six Hundred Thousand Dollars ($600,000.00); and

(B)  Simultaneously with the filing of this Final Judgment pay to the Santa Cruz County District Attorney's office, pursuant to Business and Professions Code §17203, fees and investigative costs in the sum of Two Hundred Thousand Dollars ($200,000.00).

(C)  The payments shall be made to the Santa Cruz County District Attorney's Office at 701 Ocean Street, Room 200, Santa Cruz, California 95060.

(D)  The Santa Cruz County District Attorney's Office shall distribute these amounts to the Prosecuting Offices in this action pursuant to a written agreement of these offices.  The portion of fees and investigative costs distributed to the Napa County District Attorney's Office shall be deposited into its Consumer Protection Trust Fund.

## VI. RESTITUTION

8.  Pursuant to Business and Professions Code §17203, Defendants, collectively, shall

11

do all the following:

    (A) Pay the total sum of One Hundred and Five Thousand Dollars ($105,000) in restitution to California consumers. Any portion of the $105,000 amount that was not paid to California consumers shall be paid to the California Consumer Protection Prosecution Trust Fund, previously created by the Judgment and Permanent Injunction, filed on 9/21/89, in the case of *People v. ITT Consumer Financial Corporation* (Alameda County Superior Court Case No. 656038-0) for the purpose of enhancing the investigation, prosecution, and enforcement of consumer protection actions brought pursuant to the unfair competition statutes of the State of California. Thereafter, Defendants shall have no further obligations to return the purchase price of any of its products or provide further restitution or refunds under this Final Judgment except as required by law, Defendants' return/refund policy or the terms and provisions of the Class Action Settlement referenced in sub-paragraph (B), below.

(B) Defendants shall receive a credit, dollar for dollar, for all restitution payments to California consumers pursuant to the terms and provisions of the Class Action Settlement in that action entitled *Correa, et al. v. Sensa Products, LLC*, Los Angeles County Superior Court Case No. BC 476808. Defendants shall, within one hundred twenty (120) days after the Final Effective Date of the Class Action Settlement, provide representatives of the People with an affidavit from the court-appointed Claims Administrator showing the total amount of restitution paid to California consumer and the dates of such payments. To the extent that the total amount of restitution paid to California consumers is less than One Hundred and Five Thousand Dollars ($105,000), Defendants shall pay the difference to the California Consumer Protection Prosecution Trust Fund by no later than one (1) month following the date of the affidavit. Such payment shall be delivered to the Santa Cruz County District Attorney's Office, to the attention of Assistant District Attorney Kelly J. Walker.

12

## VII. COMPLIANCE

9. For the purpose of securing compliance with the terms of this Final Judgment, Defendants shall:

(A) Maintain and upon request produce to representatives of the Prosecuting Offices representing the People in this action, within thirty (30) days of any written request, copies of any documents required to be maintained by the terms of this Final Judgment.

(B) Serve each of Defendants' present and future officers, directors, and executive managers with a copy of this Final Judgment and maintain full, complete and legible records memorializing that such service has occurred.

(C) Maintain a full, complete and legible file that contains COMPETENT AND RELIABLE SCIENTIFIC EVIDENCE for the types of claims described in Paragraph 5, above.

10. The Prosecuting Offices shall notify Defendants of any alleged violation of the terms of this Final Judgment by sending a notice to Defendants. However nothing in this paragraph shall impose a meet and confer obligation on the Prosecuting Offices prior to filing any motion in court to enforce this Final Judgment.

## VIII. JURISDICTION RETAINED

11. Jurisdiction is retained for the purposes of enabling any party to this final judgment to apply to the Court at any time for such order or directions as may be necessary or appropriate for the construction of or carrying out of this Final Judgment, for the modification or termination of any of the injunctive provisions thereof, for the enforcement of compliance therewith, or for the punishment of any unresolved violations there under.

12. This Final Judgment shall take effect immediately upon entry hereof.

Dated:_____

_____
Judge of the Superior Court

13

1
2
                              **EXHIBIT 1**
3
4   NANCY E. O'MALLEY                    EDWARD S. BERBERIAN
    District Attorney, County of Alameda  District Attorney, County of Marin
5   Scott D. Patton, SBN 148468          Andres H. Perez, SBN 186219
    Deputy District Attorney             Deputy District Attorney
6   7677 Oakport Street, Suite 650       3501 Civic Center Drive, Room 130
7   Oakland CA 94621                     San Rafael CA 94903
    (510) 777-2231                       (415) 499-6450
8
9   DEAN FLIPPO                          TONY RACKAUCKAS
    District Attorney, County of Monterey  District Attorney, County of Orange
10  John F. Hubanks, SBN 170635          Tracy E. Hughes, SBN 180494
11  Deputy District Attorney             Deputy District Attorney
    1200 Aguajito Road, Room 301         401 Civic Center Drive
12  Monterey CA 93940                    Santa Ana CA 92701
13  (831) 647-7770                       (714) 834-6528

14
15  JEFFREY F. ROSEN                     GARY LIEBERSTEIN
    District Attorney, County of Santa Clara  District Attorney, County of Napa
16  Yen B. Dang, SBN 169388              Catherine Borsetto, SBN 176337
    Deputy District Attorney             Deputy District Attorney
17  70 W. Hedding St., West Wing         931 Parkway Mall
18  San Jose CA 95110                    Napa CA 94559
    (408) 792-2818                       (707) 299-1452
19
20  JILL R. RAVITCH                      DONALD A. du BAIN
21  District Attorney, County of Sonoma  District Attorney, County of Solano
    Matthew T. Cheever, SBN 191783       Diane M. Taira, SBN 179926
22  Deputy District Attorney             Deputy District Attorney
23  2300 County Center Dr., Suite B170   675 Texas Street, Rm 4500
    Santa Rosa, CA 95403                 Fairfield, CA 94533
24  (707) 565-3161                       (707) 784-6800
25
26
27
28
29

                              14

**EXHIBIT L**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **Case Number:** |
| Plaintiff, | |
| | **Judge:** |
| v. | |
| | **Magistrate Judge:** |
| SENSA PRODUCTS, LLC, a limited liability company, SENSA, INC., formerly known as INTELLIGENT BEAUTY, INC., a corporation, ADAM GOLDENBERG, and DR. ALAN R. HIRSCH, | |
| Defendants. | |

## STIPULATED FINAL JUDGMENT AND ORDER FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed a Complaint for Permanent Injunction and Other Equitable Relief against defendants Sensa Products, LLC, Sensa, Inc., formerly known as Intelligent Beauty, Inc., Adam Goldenberg, and Dr. Alan R. Hirsch (together, "Defendants"), pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), alleging unfair or deceptive acts or practices and false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

The Commission and Defendants have stipulated to the entry of this Order in settlement of the Commission's allegations against Defendants.   The Court, having been presented with this Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief ("Order"), finds as follows:

## FINDINGS

1.      This Court has jurisdiction over the subject matter of this case and, pursuant to the Stipulation in Paragraph 4 below, jurisdiction over all parties.   Venue in the United States District Court for the Northern District of Illinois is proper.

2.      The Complaint states a claim upon which relief can be granted, and the Commission has the authority to seek the relief it has requested.

3.      The activities of Defendants, for purposes of this Order, are in or affecting commerce, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4.      The Commission and Defendants stipulate and agree to entry of this Order under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), without trial or final adjudication of any issue of fact or law.   Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order.   Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

5.      Defendants waive all rights to seek judicial review or otherwise challenge or contest the validity of this Order.   Defendants also waive any claim that they may have held under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action to the date of this Order.

6.      This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law.

7.      Pursuant to Federal Rule of Civil Procedure 65(d), the provisions of this Order are binding upon Defendants, and their officers, agents, servants, representatives, employees, and all other persons or entities in active concert or participation with them, who receive actual notice of

- 2 -

this Order by personal service or otherwise.

8.      This Order reflects the negotiated agreement of the parties.   The Commission and the Defendants have agreed that entry of this Order settles and resolves all matters of dispute between them arising from the conduct alleged in the Commission's Complaint as of the date of entry of this Order.

9.      The paragraphs of this Order shall be read as the necessary requirements of compliance and not as alternatives for compliance, and no paragraph serves to modify another paragraph unless expressly so stated.

10.    Each party shall bear its own costs and attorneys' fees.

11.    Entry of this Order is in the public interest.

## ORDER

### DEFINITIONS

For the purpose of this Order:

1.      "Corporate Defendants" means Sensa Products, LLC, Sensa, Inc., formerly known as Intelligent Beauty, Inc., and their successors and assigns.

2.      "Individual Defendants" means Adam Goldenberg and Dr. Alan R. Hirsch.

3.      "Defendants" means the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

4.      "Adequate and well-controlled human clinical study" means a human clinical study that is randomized, adequately controlled, and conducted by persons qualified by training and experience to conduct such a study.   For a Covered Product, such study shall be placebo controlled and double blind.   For a Covered Weight-Loss Program, such study shall be placebo

- 3 -

controlled and double blind as to any component that is a Covered Product and has been purported, designed, or intended to cause or assist in causing weight loss.   *Provided, however*, that any study of a conventional food need not be placebo controlled or double blind if placebo control or blinding cannot be effectively implemented given the nature of the intervention.   For the purposes of this proviso, "conventional food" does not include Sensa or any dietary supplement.   Defendants shall have the burden of proving that placebo control or blinding cannot be effectively implemented.

5.     "Advertising" and "promotion" mean any written or verbal statement, illustration, or depiction designed to effect a sale or create interest in the purchasing of products or services, whether it appears in a brochure, newspaper, magazine, pamphlet, leaflet, circular, mailer, book insert, free standing insert, letter, catalogue, poster, chart, billboard, public transit card, point of purchase display, packaging, package insert, label, film, slide, radio, television or cable television, audio program transmitted over a telephone system, program-length commercial ("infomercial"), the Internet, email, press release, video news release, or in any other medium.

6.     "Clearly and conspicuously" means:

a.     In textual communications (*e.g.*, printed publications or words displayed on the screen of an electronic device), the disclosure shall be of a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend the disclosure, in print that contrasts with the background on which it appears;

b.     In communications disseminated orally or through audible means (*e.g.*, radio or streaming audio), the disclosure shall be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend the disclosure;

c.      In communications disseminated through video means (*e.g.*, television or streaming video), the disclosure shall be in writing in a form consistent with Subsection a of this definition and shall appear on the screen for a duration sufficient for an ordinary consumer to read and comprehend the disclosure;

d.      In communications made through the Internet and other web-based applications or services:

i.      The disclosure shall be unavoidable and presented in a form consistent with Subsection a of this definition in addition to any audio or video presentation of it; and

ii.      The disclosure shall be on the same webpage, online service page, or other electronic page, in close proximity to the triggering representation, and viewable without requiring the consumer to scroll up, down, or sideways, or otherwise adjust their browser or device window in any way.   Representations and disclosures that are accessed or displayed through hyperlinks, pop-ups, interstitials, or similar means are not in "close proximity";

e.      In communications that contain both audio and visual portions, the disclosure shall be presented simultaneously in both the audio and visual portions of the communication.   *Provided, however*, that in communications disseminated through video means that contain two or more uninterrupted endorsements, the audio portion of any disclosure about the material connections to the persons giving the endorsements need only be delivered at the beginning of each such group of endorsements.   *Provided, further*, that in any communication disseminated solely through visual or solely through audio means, the disclosure may be made through the same means in which the communication is presented; and

f.      In all instances, the disclosure shall be in understandable language and syntax, and with nothing contrary to, inconsistent with, or in mitigation of the disclosures used in any communication with the consumer.

7.      "Commerce" means as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

8.      "Covered Product" means any dietary supplement, food, or drug, including, but not limited to, Sensa.   Covered Product does not include a device or behavioral intervention.

9.      "Covered Weight-Loss Program" means any weight-loss program that includes: (a) Sensa or (b) any other Covered Product sold or distributed by any Defendant and purported, designed, or intended to cause or assist in causing weight loss.   Covered Weight-Loss Program, as defined above, may include, among other things, a device or behavioral intervention.

10.      "Double blind" means that neither the participants nor the researchers know, during the course of the study, which participants belong to the control group or to the treatment group.

11.      "Endorsement" means as defined in 16 C.F.R. § 255.0(b).

12.      "Essentially Equivalent Product" means a product that contains the identical ingredients, except for inactive ingredients (*e.g.*, binders, colors, fillers, excipients), in the same form and dosage, and with the same route of administration (*e.g.*, orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the field demonstrates that the amount and combination of additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

13.      "Essentially Equivalent Weight-Loss Program" means a program that includes all

- 6 -

components of the Covered Weight-Loss Program that are purported, designed, or intended to cause or assist in causing weight loss; provided that the Covered Weight-Loss Program may contain additional components if reliable scientific evidence generally accepted by experts in the field demonstrates that such additional components are unlikely to impede or inhibit the effectiveness of the Essentially Equivalent Program.

14.    "Food" and "drug" mean as defined in Section 15 of the FTC Act, 15 U.S.C. § 55.

15.    "Material connection" means any relationship that materially affects the weight or credibility of any endorsement and that would not reasonably be expected by consumers.

16.    "Person" means a natural person, an organization, or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

17.    "Placebo controlled" means that the control group of the study receives a placebo. "Placebo" means a substance that is inactive, inert, and/or otherwise medically ineffectual in its ability to affect the endpoint(s) of the study.

18.    "Sensa" means the Sensa flavored tastants or any other substantially similar product purported, designed, or intended to promote sensory-specific satiety.

19.    The term "including" in this Order means "including without limitation."

20.    The terms "and" and "or" in this Order shall be construed conjunctively or disjunctively as necessary, to make the applicable phrase or sentence inclusive rather than exclusive.

**I.**

**PROHIBITED REPRESENTATIONS: WEIGHT-LOSS CLAIMS**

**IT IS ORDERED** that Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and their officers, agents, servants, representatives, employees, and all persons or entities in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product or Covered Weight-Loss Program, in or affecting commerce, are hereby permanently restrained and enjoined from making, or assisting others in making, directly or by implication, including through the use of a product or program name, endorsement, depiction, or illustration, any representation that such product or program:

      A.      Causes or helps cause weight loss or any specific amount of weight loss;

      B.      Causes or helps cause rapid weight loss; or

      C.      Causes or helps cause substantial weight loss;

unless the representation is non-misleading and, at the time of making such representation, Defendants possess and rely upon competent and reliable scientific evidence that substantiates that the representation is true.   For purposes of this Section, competent and reliable scientific evidence shall consist of at least two adequate and well-controlled human clinical studies of the Covered Product or of an Essentially Equivalent Product, or of the Covered Weight-Loss Program or of an Essentially Equivalent Weight-Loss Program, conducted by different researchers, independently of each other, that conform to acceptable designs and protocols and whose results, when considered in light of the entire body of relevant and reliable scientific evidence, are sufficient to substantiate that the representation is true.   Defendants shall have the

burden of proving that a product satisfies the definition of Essentially Equivalent Product or Essentially Equivalent Weight-Loss Program, as applicable.

## II.

## PROHIBITED REPRESENTATIONS: OTHER HEALTH-RELATED CLAIMS

**IT IS FURTHER ORDERED** that Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and their officers, agents, servants, representatives, employees, and all persons or entities in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product or Covered Weight-Loss Program, in or affecting commerce, are hereby permanently restrained and enjoined from making, or assisting others in making, directly or by implication, including through the use of a product or program name, endorsement, depiction, or illustration, any representation, other than representations covered under Section I of this Order, about the health benefits, performance, or efficacy of such product or program, unless the representation is non-misleading, and, at the time of making such representation, Defendants possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.   For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results.

## III.

### PROHIBITED REPRESENTATIONS REGARDING TESTS OR STUDIES

**IT IS FURTHER ORDERED** that Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and their officers, agents, servants, representatives, employees, and all persons or entities in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product or Covered Weight-Loss Program, in or affecting commerce, are hereby permanently restrained and enjoined from misrepresenting, or assisting others in misrepresenting, in any manner, expressly or by implication, including through the use of any product or program name or endorsement:

 A. The existence, contents, validity, results, conclusions, or interpretations of any test, study, or research; or

 B. That the benefits of such product or program are scientifically proven.

## IV.

### FDA APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order shall prohibit Defendants from:

 A. Making any representation for any drug that is permitted in labeling for such drug under any tentative or final standard promulgated by the Food and Drug Administration, or under any new drug application approved by the Food and Drug Administration; and

 B. Making any representation for any product that is specifically permitted in labeling for such product by regulations promulgated by the Food and Drug Administration

pursuant to the Nutrition Labeling and Education Act of 1990.

## V.

## REQUIRED DISCLOSURES OF MATERIAL CONNECTIONS

**IT IS FURTHER ORDERED** that Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and their officers, agents, servants, representatives, employees, and all persons or entities in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product or Covered Weight-Loss Program, in or affecting commerce, shall disclose, clearly and conspicuously, in close proximity to the triggering representation:

A.      For any endorsement of such product or program, all material connections between the person providing the endorsement and the Defendants or any other person manufacturing, labeling, advertising, promoting, offering for sale, selling, or distributing such product or program; and

B.      For any representation that any test or study supports any claims about the health benefits, performance, or efficacy of such product or program, all material connections with any person that has conducted, authored, or participated in the test or study.

## VI.

## EXPERT ENDORSEMENTS

**IT IS FURTHER ORDERED** that Defendant Hirsch, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, and his agents, servants, employees, and all persons or entities in active concert or participation with him who

- 11 -

receive actual notice of this Order, by personal service or otherwise, in connection with the

manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any

Covered Product or Covered Weight-Loss Program, in or affecting commerce, are hereby

permanently restrained and enjoined from making, directly or by implication, any representations

as an expert endorser, including, but not limited to, the representations covered by Sections I –

III, above, unless he possesses and relies upon:

      A.      Competent and reliable scientific evidence required for the particular

representation, as set forth above; and

      B.      An actual exercise of the represented expertise, in the form of an evaluation or test

of such product or program conducted and evaluated in an objective manner and which is

generally accepted in the relevant profession to yield accurate and reliable results.

## VII.

## MEANS AND INSTRUMENTALITIES

**IT IS FURTHER ORDERED** that Defendant Hirsch, directly or through any

corporation, partnership, subsidiary, division, trade name, or other device, and his agents,

servants, employees, and all persons or entities in active concert or participation with him who

receive actual notice of this Order, by personal service or otherwise, in connection with the

manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any

Covered Product or Covered Weight-Loss Program marketed for any health benefit, including,

but not limited to, weight loss, in or affecting commerce, are hereby permanently restrained and

enjoined from providing to another person with whom Defendant Hirsch has a material financial

connection the means and instrumentalities with which to make, directly or by implication, any

- 12 -

false or misleading statement of material fact, including, but not limited to, the representations covered by Sections I – III, above.   For purposes of this Section, "means and instrumentalities" includes, but is not limited to:

A.     Any tests, analyses, research, or studies to determine the benefits, performance, efficacy, or safety of such product or program; or

B.     Any advertising, labeling, promotional materials, or endorsements.

## VIII.

## MONETARY JUDGMENT AND CONSUMER REDRESS

**IT IS FURTHER ORDERED** that:

A.     Judgment is hereby entered in favor of the Commission and against the Corporate Defendants, jointly and severally, in the amount of Forty-Six Million Five Hundred Thousand dollars ($46,500,000) as equitable monetary relief.

B.     The Corporate Defendants are ordered to pay to the Commission Twenty-Six Million Five Hundred Thousand Dollars ($26,500,000).   Such payment must be made within ten days of the date of entry of this Order and in accordance with instructions provided by a representative of the Commission; *provided that* in no instance will payment be due before October 10, 2013.   Upon such payment to the Commission, the remainder of the judgment is suspended, subject to the Subsections below.

C.     The Commission's agreement to the judgment is expressly premised upon the truthfulness, accuracy, and completeness of the Corporate Defendants' financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely:   the financial statements of Sensa Products, LLC and Intelligent Beauty, Inc., now

- 13 -

known as Sensa, Inc., and supporting documentation submitted by Corporate Defendants'

counsel on January 25, 2013; the additional financial information and supporting documentation

submitted by Corporate Defendants' counsel on February 15, 2013, February 22, 2013, and

March 28, 2013; and the presentation slides dated March 7, 2013 and April 18, 2013 submitted

by Corporate Defendants' counsel.

      D.     The suspension of the judgment will be lifted as to the Corporate Defendants if,

upon motion by the Commission, the Court finds that the Corporate Defendants failed to disclose

any material asset, materially misstated the value of any asset, or made any other material

misstatement or omission in the financial representations identified above.

      E.     In the event of default on any obligation to make payment under this Order or if

the suspension of the judgment is lifted, the judgment becomes immediately due as to the

Corporate Defendants in the amount specified in Subsection A above, less any payment

previously made pursuant to this Section, plus interest computed pursuant to 28 U.S.C. § 1961(a)

from the date of entry of this Order.

      F.     All funds paid to the Commission pursuant to this Order shall be deposited into an

account administered by the Commission or its agents to be used for equitable relief, including,

but not limited to, consumer redress, and any attendant expenses for the administration of such

equitable relief.   In the event that direct redress to consumers is wholly or partially impracticable

or funds remain after the redress to consumers is completed, the Commission may apply any

remaining funds for such other equitable relief (including consumer information remedies) as it

determines to be reasonably related to Defendants' practices alleged in the Complaint.   Any

funds not used for such equitable relief shall be deposited in the United States Treasury as

disgorgement.   Defendants shall have no right to challenge the Commission's choice of remedies under this Section.   Defendants shall have no right to contest the manner of distribution chosen by the Commission.   No portion of any payment under the judgment herein shall be deemed a payment of any fine, penalty, or punitive assessment.

G.      Defendants relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law.   Defendants shall make no claim to or demand for return of the funds, directly or indirectly, through counsel or otherwise.

H.      Defendants agree that the facts as alleged in the Complaint filed in this action shall be taken as true without further proof in any bankruptcy case or subsequent civil litigation pursued by the Commission to enforce its rights to any payment or money judgment pursuant to this Order, including, but not limited to, a nondischargeability complaint in any bankruptcy case. Defendants further stipulate and agree that the facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and that this Order shall have collateral estoppel effect for such purposes.

I.      In accordance with 31 U.S.C. § 7701, Corporate Defendants are hereby required, unless they have done so already, to furnish to the Commission their taxpayer identifying numbers, which shall be used for the purposes of collecting and reporting on any delinquent amount arising out of Defendants' relationship with the government.

J.      Proceedings instituted under this Section are in addition to, and not in lieu of, any other civil or criminal remedies that may be provided by law, including any other proceedings the Commission may initiate to enforce this Order.

- 15 -

## IX.

## REQUIREMENT TO PROVIDE CUSTOMER LIST

**IT IS FURTHER ORDERED** that the Corporate Defendants shall, no later than sixty days after the date of entry of this Order, compile and deliver to the Commission customer information regarding all individual customers who purchased Sensa or Sensa for Men on or after June l, 2008 through the date of entry of this Order, to the extent that such purchasers are known to the Corporate Defendants through a diligent search of their records.   Such information shall include each person's name and address, the products purchased, the approximate total amount of moneys paid less any amount credited for returns or refunds, and, if available, the person's telephone number and email address.   The information shall be submitted to the Commission electronically at DEBrief@ftc.gov in a format to be approved in advance by a representative of the Commission and encrypted with encryption software such as SecureZip with the encryption key provided electronically to DEBrief@ftc.gov in a separate communication.   If a representative of the Commission requests in writing any information related to redress, a Corporate Defendant must provide it, in the form prescribed by the Commission, no later than fourteen days after the date of such Corporate Defendant's receipt of the request.

## X.

## ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Order:

- 16 -

A.      Each Defendant, within seven days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For ten years after entry of this Order, each Individual Defendant for any business that engages in conduct related to the subject matter of this Order as to which such Defendant, individually or collectively with any other Defendants, is the majority owner or directly or indirectly controls, and each Corporate Defendant must deliver a copy of this Order to:   (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.   Delivery must occur within seven days of entry of this Order for current personnel.   For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within thirty days, a signed and dated acknowledgment of receipt of this Order.

## XI.

## COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Defendants make timely submissions to the Commission:

A.      Ninety days after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury.

1.      Each Defendant must:   (a) designate at least one telephone number and an email, physical, and postal address as points of contact, which representatives of the Commission

- 17 -

may use to communicate with that Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and email, Internet, physical, and postal addresses; (c) describe the activities of each business, including the products and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendants must describe if they know or should know due to their own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission;

2.      Additionally, each Individual Defendant must:   (a) identify all telephone numbers and all email, Internet, physical, and postal addresses, including all residences; (b) identify all titles and roles in all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.      For ten years following entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within fourteen days of any change in the following:

1.      Each Defendant must report any change in:   (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or directly or indirectly controls that may affect compliance obligations arising under this Order, including:   the creation, merger, sale, or dissolution of the entity or any

- 18 -

subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.      Additionally, each Individual Defendant must report any change in:   (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs services, whether as an employee or otherwise, and any entity in which such Defendant has any ownership interest, and identify its name, physical address, and Internet address, if any.

C.      Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or any similar proceeding by or against such Defendant within fourteen days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:   "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed on:_____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:   Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, D.C. 20580.   The subject line must begin:   *FTC v. Sensa Products, LLC, et al.*, **[insert X number]**.

- 19 -

## XII.

## RECORD KEEPING PROVISIONS

**IT IS FURTHER ORDERED** that Defendants must create certain records for ten years after entry of the Order, and retain each such record for five years.   Specifically, each Individual Defendant for any business that engages in conduct related to the subject matter of this Order as to which such Defendant, individually or collectively with any other Defendants, is a majority owner or directly or indirectly controls, and each Corporate Defendant must maintain the following records:

A.      Accounting records showing the revenues from all products or services sold, all costs incurred in generating those revenues, and the resulting net profit or loss;

B.      Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:   name, addresses, and telephone numbers; job title or position; dates of service; and, if applicable, the reason for termination;

C.      Complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D.      All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.      A copy of each different advertisement or other marketing material disseminated since the date of entry of this Order.

## XIII.

## COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendants'

- 20 -

compliance with this Order:

A.     Within fourteen days of receipt of a written request from a representative of the Commission, each Defendant must:   submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents, for inspection and copying.   The Commission also is authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.     For matters concerning this Order, the Commission is authorized to communicate through undersigned counsel or other counsel designated by a Defendant or, if a Defendant is unrepresented by counsel with regard to this Order, directly with that Defendant.   Each Defendant must permit representatives of the Commission to interview any employee or other person affiliated with such Defendant who has agreed to such an interview.   The person interviewed may have counsel present.

C.     The Commission may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice.   Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XIV.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

**SO ORDERED:**


Dated: _____     _____

**UNITED STATES DISTRICT JUDGE**


**SO STIPULATED AND AGREED:**


_____

KAREN MANDEL
MICHAEL OSTHEIMER
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
Tel.: 202-326-2491, -2699
Fax: 202-326-3259
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

SENSA PRODUCTS, LLC
2301 Rosecrans Avenue
El Segundo, CA 90245

By: _____
    Kristin Chadwick, President

SENSA, INC., formerly known as
INTELLIGENT BEAUTY, INC.
2301 Rosecrans Avenue
El Segundo, CA 90245

By: _____
    Kristin Chadwick, President

- 22 -

ADAM GOLDENBERG, individually and as a
director of SENSA PRODUCTS, LLC and a
director and officer of SENSA, INC., formerly
known as INTELLIGENT BEAUTY, INC.
2301 Rosecrans Avenue
El Segundo, CA 90245


Dana Rosenfeld, Counsel for SENSA
PRODUCTS, LLC and SENSA, INC., formerly
known as INTELLIGENT BEAUTY, INC.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, D.C. 20007
Tel.:   202-342-8588
Fax:   202-342-8451


Richard Parker
Katrina Robson, Counsel for SENSA
PRODUCTS, LLC and SENSA, INC., formerly
known as INTELLIGENT BEAUTY, INC.
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C. 20006
Tel.:   202-383-5380
Fax:   202-383-5414


J. Robert Robertson, Counsel for ADAM
GOLDENBERG
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel.:   202-637-5600
Fax:   202-637-5910

- 23 -

ADAM GOLDENBERG, individually and as a
director of SENSA PRODUCTS, LLC and a
director and officer of SENSA, INC., formerly
known as INTELLIGENT BEAUTY, INC.
2301 Rosecrans Avenue
El Segundo, CA 90245

Dana Rosenfeld, Counsel for SENSA
PRODUCTS, LLC and SENSA, INC., formerly
known as INTELLIGENT BEAUTY, INC.
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, D.C. 20007
Tel.: 202-342-8588
Fax: 202-342-8451

Richard Parker
Katrina Robson, Counsel for SENSA
PRODUCTS, LLC and SENSA, INC., formerly
known as INTELLIGENT BEAUTY, INC.
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C. 20006
Tel.: 202-383-5380
Fax: 202-383-5414

J. Robert Robertson, Counsel for ADAM
GOLDENBERG
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel.: 202-637-5600
Fax: 202-637-5910

- 23 -

DR. ALAN R. HIRSCH
845 North Michigan Avenue
Chicago, IL 60611


JOEL C. WINSTON, Counsel for DR. ALAN
R. HIRSCH
Hudson Cook, LLP
1020 19th Street NW
Washington, D.C. 20036
Tel.: 202-327-9716
Fax: 202-223-6935